**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**(Panama City Division)**

Talentscale, Inc.,

Plaintiff,

v. Case No.: 5:24-mc-00001-TKW

Aery Aviation, LLC,

Defendant,

and

The Cleveland Clinic,

Garnishee.
_________________________________/

**AFFIDAVIT OF COGENT BANK**

1. My name is Gina Medlock. I am a Senior Vice President, Specialty Lending for Cogent Bank ("Cogent").

2. I have access to information in the normal course of business regarding certain of Cogent's loan and other agreements, security interests, and customer relationships. Specifically, I am familiar with Cogent's relationship with Aery Aviation, LLC ("Aery"), and the agreements pertaining to and governing Cogent's relationship with Aery. Except as otherwise indicated, all facts set forth in this Affidavit are based



**Exhibit "A"**

upon my personal knowledge, my review of business records created and maintained by Cogent in the ordinary course of business, and my knowledge as Senior Vice President, Specialty Lending for Cogent. If called to testify in this matter, I could competently testify as to the facts set forth herein.

## Background Information

3. Aery maintains a lending relationship with Cogent.

4. The Cleveland Clinic Foundation (the "Cleveland Clinic") is a medical center providing clinical and hospital care for its patients.

5. The Cleveland Clinic is one of Aery's customers who has contracted with Aery to fly organ transplants across the United States.

## The Relevant Agreements Between Cogent and Aery

6. On June 23, 2021, Cogent and Aery entered into a Business Loan Agreement. Under the Business Loan Agreement, Cogent agreed to extend a Revolving Line of Credit to Aery. The Business Loan Agreement provides that Aery may, among other things, borrow, re-pay, and re-borrow on a revolving basis advances in the aggregate of the maximum principal sum of $9,000,000.00.

7. A true and correct copy of the Business Loan Agreement is attached hereto as Exhibit 1.

8. In connection with the Business Loan Agreement, Aery executed a Revolving Line of Credit Promissory Note in the amount of $9,000,000.00 dated June

23, 2021. A true and correct copy of the Revolving Line of Credit Promissory Note is attached hereto as Exhibit 2.

9. Under the Business Loan Agreement, the Revolving Line of Credit is to be used to provide working capital to support Aery's future contracts and to provide funding for the purchase of new aircraft and equipment.

10. To secure the amounts due under the Revolving Line of Credit Promissory Note, Cogent to enter into the Business Loan Agreement, on June 23, 2021, Cogent and Aery entered into a Security Agreement. A true and correct copy of the Security Agreement is attached hereto as Exhibit 3.

11. To further induce Cogent to enter the Business Loan Agreement, and to facilitate the Business Loan Agreement, on June 23, 2021, Cogent and Aery entered into a Blocked Account Agreement, under which a Business Analysis Checking Account ending in x0189 was opened for the benefit of Aery (the "Blocked Account"). The Blocked Account was opened in the name of Cogent Bank, and Cogent Bank is the only signatory on the Blocked Account.

12. The Blocked Account Agreement provides that Cogent opened the Blocked Account solely for the purpose of receiving deposits made by or on behalf of Aery. Under the Blocked Account Agreement, all Payors (as defined in the Blocked Account Agreement) are directed to make all payments directly to the

Blocked Account and Aery agreed to immediately forward all payments and amounts that it receives to the Blocked Account.

13. Further, on a daily basis, Cogent is to transfer all available funds in the Blocked Account to the Revolving Line of Credit in order to pay down the Revolving Line of Credit.

14. Under the Blocked Account Agreement, Aery also warranted and agreed that Cogent "has a first and priority interest in and to any and all funds in the Blocked Account, which first and priority interest is superior to any interest of [Aery], other party(ies) to or any guarantor(s) of the Loan Agreement, and any other person, entity or party."

15. The Blocked Account Agreement also provides that, "All funds, amounts, payments and cash received by the [Aery] in the Blocked Account or otherwise from Payors of [Aery] via wire transfer, ACH or otherwise, shall be held for the benefit of and subject to the first priority lien of [Cogent] in such proceeds and other items, and, without limiting any other provision of this Agreement, all such proceeds shall be available for transfer accordance with this Agreement."

16. A true and correct copy of the Blocked Account Agreement is attached hereto as Exhibit 4.

17. On September 24, 2021, Cogent and Aery executed a Second Amendment to Loan Agreement that increased the amount of the Revolving Line of

Credit from $9,000,000.00 to $15,000,000.00. A true and correct copy of the Second Amendment to Loan Agreement is attached hereto as Exhibit 5.

18. In connection with the Second Amendment to Loan Agreement, Aery also executed an Amended and Restated Revolving Line of Credit Promissory Note in the amount of $15,000,000.00 dated September 24, 2021. A true and correct copy of the Amended and Restated Revolving Line of Credit Promissory Note is attached hereto as Exhibit 6.

19. To further secure the Second Amendment to Loan Agreement, on September 24, 2021, Cogent and Aery entered into an Amended and Restated Security Agreement.

20. Like the original Security Agreement, the Amended and Restated Security Agreement provides as follows:

> …Grantor hereby pledges, hypothecates, and grants to [Cogent] a continuing and first priority security interest in all of the following, whether now owned or hereinafter acquired: . . . (i) all tangible and intangible property;…Accounts (including without limitation, all accounts receivable);…Chattel Paper…; General Intangibles…; Documents; Instruments; Deposit Accounts, money, cash or cash equivalents;…Contract Rights;…(ii) together with all additions, replacements, substitutions, accessions and improvements, and all supporting obligations, profits, products and proceeds…and all interest, dividends, profits, and distributions…; and (iii) all proceeds and products of any of the foregoing…. (collectively, the "Collateral").

21. A true and correct copy of the Amended and Restated Security Agreement is attached hereto as Exhibit 7.

22. On June 24, 2021, Cogent perfected its security interest in the Collateral by filing a UCC Financing Statement (Filing Number 20210624064910) ("UCC-1") with the Virginia State Corporation Commission. The Financing Statement granted Cogent a first priority security interest in,

> (i) all tangible and intangible personal property; all Equipment (including, without limitation, all motor vehicles); furniture, Fixtures, and Goods; Accounts (including without limitation, all accounts receivable and all Healthcare Insurance Receivables); Inventory (including, without limitation returned or repossessed goods); Chattel Paper (including, without limitation, Tangible Chattel Paper and Electronic Chattel Paper); General Intangibles (including without limitation all Payment Intangibles and Software); Investment Property (including without limitation all Certificated Securities, Uncertificated Securities, Securities Entitlements, Securities Accounts, Securities Certificates, Commodity Contracts, and Commodity Accounts); Documents; Instruments; Deposit Accounts; money, cash or cash equivalents; Supporting Obligations; Letter-of-Credit Rights; Commercial Tort Claims; Contract Rights; Certificates of Deposit; trademarks, patents, and copyrights; (ii) together with all additions, replacements, substitutions, accessions and improvements, and all supporting obligations, profits, products and proceeds including insurance proceeds, cash proceeds, and non-cash proceeds including, but not limited to, all Accounts, Chattel Paper, Documents, Instruments, General Intangibles, Investment Property and Supporting Obligations relating to or arising out of any of the foregoing and all interest, dividends, income, profits, and distributions (including, without limitation, stock splits and stock dividends); and (iii) all proceeds and products of any of the foregoing including, without limitation, insurance proceeds, refunds, and premium rebates that arise out of any of the foregoing

23. A true and correct copy of the UCC-1 is attached hereto as Exhibit 8.

24. The Business Loan Agreement, the Revolving Line of Credit Promissory Note, the Security Agreement, the Blocked Account Agreement, the Second Amendment to Loan Agreement, the Amended and Restated Revolving Line of Credit Promissory

Note, and the Amended and Restated Security Agreement, and the UCC-1 are hereinafter referred to collectively as the "Loan Documents."

25. As of May 7, 2025, Aery owes $15,175,624.37 under the Revolving Line of Credit, which includes outstanding principal of $15 million plus interest and fees that have accrued.

**The Cleveland Clinic Receivables**

26. I am aware the Cleveland Clinic filed an Answer to Writ of Garnishment stating that the Cleveland Clinic was indebted to Aery in the amount of $126,434.97 for invoice numbers 4721, 4724 - 4728, 4730, 4731, 4734-4735 (the "Cleveland Clinic Receivables").

27. True and correct copies of the invoices for the Cleveland Clinic Receivables are attached hereto as Composite Exhibit "9". The Cleveland Clinic Receivables are amounts that the Cleveland Clinic owes Aery for Aery's transportation of organs on behalf of the Clinic for its patients in need of transplants.

28. The Cleveland Clinic is a "Payor" under the Blocked Account Agreement, and the Cleveland Clinic Receivables are to be paid to Aery into the Blocked Account.

29. Once deposited into the Blocked Account, the Receivables are thereafter applied to pay down the Revolving Line of Credit in accordance with the Blocked Account Agreement.

30. The Cleveland Clinic Receivables also constitute Aery's "accounts receivable" under the Loan Documents and the UCC-1, and are encumbered by Cogent's first priority security interest.

31. The Receivables thus constitute Cogent's "Collateral" in which Cogent holds a duly perfected first priority security interest under the Loan Documents.

**COGENT BANK**

By: ______________________
Gina Medlock, Senior Vice President

STATE OF FLORIDA )
) SS:
COUNTY OF Seminole )

Before me, the undersigned authority, appeared **Gina Medlock, Senior Vice President of Cogent Bank**, who [ X ] is personally known to me or [____] who produced (______________________) as identification, who, being first duly sworn, deposes and says that the foregoing Affidavit it true and correct to the best of his/her knowledge.

Sworn to and subscribed before me this 8th day of May, 2025.

SARAH FREEMAN
Notary Public
State of Florida
Comm# HH644261
Expires 2/24/2029

______________________
Notary Public

Sarah Freeman
Typed or Printed Name of Notary Public

My commission expires: 2/24/2029

**Business Loan Agreement**

**THIS BUSINESS LOAN AGREEMENT** (as amended, modified, restated, or supplemented at any time or from time to time, the "**Agreement**") is made and entered into as of this **23rd day of June, 2021** by and among **Cogent Bank, a State Chartered Bank**, having an address 1113 Saxon Blvd, Orange City, FL 32763, and its successors and assigns (the "**Bank**") and **Aery Aviation, LLC, a Virginia limited liability company** having an address of 305 Cherokee Dr., Newport News, VA 23602-4437, **Flight Support, Inc.**, **a Virginia corporation** having an address of 305 Cherokee Dr., Newport News, VA 23602-4437, **Electronic Warfare Training Support, LLC**, **a Virginia limited liability company** having an address of 700 Corporate Dr., Newport News, VA 23602-4437, and **Strategic Airborne Operations JV, LLC, a Virginia limited liability company** having an address of 305 Cherokee Dr., Newport News, VA 23602-4437 (collectively, "**Borrower**"); **Scott Beale,** having an address of 6674 Gates Mills Blvd, Gates Mills, OH 44040, ("**Guarantor**") (Borrower and Guarantor are sometimes referred to herein as a "**Loan Party**" and collectively as the "**Loan Parties**"). **Robert Dynan,** having an address of 102 Blue Heron Dr., Yorktown, VA 23692, and **Josh Walton,** having an address of 305 Cherokee Dr., Newport News, VA 23602 (collectively, the **"Validity Guarantors**"), hereby join in this Agreement for the sole purpose of acknowledging the terms hereof.

**W I T N E S S E T H:**

**WHEREAS**, Borrower has requested and, subject to the terms and conditions hereof, Bank has agreed to extend a loan on the terms and conditions of this Agreement;

**NOW, THEREFORE**, in consideration of the mutual provisions, covenants and agreements herein contained and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

**ARTICLE ONE**
**DEFINITIONS**

**1.01** **Defined Terms.** For purposes of this Agreement, in addition to the terms defined elsewhere herein, including without limitation the preamble to this Agreement, the following terms shall have the meanings set forth below (such meanings to be equally applicable to the singular and plural forms thereof):

The terms "**Account**", "**Account Debtor**", "**Certificated Security**", "**Certificates of Deposit**", "**Chattel Paper**", "**Commercial Tort Claim**", "**Commodity Account**", "**Commodity Contract**", "**Contract Rights**", "**Deposit Account**", "**Document**", "**Electronic Chattel Paper**", "**Equipment**", "**Fixtures**", "**General Intangible**", "**Goods**", "**Healthcare Insurance Receivable**", "**Instrument**", "**Inventory**", "**Investment Property**", "**Letter of Credit Right**", "**Payment Intangible**", "**Proceeds**", "**Security**"; "**Security Certificate**", "**Security Entitlement**", "**Software**", "**Supporting Obligation**", "**Tangible Chattel Paper**", "**Uncertificated Security**" shall each have the respective meanings ascribed thereto in the UCC.

"**Affiliate**" shall mean, as to any Person: **(i)** each other Person that directly, or indirectly through one or more intermediaries, controls or is controlled by or is under common control with the Person specified and **(ii)** any officer, director, manager, or general partner of such Person. "**Control**" means the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ability to exercise voting power, by contract or otherwise. "**Controlling**" and "**controlled**" have meanings correlative thereto. A Person shall be deemed to be controlled by another Person if such other Person beneficially owns or holds directly or indirectly, **5%** or more of the voting control or equity interests of such Person.

"**Agreement Regarding Closing of the Loan**" shall mean that certain Agreement Regarding Closing of Loan, if any, dated as of even date herewith, between Bank and Loan Parties and relating to any conditions hereof or of the Loan or making of advances which were to have been met or satisfied prior to the Closing but which have not been met or satisfied as of the Closing.

"**Billed Federal Government Receivables**" shall mean Accounts (a) with respect to which the Account Debtor is the United States of America or any department, agency or instrumentality thereof, (b) for which invoices have been issued to the Account Debtor, and (c) which are otherwise acceptable to Bank in its sole discretion determined in good faith for lending purposes.



**Exhibit 1**

"**Borrowing Base**" shall mean the sum of (a) 100% of the cost of Eligible Aircraft as listed in the purchase and sale agreement for the Eligible Aircraft, plus (b) 80% of the cost of Eligible Equipment as listed in each work order/purchase order less any value stated for non-recurring engineering/personnel cost, plus (c) 90% of Billed Federal Government Receivables, plus (d) 60% of Unbilled Federal Government Receivables, except that the amount advanced against Unbilled Federal Government Receivable shall not exceed $2,250,000.00 or 25% of availability, whichever is less, plus (e) 85% of Net Eligible Commercial Accounts.

"**Borrowing Base Certificate**" shall mean a borrowing base certificate in the form of **Exhibit "A."**

"**Business Day**" shall mean any day other than (i) a Saturday or a Sunday or (ii) a day on which commercial banks in Orange City, Florida are authorized or required by law to close.

"**Collateral**" shall mean all the assets, property and interests in property that shall from time to time be pledged or be purported to be pledged as direct or indirect security for any of the Obligations pursuant to any one or more of the Security Agreements or other Loan Documents.

"**Consistent Basis**" shall mean, in reference to the application of GAAP, the accounting principles observed in the current period are comparable in all material respects to those applied in the preceding period.

"**Default Condition**" shall mean any event or condition that, with the passage of time or giving of notice, or both, would constitute an Event of Default.

"**Eligible Aircraft"** shall mean an airplane, helicopter, or other machine capable of flight that the Bank agrees to finance in its reasonable discretion.

"**Eligible Equipment**" shall mean Equipment of Borrower which is acceptable to Bank in its reasonable discretion determined in good faith for lending purposes. Without limiting Bank's discretion, Bank shall, in general, consider Equipment to be Eligible Equipment if it meets, and so long as it continues to meet the following requirements: **(i)** it is owned by Borrower, Borrower has the right to subject it to a security interest in favor of Bank, and it is subject to a first priority, perfected security interest in favor of Bank and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Encumbrances; **(ii)** it is located on one of the premises listed in **Section 4.04** hereof (or at other Locations of which Bank has been advised in writing pursuant to the terms hereof, such locations are within the United States and are acceptable to Bank, and it is not in transit; **(iii)** it is held for use and used in Borrower's business and is not obsolete, damaged or unfit for further use; **(iv)** Bank has determined in good faith that it is not unacceptable due to age, type, condition, category or quantity; **(v)** it is not Equipment **(A)** with respect to which any of the representations and warranties contained in this Agreement are untrue, or **(B)** which violates any of the covenants of Borrower contained in this Agreement; and **(vi)** it is valued at the lower of **(A)** the cost of the item of Equipment, less depreciation; or **(B)** Bank's determination, in good faith, of the resale value of each item of Equipment.

"**Entity**" or "**Entities**" shall mean, in the singular, a Person that is not a natural person and in the plural Persons that are not natural persons.

"**Environmental Laws**" shall mean any and all federal, state and local laws, statutes, ordinances, rules, regulations, permits, licenses, approvals, rules of common law and orders of courts or any Governmental Authority, relating to the protection of human health or occupational safety or the environment, now or hereafter in effect and in each case as amended from time to time, including, without limitation, requirements pertaining to the manufacture, processing, distribution, use, treatment, storage, disposal, transportation, handling, reporting, licensing, permitting, investigation or remediation of Hazardous Substances, including, without limitation, the following federal laws: the Resource Conservation Recovery Act, the Comprehensive Environmental Response Compensation and Liability Act, the Superfund Amendments and Reauthorization Act, the Toxic Substances Control Act, the Hazardous Materials Transportation Act, the Clean Air Act, and the Clean Water Act.

"**Environmental Liability**" shall mean any liability, contingent or otherwise (including any liability for damages, costs of environmental investigation and remediation, costs of administrative oversight, fines, natural resource damages, penalties or indemnities) of any Loan Party directly or indirectly resulting from or based upon **(i)** any actual or alleged violation of any Environmental Law, **(ii)** the generation, use, handling, transportation, storage, treatment or disposal of any Hazardous Substances, **(iii)** any actual or alleged exposure to any Hazardous Substances, **(iv)** the release or threatened release of any Hazardous Substances or **(v)** any contract, agreement or other consensual arrangement pursuant to which liability is assumed or imposed with respect to any of the foregoing.

"**ERISA Event**" shall mean **(i)** any "reportable event", as defined in Section 4043 of the Employee Retirement Income Security Act ("ERISA") or the regulations issued thereunder with respect to an employee benefit ("**Plan**") (other than an event for which the 30-day notice period is waived); **(ii)** the existence with respect to any Plan of an "accumulated funding deficiency" (as defined in Section 412 of the Code or Section 302 of ERISA), whether or not waived; **(iii)** the filing pursuant to Section 412(d) of the Code or Section 303(d) of ERISA of an application for a waiver of the minimum funding standard with respect to any Plan; **(iv)** the incurrence by Borrower or Loan Party of any liability under Title IV of ERISA with respect to the termination of any Plan; **(v)** the receipt by Borrower or any Loan Party from the PBGC or a plan administrator appointed by the PBGC of any notice relating to an intention to terminate any Plan or Plans or to appoint a trustee to administer any Plan; **(vi)** the incurrence by Borrower or any Loan Party of any liability with respect to the withdrawal or partial withdrawal from any Plan or Multiemployer Plan; or **(vii)** the receipt by Borrower or any Loan Party of any notice, or the receipt by any multiemployer plan, as defined in ERISA, from Borrower or any Loan Party of any notice, concerning the imposition of withdrawal liability or a determination that a Multiemployer Plan is, or is expected to be, insolvent or in reorganization, within the meaning of Title IV of ERISA.

"**Event of Default**" shall mean any event so designated in this Agreement or any of the Loan Documents.

"**Financial Officer**" shall mean, with respect to Borrower, the vice president of finance, chief financial officer, principal accounting officer or treasurer of the Borrower.

"**Financial Statements**" shall mean as to any Person statements of the assets, liabilities (direct or contingent), income, expenses and cash flow prepared in accordance with GAAP or the tax accrual method, or other standards reasonably satisfactory to Bank.

"**Financing Statements**" shall mean the financing statements from Borrower to Bank to perfect Bank's security interest in the Collateral described in the Security Agreement and the other Loan Documents.

"**Fiscal Year**" shall mean any fiscal year of the Borrower.

"**GAAP**" shall mean generally accepted accounting principles in the United States.

"**Governmental Authority**" shall mean any nation or government, any state or local government political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, administrative tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative powers or functions of or pertaining to government, and any corporation or other entity owned or controlled, through stock or capital ownership or otherwise, by any of the foregoing.

"**Hazardous Substances**" shall mean any substances or materials **(i)** that are or become defined as hazardous wastes, hazardous substances, pollutants, contaminants or toxic substances under any applicable Environmental Law, **(ii)** that are defined by any applicable Environmental Law as toxic, explosive, corrosive, ignitable, infectious, radioactive, carcinogenic, mutagenic, or otherwise hazardous **(iii)** the presence of which require investigation, removal, remediation or any other response of any kind under any applicable Environmental Law or causes or threatens to cause a nuisance upon any property of a Loan Party or to any adjacent properties or poses or threatens to pose a hazard to the health or safety of persons on or about any such property, **(iv)** that consist of underground or aboveground storage tanks, whether empty, filled or partially filled with any substance, or **(v)** that contain, without limitation, asbestos, polychlorinated biphenyls, urea formaldehyde foam insulation, petroleum hydrocarbons, petroleum derived substances or wastes, crude oil, nuclear fuel, natural gas, synthetic gas, radon gas, radioactive materials, or isotopes.

"**Indebtedness**" of any Person shall mean, without duplication **(i)** all obligations of such Person for borrowed money, **(ii)** all obligations of such Person evidenced by bonds, debentures, notes or other similar instruments, **(iii)** all obligations of such Person in respect of the deferred purchase price of property or services (other than **(A)** trade payables incurred in the ordinary course of business not more than ninety (90) days past due and **(B)** and accrued obligations), **(iv)** all obligations of such Person under any conditional sale or other title retention agreement(s) relating to property acquired by such Person (other than accrued obligations), **(v)** all capital lease obligations of such Person, **(vi)** all obligations, contingent or otherwise, of such Person in respect of letters of credit, acceptances or similar extensions of credit, **(vii)** all guaranties of such Person of the type of Indebtedness described in clauses **(i)** through **(vi)** above, **(viii)** the value of property owned by such Person securing the Indebtedness of a third party, whether or not such Indebtedness has been assumed by such Person, **(ix)** all obligations of such Person, contingent or otherwise, to purchase, redeem, retire or otherwise acquire for value any common stock of such Person, **(x)** all off-balance sheet liabilities or such Person, **(xi)(xi)** all merchant cash advances, including but not limited to lump-sum payments in exchange for agreed-upon percentages or future sales, and **(xii)** all mezzanine, shareholder, and investor debt.The Indebtedness of any Person shall include the Indebtedness of any partnership or joint venture in which such Person is a general partner or a joint venturer, except to the extent that the terms of such Indebtedness provide that such Person is not liable therefor.

"**Insider**" shall mean the following: **(i)** with respect to a Loan Party that is a natural person, **(A)** a relative of the natural person or of a general partner of the natural person, **(B)** a partnership in which the natural person is a general partner, **(C)** a general partner in a partnership in which the natural person is a general partner, **(D)** a corporation of which the natural person is a director, officer, or person in control, or **(E)** any Affiliate of the natural person or any Affiliate of any Insider of the natural person; **(ii)** with respect to a Loan Party that is a corporation, **(A)** a director of the corporation, **(B)** an officer of the corporation, **(C)** a person in control of the corporation, **(D)** a partnership in which the corporation is a general partner, **(E)** a general partner in a partnership in which the corporation is a general partner, **(F)** a relative of a general partner, director, officer, or person in control of the corporation, or **(G)** any Affiliate of the corporation or any Affiliate of any Insider of the corporation; **(iii)** with respect to a Loan Party that is a partnership, **(A)** a general partner in the partnership, **(B)** a relative of a general partner in, a general partner of, or a person in control of the partnership, **(C)** another partnership in which the partnership is a general partner, **(D)** a general partner in a partnership in which the partnership is a general partner, **(E)** a person in control of the partnership, or **(F)** any Affiliate of the partnership or any Affiliate of any Insider of the partnership.

"**Landlord's Waiver and Consent Agreement**" shall mean a landlord waiver, subordination, or acknowledgement agreement of any lessor or other Person in possession of, having a Lien upon, or having rights or interests in the Collateral, in each case, in form and substance satisfactory to Bank.

"**Laws**" shall mean all statutes, laws, ordinances, regulations, orders, writs, judgments, injunctions, decrees or awards of the United States or any state, county, municipality or other Governmental Authority.

"**Lien**" shall mean any mortgage, pledge, hypothecation, assignment, security interest, lien (statutory or otherwise), preference, priority, charge or other encumbrance of any nature, whether voluntary or involuntary, including, without limitation, the

interest of any vendor or lessor under any conditional sale agreement, title retention agreement, capital lease or any other lease or arrangement having substantially the same effect as any of the foregoing.

"**Loan**" shall mean the Line of Credit, as defined in **Article Two** hereof.

"**Loan Documents**" shall mean, collectively, this Agreement, the Note, the Security Agreement(s), any Subordination Agreement, any Guaranty, and all other agreements, instruments, documents and certificates now or hereafter executed and delivered to the Bank by or on behalf of any Loan Party with respect to this Agreement and the transactions contemplated hereby, in each case as amended, modified, supplemented or restated from time to time.

"**Material Adverse Effect**" shall mean a material adverse effect upon **(i)** the financial condition, operations, business, properties, liabilities (actual or contingent), assets, or prospects of Borrower or any of the other Loan Parties, **(ii)** the ability of any of the Loan Parties to perform their respective obligations under this Agreement or any of the other Loan Documents to which they are party or **(iii)** the legality, validity or enforceability of this Agreement or any of the other Loan Documents or the rights and remedies of Bank hereunder and thereunder.

"**Material Indebtedness**" shall mean Indebtedness (other than the Loan) of any Loan Party, individually or in an aggregate principal amount exceeding $1,000,000.00.

"**Maturity Date**" shall mean the maturity date stated in the Note.

"**Net Eligible Commercial Account**" shall mean an Account, which is not a Billed Federal Government Receivable or an Unbilled Federal Government Receivable, for a commercial purpose, owing to Borrower which is acceptable to Bank in its reasonable discretion determined in good faith for lending purposes. Bank may set credit eligibility limits during the term of this Agreement and establish limitations on any intercompany accounts. Without limiting Bank's discretion, Bank shall, in general, consider an Account to be a Net Eligible Commercial Account if it meets, and so long as it continues to meet, the following requirements:

(i) it is genuine and in all respects what it purports to be;

(ii) it is owned by Borrower, Borrower has the right to subject it to a security interest in favor of Bank or assign it to Bank and it is subject to a first priority perfected security interest in favor of Bank and to no other claim, lien, security interest or encumbrance whatsoever, other than Permitted Encumbrances;

(iii) it arises from (A) the performance of services by Borrower in the ordinary course of Borrower's business, and such services have been fully performed and acknowledged and accepted by the Account Debtor thereunder; or (B) the sale or lease of Goods by such Borrower in the ordinary course of such Borrower's business, and (x) such Goods have been completed in accordance with the Account Debtor's specifications (if any) and delivered to the Account Debtor, (y) such Account Debtor has not refused to accept, returned or offered to return, any of the Goods which are the subject of such Account, and (z) Borrower has possession of, or such Borrower has delivered to Bank (at Bank's request) shipping and delivery receipts evidencing delivery of such Goods;

(iv) it is evidenced by an invoice rendered to the Account Debtor thereunder and does not remain unpaid ninety (90) days past the invoice date thereof; provided, however, that if more than twenty five percent (25%) of the aggregate dollar amount of invoices owing by a particular Account Debtor remain unpaid ninety (90) days after the respective invoice dates thereof, then all Accounts owing by that Account Debtor shall be deemed ineligible; further provided that the Bank may approve a period of time greater than ninety (90) days for individual Account Debtors and the Bank has approved a period of time of one hundred twenty (120) days for Accounts owed to the Borrower by the Account Debtor Cleveland Clinic Foundation.

(v) it is a valid, legally enforceable and unconditional obligation of the Account Debtor thereunder, and it shall not be a Net Eligible Commercial Account to the extent of any setoff, counterclaim, credit, allowance or adjustment by such Account Debtor;

(vi) the contract or order out of which the Account arises complies in all material respects with applicable law;

(vii) the Account Debtor thereunder is not a Loan Party, an Affiliate of a Loan Party or a director, officer, employee or agent of Borrower, a Loan Party or any Affiliate of a Loan Party, except that Accounts owing to Aery Aviation, LLC by Strategic Airborne Operations JV, LLC may be deemed eligible;

(viii) it is not an Account with respect to which the Account Debtor is located either (A) outside the United States of America; or (B) in a state which requires Borrower, as a precondition to commencing or maintaining an action in the courts of that state, either to (y) receive a certificate of authority to do business and be in good standing in such state; or (z) file a notice of business activities report or similar report with such state's taxing authority, unless Borrower has taken all required actions described in clauses (y) or (z), or the failure to take any required action described in either clause (y) or (z) may be cured retroactively by Borrower at its election, or Borrower has proven, to Bank's satisfaction, that it is exempt from any such requirements;

(ix) the Account Debtor's obligation to pay is not subject to any repurchase obligation or return right, as with sales made on a bill-and-hold, guaranteed sale, sale on approval, sale or return or consignment basis;

(x) it is not an Account (A) with respect to which any representation or warranty contained in this Agreement is untrue in any material respect; or (B) which violates any of the covenants of Borrower contained in this Agreement;

(xi) it is not an Account which, when added to a particular Account Debtor's other indebtedness to Borrower, exceeds twenty percent (20%) of all Accounts of Borrower or a credit limit determined by Bank in its reasonable discretion determined in good faith for that Account Debtor (except that Accounts excluded from Net Eligible Commercial Accounts solely by reason of this clause (xii) shall be Net Eligible Commercial Accounts to the extent of such credit limit), provided that Bank shall give Borrower written notice of any such credit limit;

(xii) it is not an Account with respect to which the prospect of payment or performance by the Account Debtor is or will be impaired, as determined by Bank in its reasonable discretion determined in good faith;

(xiii) it is not an Account which is owing by any Account Debtor which (A) is subject to any petition in bankruptcy, (B) has applied for relief under the U.S. Bankruptcy Code or any other insolvency law, (C) has made an assignment for the benefit of creditors, (D) is or becomes insolvent, or (E) has terminated its business operations; and

(xiv) it is not a retainage, bonded, contra account, or pay when paid account.

"**Note**" shall mean the Line of Credit Note, as defined in Article Two hereof.

"**Obligations**" shall mean **(a)** all amounts owing by any of the Loan Parties to Bank pursuant to or in connection with the Note, this Agreement or any other Loan Document or otherwise with respect to the Loan, including without limitation, all principal, interest (including any interest accruing after the filing of any petition in bankruptcy or the commencement of any insolvency, reorganization or like proceeding relating to any Loan Party, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), all reimbursement obligations, fees, expenses, indemnification and reimbursement payments, costs and expenses (including all fees and expenses of counsel to Bank incurred pursuant to the Note, this Agreement or any other Loan Document), whether direct or indirect, absolute or contingent, liquidated or unliquidated, now existing or hereafter arising hereunder or thereunder, **(b)** Omitted, **(c)** all Treasury Management Obligations, **(d)** any obligations under any purchasing card or credit card account established for a Loan Party by Bank or any affiliate of Bank, and **(e)** all other indebtedness of whatever kind arising of any Loan Party to Bank or any affiliate of Bank, together with all renewals, extensions, modifications or refinancings of any of the foregoing.

"**Organizational Documents**" shall mean as to any Person which is not a natural person, the documents and/or instruments creating and/or governing the formation or operation of such Person, including without limitation such documents required to be filed with any Governmental Authority having jurisdiction over the creation or formation of such Person and including without limitation, articles of incorporation, bylaws, shareholder agreements, voting trust agreements, articles of organization, operating agreements, management agreements, certificates of limited partnership, partnership agreements, statements of qualification, trust agreements or indentures or other agreements or instruments as appropriate for such Person.

"**Overadvance**" shall mean circumstance where the principal amount outstanding under the Line of Credit exceeds the Borrowing Base.

"**Permitted Encumbrances**" shall mean: **(i)** Liens imposed by law for taxes, assessments or charges or levies of any Governmental Authority not yet due or which are being contested in good faith by appropriate proceedings and with respect to which adequate reserves are being maintained in accordance with GAAP; **(ii)** pledges, Liens and deposits made in the ordinary course of business in compliance with workers' compensation, unemployment insurance and other social security laws or regulations; **(iii)** deposits or Liens to secure the performance of bids, trade contracts, leases, statutory obligations, surety and appeal bonds, performance bonds and other obligations of a like nature, in each case in the ordinary course of business; **(iv)** easements, zoning restrictions, rights-of-way and similar encumbrances on real property imposed by law or arising in the ordinary course of business that do not secure any monetary obligations and do not materially detract from the value of the affected property or materially interfere with the ordinary conduct of business of Borrower; **(v)** extensions, renewals or replacements of any Lien referred to in paragraphs **(i)** through **(iv)** above, *provided* that the principal amount of the obligation secured thereby is not increased and that any such extension, renewal or replacement is limited to the property originally encumbered thereby; **(vi)** statutory Liens on deposit accounts maintained with, or other property in the custody of, a depositary bank pursuant to its general business terms and in the ordinary course of business, provided that such Liens do not secure any Indebtedness; **(vii)** Liens in respect of judgments that would not result in an Event of Default under this Agreement; **(viii)** Liens consisting of pledges and deposits in the ordinary course of business securing liability for reimbursement or indemnification obligations to (including obligations in respect of letters of credit or bank guarantees for the benefit of) insurance carriers providing property, casualty or liability insurance to any Loan Party not to exceed at any time or from time to time the sum of $1,000,000.00 in the aggregate; **(ix)** Liens that are contractual rights of set-off relating to purchase orders and other agreements entered into with customers of Borrower in the ordinary course of business; and **(x)** Liens identified on Exhibit B hereto.

"**Permitted Investments**" shall mean: **(i)** direct obligations of, or obligations the principal of and interest on which are unconditionally guaranteed by, the United States (or by any agency thereof to the extent such obligations are backed by the full faith and credit of the United States), in each case maturing within one year from the date of acquisition thereof; **(ii)** commercial paper having the highest rating, at the time of acquisition thereof, of S&P or Moody's and in either case maturing within **six months** from the date of acquisition thereof; **(iii)** certificates of deposit, bankers' acceptances and time deposits maturing within **180 days** of the date of acquisition thereof issued or guaranteed by or placed with, and money market deposit accounts issued or offered by, any domestic office of any commercial bank organized under the laws of the United States or any state thereof which has a combined capital and surplus and undivided profits of not less than **$500,000,000**; **(iv)** fully collateralized repurchase agreements with a term of

not more than **30 days** for securities described in clause **(i)** above and entered into with a financial institution satisfying the criteria described in clause **(iii)** above; **(v)** mutual funds investing solely in any one or more of the Permitted Investments described in the foregoing clauses **(i)** through **(iv);** and **(vi)** any investments, deposits, or other accounts made with the Bank.

"**Person**" shall mean any natural person, corporation, association, joint venture, partnership, limited liability company, company, association, trust, Governmental Authority or other entity.

"**Responsible Officer**" shall mean with respect to the Borrower any of the president, the chief executive officer, the chief operating officer, the chief financial officer, the treasurer or a vice president or a manager or managing member or a general partner or managing general partner of the Borrower or such other representative of the Borrower as may be designated in writing by any one of the foregoing with the consent of Bank; and, with respect to the financial covenants only, the chief financial officer or the treasurer of the Borrower. Any document delivered in connection with this Agreement or any of the other Loan Documents that is signed by a Responsible Officer of the Borrower shall be conclusively presumed to have been authorized by all necessary corporate, partnership or other entity action on the part of the Borrower and such Responsible Officer shall be conclusively presumed to have acted on behalf of the Borrower.

"**Security Agreement**" shall mean the Security Agreement, made by the Borrower in favor of Bank dated on or about the date hereof, pursuant to which Borrower has granted to Bank a security interest in and to that portion of the Collateral described therein, as amended, modified, restated or supplemented at any time or from time to time.

"**Subordination Agreements**" shall mean the collective reference to, and "**Subordination Agreement**" means each of, any intercreditor or subordination agreement, in form and substance satisfactory to Bank, from the holders of any subordinate debt of Borrower in favor of Bank.

"**Subsidiary**" shall mean, with respect to any Person, any corporation or other Person of which more than **fifty percent (50%)** of the outstanding capital stock or other equity interests having ordinary voting power to elect a majority of the board of directors, board of managers or other governing body of such Person, is at the time, directly or indirectly, owned or controlled by such Person and one or more of its other Subsidiaries or a combination thereof (irrespective of whether, at the time, securities of any other class or classes of any such corporation or other Person shall or might have voting power by reason of the happening of any contingency).

"**Term**" shall be as defined in the Note.

"**Treasury Management Obligations**" shall mean, collectively, all obligations and other liabilities of any Loan Party that is an entity owing to Bank or any affiliate of Bank pursuant to any agreements governing the provision to such Loan Party of treasury or cash management services, including deposit accounts, funds transfer, automated clearing house, zero balance accounts, returned check concentration, controlled disbursement, lockbox, account reconciliation and reporting and trade finance services.

"**UCC**" shall mean the Uniform Commercial Code as in effect in Florida as amended or modified from time to time.

"**Unbilled Federal Government Receivables**" shall mean Accounts (a) with respect to which the Account Debtor is the United States of America or any department, agency or instrumentality thereof, (b) not yet evidenced by an invoice rendered to the Account Debtor thereunder but projected to be invoiced within thirty (30) days after the last date of the service giving rise to such Account based upon documentation satisfactory to the Bank in its sole discretion, and (c) which are otherwise acceptable to Bank in its sole discretion determined in good faith for lending purposes.

**1.02 Accounting Terms and Determinations**. Unless otherwise defined or specified herein, all accounting terms used herein shall be interpreted, all accounting determinations hereunder shall be made, and all Financial Statements required to be delivered hereunder shall be prepared, in accordance with GAAP as in effect from time to time, applied on a Consistent Basis or other standard acceptable to Bank. Notwithstanding any other provision contained herein, all Financial Statements delivered hereunder shall be prepared, and all financial covenants contained herein shall be calculated, without giving effect to any election under Statement of Financial Accounting Standards 159 (or any similar accounting principle) permitting a Person to value its financial liabilities at the fair value thereof. For purposes of determining compliance with any covenant (including computation of any financial covenant) contained herein, Indebtedness of the Loan Parties shall be deemed to be carried at 100% of the outstanding principal amount thereof, and the effects of FASB Accounting Standards Codification 825 on financial liabilities shall be disregarded.

**1.03 Internal References & Interpretation of Terms**. Unless otherwise specified or unless the context otherwise requires, all references herein to sections, annexes, schedules and exhibits are references to sections, annexes, schedules and exhibits in and to this Agreement, and all terms defined in this Agreement shall have the defined meanings when used in any other Loan Document or any certificate or other document made or delivered pursuant hereto. Any of the terms defined herein may, unless the context otherwise requires, be used in the singular or the plural, depending on the reference. The use

herein of the word "include" or "including", when following any general statement, term or matter, shall not be construed to limit such statement, term or matter to the specific items or matters set forth immediately following such word or to similar items or matters, whether or not non-limiting language (such as "without limitation" or "but not limited to" or words of similar import) is used with reference thereto, but rather shall be deemed to refer to all other items or matters that fall within the broadest possible scope of such general statement, term or matter. The word "will" shall be construed to have the same meaning and effect as the word "shall"; and the words "asset" and "property" shall be construed as having the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, securities, accounts and contract rights. The terms lease and license shall include sub-lease and sub-license, as applicable. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. Except as otherwise expressly provided herein or therein, any reference in this Agreement or any other Loan Document to any agreement, document or instrument shall mean such agreement, document or instrument as amended, restated, supplemented or otherwise modified from time to time, in each case, in accordance with the express terms of this Agreement or such Loan Document. Any reference herein or in any other Loan Document to the satisfaction, repayment, or payment in full of the Obligations (or words of like import) shall mean the payment or repayment in full in immediately available funds of (i) the principal amount of, and interest accrued and unpaid with respect to, all outstanding Loans, together with the payment of any premium applicable to the repayment of the Loans, (ii) all costs and expenses payable by the Loan Parties to the Bank pursuant to the Loan Documents and that have accrued and are unpaid regardless of whether demand has been made therefor, and (iii) all fees or charges that have accrued hereunder or under any other Loan Document and are unpaid.

## ARTICLE TWO
## LOAN

**2.01 Line of Credit**.

**(a)** *Line of Credit*. Subject to the terms and conditions of this Agreement, Bank agrees to make available to Borrower a revolving line of credit (the "**Line of Credit**"). During the Term, Borrower may borrow, re-pay and re-borrow on a revolving basis advances (each an "**Advance**" and collectively, "**Advances**") in the aggregate outstanding at any one time or from time to time, the lesser of (i) the maximum principal sum of **$<u>9,000,000.00</u>** (the "**Line of Credit Commitment**") or (ii) the Borrowing Base; provided, that if, at any time hereafter an Overadvance exists, Borrower will immediately within two (2) Business Days of receiving written notice thereof repay the Line of Credit by the amount of such Overadvance or, at Bank's option, provide additional Collateral or Accounts to bring the Borrower back into compliance with the Borrowing Base; further provided, however, that nothing contained herein shall be deemed to limit the right of the Bank to declare an Event of Default if Borrower does not bring the Loan back into compliance with the Borrowing Base within five (5) Business Days of receiving such written notice. The Line of Credit shall be evidenced by that revolving line of credit promissory note (together with any renewals, modifications, amendments, restatements, supplements or substitutions thereof, the "**Line of Credit Note**") made by Borrower and payable to the order of Bank in the amount of the Line of Credit, which shall be executed and delivered simultaneously with the execution and delivery of this Agreement, and shall accrue interest as provided in and as payable under the Line of Credit Note, with principal and interest to be payable under and pursuant to the Line of Credit Note as provided in the Line of Credit Note.

**(b)** *Line of Credit Fees*.

(i) *Annual Facility Fee*. Borrower shall unconditionally pay to Bank a fee (the "**Facility Fee**") of **<u>0.25% of the Line of Credit Commitment</u>**, which is due and payable in full in good collected funds as of the date of the execution and delivery of this Agreement and then annually on each anniversary date of this Agreement (or if such date is not a Business Day, on the next succeeding Business Day). In the event that Borrower does not pay any Facility Fee as herein provided, Bank, without prejudice to its right to declare an Event of Default as a result of such failure after ten (10) days written notice to the Borrower of such failure to pay the Facility Fee, may terminate the Line of Credit Commitment by giving written notice of such termination to Borrower, whereupon Borrower shall have no further entitlement to receive Advances under the Line of Credit.

(ii) *Collateral Management Fee.* Borrower shall unconditionally pay to Bank a fee (the "**Collateral Management Fee**") of **$1,000.00 per month**, which is due and payable monthly in full and in good collected funds on the **5th** day of each month following the execution of this Agreement (or if such date is not a Business Day, on the next succeeding Business Day). In the event that Borrower does not pay any Collateral Management Fee as herein provided, Bank, without prejudice to its right to declare an Event of Default as a result of such failure, may terminate the Line of Credit Commitment by giving written notice of such termination to Borrower, whereupon Borrower shall have no further entitlement to receive Advances under the Line of Credit.

(iii) *Draw Fee.* Borrower shall unconditionally pay to the Bank a fee (the "**Draw Fee**") in the amount of **1.5% of each Advance** made by the Bank to the Borrower that is for the purchase of Eligible Aircraft or Eligible Equipment.

**(c)** *Procedure for Advances*.

(i) Advances made for Billed Federal Government Receivables, Unbilled Federal Government Receivables, and Net Eligible Commercial Accounts will be made under the Line of Credit automatically pursuant to the Master Treasury Agreement entered into or to be entered into between the Borrower and Bank.

(ii) When the Borrower desires that the Bank make an Advance for Eligible Aircraft or Eligible Equipment, the Borrower shall deliver to the Bank a Request for Line of Credit Advance and provide to the Bank all documentation that Bank may request to support the Borrower's request, including but not limited to the purchase and sale agreement for the aircraft to be purchased and the work order/purchase order for the equipment to be purchased. The Bank may, in its reasonable discretion, require an appraisal and/or survey, performed by an appraiser acceptable to Bank, on the specific equipment to be financed. The Borrower shall pay for the cost of any such appraisal or survey and all associated out of pocket expenses incurred by the Bank. The Bank shall, in its reasonable discretion, determine whether it will make the requested Advance. If the Bank agrees to make the requested Advance, the Borrower shall execute all documents required by the Bank to give effect to such Advance. Each Advance made shall be evidenced by documents that the Bank may require in its sole discretion. The Bank shall file a UCC-1 financing statement as to the specific equipment financed. The amounts advanced under the Guidance Line of Credit shall also be cross-collateralized in all respects with the Revolving Line of Credit. Any Advances made for Eligible Aircraft shall require title work and a recorded Aircraft Chattel Mortgage.

**(d)** *Purpose*. The Line of Credit shall be used solely for business purposes to: <u>Provide ongoing working capital to support current and future contracts and provide funding for the purchase of new aircraft and equipment</u>.

**(e)** *Blocked Account and Collections*.

(i) Contemporaneously herewith, Borrower will establish with Bank a restricted depository account with Bank (the "**Blocked Account**"), and enter into a blocked account arrangement with Bank pursuant to a separate written Blocked Account Agreement in such form and substance as is required by Bank (a "**Blocked Account Agreement**") for the purposes of providing for collection of its Accounts and other rights to payment as provided in the Security Agreement and in such Blocked Account Agreement, and which Blocked Account Agreement shall detail the methods of collection and the application and disposition of Borrower's Accounts, and other rights to payment provided, that if an Event of Default has occurred and is continuing, all such collections shall be applied to the Loan in such manner and order as Bank shall determine in its sole and absolute discretion consistent with the Security Agreement.

(ii) Borrower will cause all collections with respect to its Accounts and any other rights to payment to be sent, and where applicable will direct all Account Debtors on such Accounts and other rights of payment to send, directly to the Blocked Account established pursuant to the Blocked Account Agreement. In the event that Borrower receives any collections of its Accounts and other rights to payment, Borrower will, promptly upon receipt and in any event within one Business Day of receipt, forward such collections directly to the Blocked Account in the form received and as otherwise provided in the Blocked Account Agreement, and if requested by Bank, will promptly notify Bank of such event.

(iii) Except to the extent permitted by the Blocked Account Agreement and the Security Agreement, Borrower shall not withdraw any amounts from the accounts into which the collections remitted to the Blocked Account are deposited, nor shall Borrower change the procedures under the agreements governing the Blocked Account and related accounts.

(iv) Bank reserves the right to, in its sole discretion, require the Borrower to enter into a lockbox arrangement with the Bank and to require that all Account Debtors on Borrower's Accounts to remit payments to a lockbox. If Bank exercises its discretion to require the establishment of a lockbox arrangement at any future point in time, Borrower shall execute all required agreements and other documents (the "Lockbox Agreement") to establish the lockbox arrangement and shall abide by all terms of the Lockbox Agreement.

**(f)** *Notification and Verification of Accounts*. Bank is hereby authorized to notify any Account Debtor obligated with respect to any Account that the underlying Account has been assigned to Bank by Borrower and that payment thereof is to be made to the order of and directly and solely to Bank. The Bank will conduct verification of outstanding invoices prior to the initial funding and thereafter on a random basis during the term of the Loan. All such verifications shall be performed at the expense of the Borrower. The Borrower hereby grants to Bank and its designees, where reasonably practical, the right to enter any allowed premises on which the Collateral (or any part thereof) is located or any other property on or from which the Borrower conducts its business operations for the purpose of making such inspections, examinations and assessments as the Bank in its reasonable discretion deems necessary or desirable to determine the use, operation and ownership of the Collateral, which entry, upon written notice, shall occur during normal business hours unless impractical to do hours.

**(g)** *Accordian Feature*.

(i) Request for Increase. Borrower may, at any time during the Term for so long as the Line of Credit Commitment hereunder has not been terminated and no Default Condition or Event of Default that results in a Material Adverse Effecthas occurred and is continuing, request that the Line of Credit Commitment be increased to an amount up to **$12,000,000.00** (each such requested increase being a "Commitment Increase") by written notice to Bank requesting such Commitment Increase. Any such Commitment Increase shall be subject to (i) submission to Bank of such information as Bank shall request, (ii) underwriting by Bank, (iii) Bank's written approval in its sole and absolute discretion (i.e., it may grant or withhold such approval for any reason or for no reason whatsoever), and (iv) such terms and conditions as Bank shall require in its sole and absolute discretion and nothing contained herein shall constitute the agreement or commitment of, or impose any obligation on, Bank to increase the Line of Credit Commitment by the amount of any such Commitment Increase.

(ii) Effectiveness of Increase. Any such Commitment Increase shall become effective only upon (i) Bank's agreement to a Commitment Increase in such amount, if any, as Bank shall determine, and setting forth such terms and conditions with respect to such Commitment Increase as Bank shall require in its reasonable discretion, (ii) satisfaction of conditions of such Commitment Increase as Bank shall require, (iii) the Loan Parties' execution and delivery of such documents and/or instruments as Bank shall require in connection with such Commitment Increase, including without limitation any

supplement, restatement or amendment to this Agreement or the other Loan Documents as shall be necessary to effectuate such Commitment Increase in accordance with Bank's agreement to provide the same, and such additional customary documents and filings (including amendments to the Security Agreement and title endorsement bringdowns), (iv) Bank's receipt of customary legal opinions, resolutions and other customary closing certificates and documentation as required by Bank, consistent with those delivered as of the date of this Agreement, and (v) payment of such additional fees as Bank shall determine as a condition of such Commitment Increase and other reasonable fees and costs of Bank incurred in connection with such Commitment Increase. Each such Commitment Increase shall be secured by all of the Collateral securing the Loans and upon any such Commitment Increase, the Line of Credit Commitment will thereafter be increased by the amount of such Commitment Increase.

## ARTICLE THREE
## CONDITIONS TO LOAN(S)

**3.01** **Conditions To Closing of the Loan(s)**. The obligations of Bank to extend the Loan shall not become effective until the date on which the last of the following conditions is satisfied:

**(a)** Bank shall have received all fees and other amounts due and payable on or prior to the date hereof, and reimbursement or payment of all out-of-pocket expenses (including reasonable fees, charges and disbursements of counsel to Bank) required to be reimbursed or paid by Borrower hereunder or under any other Loan Document.

**(b)** The Bank (or its counsel) shall have received the following (all of which shall be in form and substance satisfactory to Bank in its reasonable discretion):

(i) This Agreement signed by or on behalf of each party hereto.

(ii) Duly executed Note(s) payable to the Bank.

(iii) Duly executed other Loan Documents, including without limitation, the Security Agreement.

(iv) Certificate of the secretary, authorized officer, general partner, manager or member of the Borrower in form and substance acceptable to the Bank, attaching and certifying copies of its Organizational Documents, including without limitation the Operating Agreements, and authorizing resolutions or unanimous written consents, as appropriate for each such Loan Party, authorizing the execution, delivery and performance of the Loan Documents to which it is a party and certifying the name, title and true signature of each officer, or other authorized representative, as applicable, of each such Loan Party executing the Loan Documents to which it is a party.

(v) Certificates of good standing, status, or existence, as applicable, from the Secretary of State or other proper governmental office of the jurisdiction of organization of the Borrower and each other jurisdiction where any such Loan Party is required to be qualified to do business as a foreign entity.

(vi) Certified copies of all consents, approvals, authorizations, registrations and filings and orders required or advisable to be made or obtained under any requirement of Law in connection with the execution, delivery, performance, validity and enforceability of the Loan Documents, and such consents, approvals, authorizations, registrations, filings and orders shall be in full force and effect and all applicable waiting periods shall have expired.

(vii) If applicable, duly executed payoff letters or other evidence satisfactory to the Bank from any other banks/lenders under any existing loans or credit facilities of Borrower.

(viii) Subordination Agreements executed by each other Person specified by Bank.

(ix) A copy of, or a certificate as to coverage under the, insurance policies for hazard insurance, loss of rents, flood, and liability insurance, and all other insurance policies required by the applicable provisions of the Security Agreement,each of which shall be endorsed or otherwise amended to include a customary Bank's loss payable endorsement and to name the Bank as additional insured, mortgagee or lender loss payee as appropriate and in form and substance satisfactory to the Bank in its sole discretion;

(x) With respect to the Accounts Receivable for the Borrower, an aging report that (i) identifies each Account Receivable by customer name, (ii) shows the amount of each Account Receivable on an aging basis, and (iii) includes the address, phone number, and email address, if applicable, for each Account Receivable customer.

(xi) Current financial statements and supporting financial documents for Borrower and Guarantor in form and substance satisfactory to Bank.

(xii) Properly completed and executed attestation forms, for Borrower and Guarantor, using Bank's attestation form, certifying their respective personal and other financial statements to Bank.

(xiii) Duly executed certification of beneficial ownership for the Borrower.

(xiv) Duly executed Agreement Regarding Closing of the Loan.

(xv) The Borrower shall have provided to the Bank a properly executed IRS Form W-9.

(xvi) Duly executed and completed Authorization to Debit Account for Loan Payments.

(xvii) The following searches (to be performed by Bank or its counsel) as to the Borrower and Guarantor, with the results being satisfactory to the Bank in its reasonable discretion: (a) UCC-1 Financing Statement search; (b) judgment lien search; (c) federal lien search.

(xviii) Borrower shall have established the deposit account as required by **Section 5.12** hereof.

(xix) All signors shall provide legible copies of their driver's licenses.

**(c)** Each document (including, without limitation, any Uniform Commercial Code financing statements) required by the Security Agreement or under law or reasonably requested by the Bank to be filed, registered or recorded in order to create in favor of the Bank a perfected Lien on the Collateral described therein, prior and superior in right to any other Person (other than with respect to Liens expressly permitted pursuant to the terms of this Agreement or the Security Agreement), shall be in proper form for filing, registration or recordation.

**3.02** **Conditions to Advances**. The obligation of the Bank to make any Advance is subject to the satisfaction of the following conditions:

**(a)** At the time of and immediately after giving effect to such Advance, no Default Condition or Event of Default that results in a Material Adverse Effect shall exist.

**(b)** At the time of and immediately after giving effect to such Advance, all representations, warranties, and covenants of each Loan Party set forth in this Agreement and every other Loan Document shall be true and correct in all material respects (except where the same are qualified by materiality or by Material Adverse Effect, in which case the same shall be true and correct in all respects) on and as of the date of such Advance, in each case before and after giving effect thereto. At the request of Bank in its reasonable discretion, the Loan Parties shall provide to the Bank prior to the Bank making any Advance a Covenant Compliance Certificate.

**(c)** Those items shown on the Schedule of Post-Closing Items attached to the Agreement Regarding Closing of the Loan shall have been completed, if the required completion date shown on the Schedule of Post-Closing Items is prior to the date of such Advance.

Each Request for Line of Credit Advance shall be deemed to constitute a representation and warranty by Borrower that all conditions specified in this Section have been satisfied.

**3.03** **Delivery of Documents**. All of the Loan Documents, certificates and other documents and papers referred to in this Article Three, unless otherwise specified, shall be delivered to Bank and, except for the Note, in sufficient counterparts or copies as Bank shall require and shall be in form and substance satisfactory in all respects to Bank.

## ARTICLE FOUR
## REPRESENTATIONS AND WARRANTIES

To induce Bank to enter into this Agreement and to extend to Borrower the Loan, each of the Loan Parties on behalf of and for himself/itself only, represents and warrants to Bank both before and after giving effect to the transactions contemplated hereby, which representations and warranties shall be deemed made as of the date of this Agreement, as follows:

**4.01** **Continuing Nature of Warranties**. The representations and warranties made herein shall be true and correct as of the date hereof and shall remain true and correct in all material respects at all times hereafter so long as any portion of the Loan shall remain outstanding. All such representations and warranties are given as an inducement to Bank to extend credit to Borrower. Bank is relying on the validity and accuracy of such representations and warranties and all of such representations and warranties shall survive any and all bankruptcy, reorganization, arrangement, liquidation, dissolution or insolvency proceedings relating to Borrower or Guarantor, if any.

**4.02** **Existence; Power**. The Borrower (i) is duly organized, validly existing and in good standing as a corporation, partnership or limited liability company, as applicable, under the laws of the jurisdiction of its organization, (ii) has all requisite power and authority to carry on its business as now conducted, and (iii) is duly qualified to do business, and is in good standing, in each jurisdiction where such qualification is required, except where a failure to be so qualified could not reasonably be expected to result in a Material Adverse Effect. Each Loan Party that is a natural person is sui juris and otherwise of full legal capacity to enter into this Agreement and the other Loan Documents and to own its properties

**4.03** **Organizational Power; Authorization**. The execution, delivery and performance by the Borrower of the Loan Documents to which each is a party are within such Person's organizational powers, as applicable, and have been duly authorized, as applicable, by all necessary organizational, and if required, shareholder, partner or member action. This Agreement and each other Loan Document dated the date hereof has been duly executed and delivered by the Loan Parties, and constitute, and each other Loan Document to which any Loan Party will become a party, when executed and delivered by such Loan Party shall constitute, valid and binding obligations of the Loan Parties, enforceable against each such Loan Party in accordance with their respective terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity.

**4.04 Places of Business; Fictitious Names; Location of Collateral**. Each Loan Party's correct legal name and address is as set forth in the preamble to this Agreement and, as to the Borrower, (i) the jurisdiction of each Loan Party is as set forth in the preamble to this Agreement; (ii) the chief executive office of the Borrower is as set forth in the preamble to this Agreement; and **(iii)** the only other places of business of the Borrower is as follows: 305 Cherokee Dr., Newport News, VA 23602-4437; 1460 McManus, Newport News, VA; 700 Corporate Drive, Newport News, VA; 531 Edwards Court, Newport News, VA; 2487 Cedarcrest Rd., Acworth, GA. Except as disclosed in the preamble hereto: **(i)** the Borrower has not been organized in any other jurisdiction, nor changed any such location in the last five (5) years, **(ii)** no Loan Party has changed its name in the last five (5) years, and **(iii)** during such period no Loan Party has used, nor does any Loan Party now use, any fictitious or trade name except for the following: Flight Support, Inc. operates under a fictitious name of Electronic Warfare Training Support LLC and Electronic Warfare Training Support LLC operates under the fictitious names of EWTS, EWTS, LLC, and Electronic Warfare Tactical Support. The Collateral consisting of inventory and equipment is located at the following locations and no others: 305 Cherokee Dr., Newport News, VA 23602-4437; 1460 McManus, Newport News, VA; 700 Corporate Drive, Newport News, VA; 531 Edwards Court, Newport News, VA; 2487 Cedarcrest Rd., Acworth, GA. The books and records relating to the Collateral consisting of accounts receivable is located at the following locations and no others: 305 Cherokee Dr., Newport News, VA 23602-4437; 2487 Cedarcrest Rd., Acworth, GA; NAS North Island, CA; 6674 Gates Mills Blvd, Gates Mills, Ohio.

**4.05 Pending Litigation**. There are no judgments or judicial or administrative orders, proceedings or investigations (civil or criminal) pending or, to the knowledge of the Loan Parties, threatened, against any Loan Party in any court or before any Governmental Authority, which, if adversely determined, could reasonably be expected to cause a Material Adverse Effect. No member, manager, partner, shareholder, director, or executive officer of the Borrower nor any Loan Party that is a natural person has been indicted or convicted in connection with or is engaging in any racketeering or other similar criminal conduct or activity, or is currently subject to any lawsuit or proceeding or under investigation in connection with any racketeering or other similar criminal conduct or activity.

**4.06 Governmental Approvals; No Conflicts**. To the best knowledge of the Loan Parties, and except as provided on Exhibit A to Definition of Permitted Encumbrances, the execution, delivery and performance by the Loan Parties of this Agreement, and the other Loan Documents to which each is a party **(i)** do not require any consent or approval of, registration or filing with, or any action by, any Governmental Authority, except those as have been obtained or made and are in full force and effect, **(ii)** do not violate or result in the breach of any of the terms and provisions of any Organizational Document to which any Loan Party is bound or is a party, **(iii)** will not violate any requirements of Law applicable to any Loan Party, or any judgment, order or ruling of any Governmental Authority, **(iv)** will not violate or result in a default under any indenture, material agreement or other material instrument binding any Loan Party or any of their respective assets or give rise to a right thereunder to require any payment to be made by any Loan Party and **(v)** will not result in the creation or imposition of any Lien on any asset of a Loan Party, except Liens created under the Loan Documents.

**4.07 Financial Statements**. The respective Financial Statements of the Borrower delivered to Bank in connection with the Loan (including in all cases the notes thereto, if any) have been prepared in accordance with GAAP or other standard acceptable to Bank, are accurate and complete in all material respects as of the respective dates thereof, are consistent with each such Person's books and records (which, in turn, are accurate and complete in all material respects), present fairly in all material respects each such Person's respective financial condition, results of operations and cash flows as of the respective times and for the respective periods referred to therein. The respective Financial Statements of each Loan Party that is a natural person delivered to Bank in connection with the Loan have been prepared on Bank's standard form of personal Financial Statement or other form approved by Bank, are accurate and complete in all material respects as of the respective dates thereof, and to the extent that any of the assets shown on any such Person's Financial Statement are jointly owned with any other Person, such ownership is so designated on such Financial Statement, together with a notation as to such Loan Party's interest therein. Since March 31, 2021, there have been no changes to the financial condition of any Loan Party which have had or could reasonably be expected to have, singly or in the aggregate, a Material Adverse Effect. No Loan Party has any Indebtedness, Lien or other liability that would be required to be disclosed on a balance sheet in accordance with GAAP, except for those (i) set forth on the Financial

Statements referred to hereinabove or (ii) incurred in the ordinary course of business since the respective date of such Person's Financial Statement referred to hereinabove.

**4.08** **Compliance with Laws and Agreements**. To the best knowledge of Borrower, Borrower and their respective Subsidiaries, if any, are in compliance with **(a)** all requirements of Law and all judgments, decrees and orders of any Governmental Authority and **(b)** all indentures, agreements or other instruments binding upon it or its properties, except where non-compliance, either singly or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.09** **Taxes**. Each of the Loan Parties has timely filed or caused to be filed all Federal and state income tax returns and all other material tax returns that are required to be filed by them, and have paid all taxes shown to be due and payable on such returns or on any assessments made against it or its property, except where the same are currently being contested in good faith by appropriate proceedings and for which such Loan Party has set aside on its books adequate reserves in accordance with GAAP. The charges, accruals and reserves on the books of the Loan Parties in respect of such taxes are adequate, and no tax liabilities that could be materially in excess of the amount so provided are anticipated.

**4.10** **ERISA**. To the best knowledge of the Borrower, Borrower is in compliance with all applicable provisions of the Employee Retirement Income Security Act of 1974, as amended ("**ERISA**"), the Internal Revenue Code of 1986, as amended (the "**Code**") and the regulations and published interpretations thereunder with respect to all employee benefit plans covered thereby. No ERISA Event has occurred or is reasonably expected to occur that, when taken together with all other such ERISA Events for which liability is reasonably expected to occur, could reasonably be expected to result in a Material Adverse Effect.

**4.11** **Investment Company Act, etc**. None of the Loan Parties that is an Entity is **(i)** an "investment company" or is "controlled" by an "investment company", as such terms are defined in, or subject to regulation under, the Investment Company Act of 1940, as amended, or **(ii)** otherwise subject to any other regulatory scheme limiting its ability to incur debt or requiring any approval or consent from or registration or filing with, any Governmental Authority in connection therewith.

**4.12** **Margin Regulations**. None of the proceeds of the Loan will be used, directly or indirectly, for "purchasing" or "carrying" any "margin stock" with the respective meanings of each of such terms under Regulation U of the Board of Governors of the Federal Reserve System as now and from time to time hereafter in effect or for any purpose that violates the provisions of the Regulation U. None of the Loan Parties is engaged principally, or as one of its important activities, in the business of extending credit for the purpose of purchasing or carrying "margin stock."

**4.13** **Ownership of Property**.

**(a)** The Borrower has good title to, or valid leasehold interests in, all of its real and personal property material to the operation of its business, including all such properties reflected in the most recent Financial Statements referred to in **Section 4.07** hereof or purported to have been acquired by any such Person after said date (except as sold or otherwise disposed of in the ordinary course of business), and are in each case free and clear of Liens other than Permitted Encumbrances. All leases that individually or in the aggregate are material to the business or operations of the Borrower are valid, subsisting and in full force and effect.

**(b)** The Borrower owns, or is licensed or otherwise has the right to use, all patents, trademarks, service marks, trade names, copyrights and other intellectual property material to its business, and to the Loan Parties' knowledge the use thereof by such Loan Parties does not infringe in any material respect on the rights of any other Person.

**(c)** The properties of each Loan Party that is an Entity are insured with financially sound and reputable insurance companies which are not Affiliates of the Loan Parties, in such amounts with such deductibles and covering such risks as are customarily carried by companies engaged in similar businesses and owning similar properties in localities where the Loan Parties operate.

**4.14** **Subsidiaries**. Loan Parties that are Entities expressly acknowledge and agree that it is a condition of the Loan that all Subsidiaries of the Borrower be Borrowers and/or Guarantors subject to the terms of this Agreement. The Borrower has no Subsidiaries except for each other.

**4.15** **Loan Party Disclosures**. Each Loan Party has disclosed to Bank all agreements, instruments, and corporate or other restrictions to which any Loan Party is subject, and all other matters known to any of them, that, individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect. None of the reports, Financial Statements, certificates nor other information furnished by or on behalf of any Loan Party to the Bank in connection with the negotiation of this Agreement or any other Loan Document or delivered hereunder or thereunder (as modified or supplemented by any other information so furnished) contains any material misstatement of fact nor omits to state any material fact necessary to make the statements therein, taken as a whole, in light of the circumstances under which they were made, not misleading.

**4.16** **Labor Relations**. No Loan Party that is an Entity, is a party to any collective bargaining agreement nor has any labor union been recognized as the representative of its employees. There are no strikes, lockouts, collective bargaining activities or other material labor disputes or grievances against any Loan Party, or, to the Loan Parties' knowledge, threatened against or affecting any of the Loan Parties, and no significant unfair labor practice, charges or grievances are pending against any Loan Party, or to the Loan Parties' knowledge, threatened against any of them before any Governmental Authority, except where the result of any of the foregoing, either singly or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect.

**4.17** **OFAC**. None of the Loan Parties **(i)** is a person whose property or interest in property is blocked or subject to blocking pursuant to Section 1 of Executive Order 13224 of September 23, 2001 Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism (66 Fed. Reg. 49079 (2001)), **(ii)** engages in any dealings or transactions prohibited by Section 2 of such executive order, or is otherwise associated with any such person in any manner violative of Section 2, or **(iii)** is a person on the list of Specially Designated Nationals and Blocked Persons or subject to the limitations or prohibitions under any other U.S. Department of Treasury's Office of Foreign Assets Control regulation or executive order.

**4.18** **Patriot Act; Foreign Corrupt Practices Act**. To the best of the Loan Parties knowledge, each of the Loan Parties is in compliance, in all material respects, with (i) the Trading with the Enemy Act, as amended, and each of the foreign assets control regulations of the United States Treasury Department (31 CFR, Subtitle B, Chapter V, as amended) and any other enabling legislation or executive order relating thereto, and (ii) the Uniting And Strengthening America By Providing Appropriate Tools Required To Intercept And Obstruct Terrorism (USA Patriot Act of 2001). No part of the proceeds of the Loan will be used, directly or indirectly, for any payments to any governmental official or employee, political party, official of a political party, candidate for political office, or anyone else acting in an official capacity, in order to obtain, retain or direct business or obtain any improper advantage, in violation of the United States Foreign Corrupt Practices Act of 1977, as amended.

**4.19** **Absence of Defaults**. No Default Condition or Event of Default has occurred or is continuing in any of the Borrower's material agreements that would result in a Material Adverse Effect.

**4.20** **No Loans by Insiders**. None of the Insiders have made any loan(s) to the Borrower, except as identified in **Section 4.21** hereof.

**4.21** **Mezzanine, Shareholder, & Investor Debt.** Borrower has no current mezzanine, shareholder, investor, or insider debt except for the following: Aviation Capital Partners, L.P., a company owned solely by Scott Beale entered into a revolving line of credit note (the "Note") with Aery Aviation, LLC dated December 31, 2017, in the amount of $1,000,000.00, with the following general payment terms: Essential part of Mr. Beale's ownership interest in Aery and for working capital purposes. Nothing is currently drawn down on the Note. Loan Parties shall notify the Bank prior to incurring any mezzanine, shareholder, or investor debt, and Loan Parties shall not incur any mezzanine, shareholder, or investor debt without written approval of the Bank. Bank may condition its approval on the execution of an Intercreditor Agreement or Subordination Agreement in form and substance satisfactory to the Bank in its

sole discretion.

## ARTICLE FIVE
## AFFIRMATIVE COVENANTS

Each of the Loan Parties covenants and agrees, for himself/itself only, until such time as the Obligations have been indefeasibly paid in full in cash and any obligation of Bank to fund any portion of the Loan has terminated or expired:

**5.01 Payment of Obligations**. Borrower shall pay principal, interest, fees and other charges on the Loan and the other Obligations as and when due pursuant to the Note, this Agreement, and the other Loan Documents.

**5.02 Financial Statements and Other Reporting**.

**(a)** *Annual Financial Statements of Borrower.* As soon as available and in any event within **one hundred twenty (120) days** after the end of each Fiscal Year Borrower shall submit to Bank consolidated and consolidating annual financial statements for the Borrower, and any and all Subsidiaries of the Borrower, for the Fiscal Year most recently ended, prepared in conformity with GAAP consistently applied and consisting of a balance sheet, and related statements of income, equity and cash flows (together with footnotes thereto) of Borrower and its respective Subsidiaries audited by an independent certified public accountant acceptable to Bank (without a "going concern" or like qualification, exception or explanation and without any qualification or exception as to scope of such audit) to the effect that such financial statements present fairly in all material respects the financial condition and the results of operations of the Borrower and its respective Subsidiaries for such Fiscal Year on a consolidated and consolidating basis certified to the Bank by a Financial Officer of the Borrower.

**(b)** *Quarterly Financial Statements of Borrower.* As soon as available and in any event within **forty five (45) days** after the end of each calendar quarter, the Borrower shall submit to Bank internally prepared financial statements including consolidated and consolidating balance sheet of the Borrower and its respective Subsidiaries as of the end of such calendar month, and the related consolidated and consolidating statements of income and cash flows and profit and loss statement of the Borrower and its respective Subsidiaries, for such calendar quarter and the then elapsed portion of such Fiscal Year, setting forth in each case in comparative form the figures for the corresponding calendar quarter and the corresponding portion of Borrower's previous Fiscal Year certified to Bank by a Financial Officer of the Borrower, all of which shall be prepared in accordance with GAAP.

**(c)** *Borrower Tax Return.* As soon as available, and in any event within **forty five (45) days** of the date of filing thereof, Borrower shall submit to Bank a complete copy of its federal income tax return for each calendar year or filing of federal tax return after grant of an extension together with all schedules or exhibits thereto.

**(d)** *Budgets and Projections*. As soon as available, and prior to the start of Borrowers' fiscal year, Borrower shall furnish to the Bank a copy of the annual budget, which shall include a detailed monthly breakdown of all items included therein.

**(e)** *Borrowing Base Report*. Fifteen (15) days after the Loan commences, on a monthly basis, Borrower shall furnish to the Bank a current borrowing base report in a form and substance satisfactory to the Bank (the "**Borrowing Base Report**") with all supporting documentation and schedules.

**(f)** *Guarantor Personal Financial Statement and Real Estate Owned Schedule.* As soon as available and in any event by **<u>June 30th</u>** of each year, each Guarantor that is a natural person shall furnish to Bank, (i) a then current personal financial statement in form and content acceptable to Bank and a certificate to Bank disclosing and certifying as to all material changes in their debt or net worth or otherwise certifying that there has been no material change in their personal debt or net worth since the previous

financial statement delivered to Bank, and (ii) a real estate owned schedule. The real estate owned schedule may be included as a part of the financial statements.

**(g)** *Guarantor Tax Return.* As soon as available, and in any event within **forty five (45) days** of the date of filing or filing of federal tax return after filing extension request thereof, each Guarantor that is a natural person shall submit to Bank a complete copy of his federal income tax return for each calendar year together with all schedules or exhibits thereto, as well as copies of all Schedules K-1 received by such Guarantor for the tax year covered by such return. Guarantor shall provide a copy of all extensions given for the filing of its federal tax return.

**(h)** Upon occurrence, Loan Parties shall provide to Bank prompt written notice of any change **(i)** in any of the Loan Parties' organizational name, **(ii)** in the jurisdiction of organization or formation of any Loan Party, **(iii)** in any Loan Party's identity or form of organization or **(iv)** in any Loan Party's Federal Taxpayer Identification Number. The Loan Parties agree not to effect or permit any change referred to in the preceding sentence unless all filings have been made under the UCC or otherwise that are required in order for the Bank to continue at all times following such change to have a valid, legal and perfected security interest in all the Collateral.

**(i)** Promptly following any written request therefor by Bank, Loan Parties shall provide to Bank such other information regarding the results of operations, business affairs and financial condition of the Borrower and its respective Subsidiaries, if any, as Bank may reasonably request.

All financial statements and financial information submitted to Bank in accordance with this Agreement shall include, among other things, detailed information regarding **(i)** any Entities of which the applicable Loan Party is the majority owner and **(ii)** any Entities of which the applicable Loan Party is not the majority owner, but for which such Loan Party is directly or contingently liable on debts or obligations of any kind incurred by those Entities. All financial statements or records submitted to Bank via electronic means, including, without limitation by facsimile, open internet communications or other telephonic or electronic methods, including, without limitation, documents in Tagged Image Format Files ("**TIFF**") or Portable Document Format ("**PDF**") shall be treated as originals, fully binding and with full legal force and effect and the parties waive any rights they may have to object to such treatment. The Bank may rely on all such records in good faith as complete and accurate records produced or maintained by or on behalf of the party submitting such records.

**5.03 Maintenance of Insurance, Financial Records and Existence***.*

**(a)** *Required Insurance.* Loan Parties that are Entities shall maintain or cause to be maintained insurance on Loan Parties' (and, if applicable, their respective direct or indirect Subsidiaries') properties and assets against fire, casualty, public liability, as well as general liability, and other liability insurance related to the business of Loan Parties (or, if applicable, their respective direct or indirect Subsidiaries) as is customary for such business, all in such amounts, with such deductibles and with such insurers as are customary for such business (the "**Required Insurance**"). All of the policies relating to the Required Insurance shall contain standard "mortgagee" (where applicable), "lender loss payable" and "additional insured" (where applicable) clauses issued in favor of Bank pursuant to which all losses thereunder shall be paid to Bank as Bank's interests may appear. Such policies shall expressly provide that the Required Insurance cannot be altered in any way adverse to Bank or canceled without **thirty (30) days'** (**or ten (10) days** with respect to nonpayment of premium) prior written notice to Bank and shall insure Bank notwithstanding the act or neglect of the insured. At or prior to the date hereof, Borrower shall furnish Bank with insurance certificates certified as true and correct and being in full force and effect as of the date hereof or such other evidence of the Required Insurance as Bank may require. In the event the Borrower fails to procure or causes to be procured any of the Required Insurance or to timely pay or cause to be paid the premium(s) on any of the Required Insurance, Bank may do so for Borrower, but Borrower shall continue to be liable for the same. Borrower further covenants that all insurance premiums owing under its current casualty policy or policies will be paid when due. Borrower also agrees to notify Bank, promptly, upon Borrower's receipt of a notice of termination, cancellation or non-renewal from its insurance company of any of the Required Insurance. Borrower hereby appoints Bank as its attorney-in-fact, exercisable at Bank's option upon the occurrence and during the continuance of an Event of Default, to endorse any check which may be payable to Borrower in order to collect the proceeds of the Required

Insurance. The foregoing general requirements shall not be in limitation or derogation of any other requirement of Borrower to obtain and/or maintain insurance as specified in any other Loan Document, including without limitation, any Security Agreement.

**(b)** *Financial Records.* Loan Parties shall keep current and accurate books of records and accounts in which full and correct entries in all material respects will be made of all of their respective business transactions, and will reflect in their Financial Statements adequate accruals and appropriations to reserves, all in accordance with GAAP or other standards approved by Bank in writing. Borrower shall not change its Fiscal Year end date without prior written notice to Bank.

**(c)** *Existence; Rights; Conduct of Business.* The Borrower shall do (or cause to be done) all things reasonably necessary to preserve and keep in full force and effect its legal existence and good standing and the Borrower's rights, licenses, permits, privileges, franchises, patents, copyrights, trademarks and trade names material to the conduct of its business, and will continue to engage in the same business as presently conducted or such other businesses that are reasonably related thereto.

**5.04 Notices of Material Events**. Borrower shall furnish to Bank prompt written notice of the following:

**(a)** The occurrence of any Default Condition or Event of Default that would result in a Material Adverse Effect.

**(b)** The filing or commencement of any action, suit, proceeding or investigation by or before any arbitrator or Governmental Authority, against or, to the knowledge of any Loan Party, affecting any Loan Party which, if adversely determined, could reasonably be expected to result in a Material Adverse Effect.

**(c)** Any change in the nature or extent of Hazardous Substances maintained on or with respect to any property of a Loan Party or the occurrence of any event or any other development by which any Loan Party **(i)** fails to comply with any Environmental Law or to obtain, maintain or comply with any permit, license or other approval required under any Environmental Law, **(ii)** becomes subject to any Environmental Liability, **(iii)** receives notice of any claim with respect to any Environmental Liability, or **(iv)** becomes aware of any basis for any Environmental Liability and in each of the preceding clauses, which individually or in the aggregate, could reasonably be expected to result in a Material Adverse Effect.

**(d)** The occurrence of any ERISA Event that alone, or together with any other ERISA Events that have occurred, could reasonably be expected to result in a Material Adverse Effect.

**(e)** The occurrence of any default or event of default that results in a Material Adverse Effect, or the receipt by any Loan Party of any written notice of an alleged default or event of default that results in a Material Adverse Effect, in respect of any Material Indebtedness of any Loan Party.

**(f)** The receipt of a notice of termination for default for any contract relating to any Unbilled Federal Government Receivable.

**(g)** The failure of the Borrower to maintain an active central Contractor Registration in the System for Award Management (SAM) with the United States Government, along with correct EFT information.

**(h)** Any other development that results in, or could reasonably be expected to result in, a Material Adverse Effect.

Each notice delivered under this Section 5.04 shall be accompanied by a written statement of a Responsible Officer of Borrower setting forth the details of the event or development requiring such notice and any action taken or proposed to be taken with respect thereto.

**5.05 Litigation**. The Loan Parties shall give prompt notice to Bank of any litigation claiming in excess of $1,000,000.00 from any Loan Party or which, if adversely determined, could reasonably be expected to cause a Material Adverse Effect.

**5.06 Taxes**. Each Loan Party shall pay all taxes when due (other than taxes levied upon Bank based upon or measured by Bank's income or revenues), if any, in connection with the Loan, the Loan Documents and/or the execution, delivery or recording of any mortgage, deed of trust, security deed, security agreement, financing statements or other Loan Documents. The Obligations of the Loan Parties under this section shall survive the payment of Borrower's Obligations under this Agreement and the termination of this Agreement.

**5.07 Compliance with Laws, etc**. The Loan Parties shall take all reasonable steps to: **(i)** comply with all laws, rules, regulations and requirements of any Governmental Authority applicable to its business and properties, including without limitation, all Environmental Laws, ERISA, and the Occupational Safety and Health Act of 1970, as amended ("**OSHA**"), except where the failure to do so, either individually or in the aggregate, could not reasonably be expected to result in a Material Adverse Effect; **(ii)** at all times maintain their respective properties in compliance with all applicable Environmental Laws and free of any Hazardous Substances except in compliance with all applicable Environmental Laws; **(iii)** pay, perform or otherwise satisfy any fine, charge, penalty, fee, damage, order, judgment, decree or imposition related thereto which, if unpaid, would constitute a lien or encumbrance on any Collateral, other than a Permitted Encumbrance, unless **(a)** the validity thereof shall be contested diligently and in good faith by appropriate proceedings and with counsel reasonably satisfactory to Bank and **(b)** so long as Borrower shall at all times have deposited with Bank, or posted a bond satisfactory to Bank in, a sum equal to the amount necessary (in the reasonable discretion of Bank) to comply with such order or directive (including, but not limited to, the amount of any fine, penalty, interest or cost that may become due thereon by reason of or during such contest); provided, however, that Bank shall be subrogated to the rights of the payee of such amount upon payment in full with respect to such fine, charge, or any portion thereof, and **(iv)** to take all appropriate response actions, including any removal or remedial actions, in the event of a release, emission, discharge, or disposal of any Hazardous Substances in, on, under or their respective properties necessary in order for such property to be or remain in compliance with all Environmental Laws.

**5.08 Payment of Obligations**. The Loan Parties shall pay and discharge at or before maturity, all of their respective obligations and liabilities (including without limitation all tax liabilities and claims that could result in a statutory Lien) before the same shall become delinquent or in default, except where **(a)** the validity or amount thereof is being contested in good faith by appropriate proceedings, **(b)** the affected Loan Party has set aside on its books adequate reserves with respect thereto in accordance with GAAP and **(c)** the failure to make payment pending such contest could not reasonably be expected to result in a Material Adverse Effect.

**5.09 Visitation, Inspection, etc**. The Loan Parties shall permit any of Bank's officers or other representatives, where practical and except in the case of any military installation, to visit and inspect any location(s) of such Loan Party (and, if applicable, any direct or indirect Subsidiary) or where any Collateral is kept during regular business hours to examine and audit all of such Person's books of account, records, reports and other papers, to make copies and extracts therefrom and to discuss its affairs, finances and accounts with its officers, employees and independent certified public accountants and attorneys. The Bank shall perform a site visit and inspection within thirty (30) days of the date of this Agreement. As long as there is no Event of Default that would result in a Material Adverse Effect, the Bank will provide written notice prior to making such visitations or inspections. If there is an Event of Default, visitations and inspections may at the Bank's sole discretion be made without notice. Borrower shall pay to Bank all reasonable fees, costs and expenses actually incurred by Bank in connection with such inspections.

**5.10 Maintenance of Properties**. Loan Parties that is an Entity shall keep and maintain (and, if applicable cause each direct or indirect Subsidiary to keep and maintain) all property material to the conduct of its business in good working order and condition, ordinary wear and tear excepted.

**5.11 Use of Proceeds**. Borrower shall use the proceeds of the Loan for the business purposes stated herein. No part of the proceeds of the Loan will be used, whether directly or indirectly, for any

purpose that would violate any rule or regulation of the Board of Governors of the Federal Reserve System, including without limitation Regulations T, U or X.

**5.12 Operating Accounts*.*** Borrower shall establish and thereafter maintain with Bank until such time as the Obligations have been indefeasibly paid in full in good collected funds and the commitment to fund the Line of Credit has been terminated an operating depository account which shall at all times have a minimum average daily cash balance of $500,000.

**5.13 Leased Premises**. In the event that any Collateral or books and records related thereto is or becomes located on any of the properties leased by the Loan Parties (and, if applicable, any direct or indirect Subsidiary of any of the Loan Parties), Loan Parties that is an Entity shall promptly upon written request by Bank obtain from the owner and landlord of such leased properties a Landlord's Waiver and Consent Agreement in form and substance reasonably acceptable to Bank.

**5.14 Further Assurances**. The Loan Parties that is an Entity shall execute and/or deliver any and all further documents, financing statements, agreements and instruments, and take all further action (including filing Uniform Commercial Code and other financing statements, mortgages and deeds of trust and preparing all documentation relating to filings under the Federal Assignment of Claims Act) that may be required under applicable law, or that Bank may reasonably request, in order to effectuate the transactions contemplated by the Loan Documents and in order to grant, preserve, protect and perfect the validity and first priority of the security interests created or intended to be created by the Security Agreements. In addition, from time to time, Borrower shall, at its sole cost and expense, promptly secure the Obligations by pledging or creating, or causing to be pledged or created, perfected security interests with respect to such of its assets and properties as the Bank shall designate (it being understood that it is the intent of the parties that the Obligations shall be secured by substantially all the assets of the Borrower (including properties acquired subsequent to date hereof)). Such security interests and Liens will be created under the Security Agreements and other security agreements, mortgages, deeds of trust and other instruments and documents in form and substance reasonably satisfactory to Bank, and Borrower shall deliver or cause to be delivered to Bank all such instruments and documents (including legal opinions, title insurance policies, ownership and encumbrances reports and lien searches) as Bank shall reasonably request to evidence compliance with this Section. In furtherance of the foregoing, Borrower shall give prompt notice to Bank of the acquisition by Borrower (and, if applicable, by any direct or indirect Subsidiary) of any real property (or any interest in real property) or of any acquisition by Borrower of personal property that is maintained in a title form, such has vehicles or equipment that is in excess of $50,000.

**5.15 Additional Costs**. If, due to any change in any law or in the official interpretation of any law (including, without limitation, any rules, regulations, orders or decrees of any governmental authority) on or after the date of this Agreement, or the compliance with any guideline or request not applicable on the date of this Agreement from any central bank or other governmental authority (whether or not having the force of law). (i) there shall be any increase in the cost to Bank of agreeing to make or making, funding, continuing, converting into or maintaining any Advances, then upon written demand by Bank, Borrower shall promptly pay to Bank amounts so demanded; or (ii) Bank determines that the amount of capital or liquidity required or expected to be maintained by Bank or Bank's holding company has been or would be affected, and that the amount of such capital or liquidity is increased by or based upon the existence of Bank's Advances or commitment to extend credit hereunder, thereby reducing the rate of return on Bank's capital or on the capital of such holding company, then, upon written demand by Bank, Borrower shall promptly pay to Bank or such holding company amounts sufficient to compensate Bank or such holding company, as the case may be, the amount so demanded. A certificate as to such amounts submitted to Borrower by Bank shall be conclusive and binding on Borrower for all purposes, absent manifest error.

**5.16 Cross-Collateralization & Cross-Default**. All future Obligations of the Borrower in favor of the Bank shall be cross-collateralized and cross-defaulted with the Loan and with each other.

## ARTICLE SIX
## NEGATIVE COVENANTS

The Loan Parties covenant and agree until such time as the Obligations have been indefeasibly paid in full in cash and any obligation of Bank to fund any portion of the Loan has terminated or expired:

**6.01 Fundamental Changes**.

**(a)** Borrower shall not (and, if applicable, shall not permit any of its direct or indirect Subsidiaries to), without prior written Bank approval which approval shall not be unreasonably withheld, merge into or consolidate with any other Person, or permit any other Person to merge into or consolidate with it, or sell, lease, transfer or otherwise dispose of (in a single transaction or a series of transactions) all or substantially all of its assets (in each case, whether now owned or hereafter acquired) or all or substantially all of the equity interests of any of its Subsidiaries (in each case, whether now owned or hereafter acquired), liquidate, dissolve or create or acquire any additional Subsidiary.

**(b)** Borrower shall not (and, if applicable, shall not permit any of its direct or indirect Subsidiaries to) without prior written Bank prior approval which approval shall not be unreasonably withheld, engage in any business other than businesses that are similar or complementary to the type conducted by Borrower (or, as applicable, such Subsidiary) on the date hereof and businesses complementary or reasonably related thereto.

**(c)** Borrower will do or cause to be done all things necessary to preserve and to keep in full force and effect their corporate existence and rights and its franchises, trade names, patents, trademarks and permits which are necessary for the continuance of its business; maintain its company management satisfactory to Bank; and continue to engage principally in the business currently operated by Borrower.

**(d)** Borrower shall not permit or suffer to exist any of the following, without prior written Bank approval which approval shall not be unreasonably withheld: **(i)** the transfer, exchange or acquisition of ownership, directly or indirectly, beneficially or of record, by any person or group of any of the outstanding shares of voting stock or other equity interests of Borrower other than by those Persons who have ownership interests in the Borrower as of the date of this Agreement; or **(ii)** occupation of a majority of seats on the board of directors, board of managers or other managing group of Borrower by Persons other than Persons nominated or appointed by the current board of directors, board of managers or other managing group of Borrower.

**(e)** Borrower shall not, without prior written Bank approval which approval shall not be unreasonably withheld permit or suffer to exist any event where Guarantor cease to be in control of the management of the Borrower.

**6.02 Amendment to Material Documents**. The Borrower shall not (and, if applicable, shall not permit any of its direct or indirect Subsidiaries to) amend, modify or waive any of its rights in a manner materially adverse to the Bank, or which could otherwise be reasonably expected to have a Material Adverse Effect under (i) its Organizational Documents or (ii) any material contract.

**6.03 Subordinated Debt Payments**. The Loan Parties shall not make any payment on Subordinated Debt in contravention of the terms and conditions of any Subordination Agreements.

## ARTICLE SEVEN
## FINANCIAL COVENANTS

The Loan Parties covenant and agree until such time as the Obligations have been indefeasibly paid in full in cash and any obligation of Bank to fund any portion of the Loan has terminated or expired:

**7.01 Minimum Debt Service Coverage Ratio**. Borrower and its Subsidiaries shall maintain a Debt Service Coverage Ratio determined on a consolidated basis of not less than **<u>1.25 to 1.00</u>**, tested

annually, based upon the financial statements required to be delivered pursuant to **Section 5.02 hereof**, beginning with the receipt of the audited financial statements for the year 2021. "**Debt Service Coverage Ratio**" means the ratio of (a) EBITDA for the period of measure to (b) the sum of (i) Borrower's and all Subsidiaries' interest expense, and (ii) all principal payments with respect to Indebtedness that were paid or were due and payable by Borrower during the period. "**EBITDA**" means, on a consolidated basis, the amount of Borrower's earnings before interest, taxes, depreciation and amortization expense for the measurement period.

**7.02 Funded Indebtedness to EBITDA Ratio**. Borrower and its Subsidiaries shall maintain a Funded Indebtedness to EBITDA Ratio determined on a consolidated basis of not more than **4.00 to 1.00**, tested annually, based upon the financial statements required to be delivered pursuant to **Section 5.02** hereof, beginning with the receipt of the audited financial statements for the year 2021. "**Funded Indebtedness to EBITDA**" means the ratio of **(a)** Indebtedness **(i)** in respect of money borrowed or **(ii)** evidenced by a note, debenture (senior and subordinated) or other like written obligation to pay money, or **(iii)** in respect of rent or hire of property under leases or lease arrangements which under generally accepted accounting principles are required to be capitalized, or **(iv)** in respect of obligations under conditional sales or other title retention agreements to **(b)** EBITDA for the measurement period. "**EBITDA**" means, on a consolidated basis, the amount of Borrower's earnings before interest, taxes, depreciation and amortization expense for the measurement period.

## ARTICLE EIGHT
## SECURITY

**8.01 Security Agreement**. The Loan and all other Obligations shall be secured by the Security Agreement which encumbers, and grants to Bank a first priority security interest in and to, the Collateral described therein, which Collateral shall be all assets of the Borrower.

**8.02 Aircraft Chattel Mortgage and Security Agreement.** The Loan shall be further secured by an Aircraft Chattel Mortgage and Security Agreement which encumbers, and grants to Bank a first priority security interest in and to each Eligible Aircraft for which an Advance is made by the Bank.

**8.03** The Loan shall be secured by all other agreements that the Bank may require to perfect its security interests in the Collateral.

## ARTICLE NINE
## DEFAULTS AND REMEDIES UPON DEFAULTS

**9.01 Events of Default**. Any one or more of the following shall constitute an "**Event of Default**" hereunder:

**(a)** the failure by a Loan Party to pay after ten (10) business days when due **(i)** any payment of principal and/or interest on or with respect to **(A)** the Loan under the Note, **(B)** any other Obligation, or **(C)** any other Loan Document, whether a regularly scheduled payment, at maturity or by acceleration, or **(ii)** any taxes or assessments required to be paid hereunder, or **(iii)** any insurance premiums required to keep the insurance coverage required hereunder or pursuant to any Security Agreement or any other Loan Document in full force and effect at any time, or **(iv)** any other monetary sum required to be paid pursuant to the terms of any other Loan Document; or

**(b)** any representation or warranty made or deemed made by or on behalf of any Loan Party in or in connection with this Agreement or any other Loan Document (including the Schedules attached thereto) and any amendments or modifications hereof or waivers hereunder, or in any certificate, report, financial statement or other document submitted to Bank by any Loan Party, or any authorized representative thereof pursuant to or in connection with this Agreement or any other Loan Document shall prove to be materially incorrect when made and results in a Material Adverse Effect; or

**(c)** a breach, which results in a Material Adverse Effect, of any **(i)** affirmative covenant as provided in **Article Five**, **(ii)** negative covenant as provided in **Article Six** hereof or **(iii)** any financial covenant as provided in **Article Seven** hereof; or

**(d)** a default or breach which is not otherwise the subject of any other provision of this **Article Nine** shall occur in the performance of any of the covenants or agreements of any Loan Party contained in this Agreement, the Note, any Guaranty, the Security Agreements or any other Loan Document and such default is not capable of being cured, or if capable of being cured shall continue uncured to the reasonable satisfaction of Bank for a period of **thirty (30) days** after written notice thereof from Bank to Borrower, or such other lesser or greater period of time, if any, with or without notice as specifically set forth in the applicable document or instrument.

**(e)** any Loan Party (whether as primary obligor or as guarantor or other surety) shall default on any Indebtedness of such Person other than the Obligations and such default results in a Material Adverse Effect; or

**(f)** any Loan Party shall **(i)** commence a voluntary case or other proceeding or file any petition seeking liquidation, reorganization or other relief under any federal, state or foreign bankruptcy, insolvency or other similar law now or hereafter in effect or seeking the appointment of a custodian, trustee, receiver, liquidator or other similar official of it or any substantial part of its property, **(ii)** consent to the institution of, or fail to contest in a timely and appropriate manner, any proceeding or petition described in clause **(i)**, **(iii)** apply for or consent to the appointment of a custodian, trustee, receiver, liquidator or other similar official for any Loan Party or for a substantial part of their assets, **(iv)** file an answer admitting the material allegations of a petition filed against it in any such proceeding, **(v)** make a general assignment for the benefit of creditors, or **(vi)** take any action for the purpose of effecting any of the foregoing; or

**(g)** an involuntary proceeding shall be commenced or an involuntary petition shall be filed seeking **(i)** liquidation, reorganization or other similar relief in respect of any Loan Party or their debts, or any substantial part of its assets, under any federal, state or foreign bankruptcy, insolvency or other similar law now or hereafter in effect or **(ii)** the appointment of a custodian, trustee, receiver, liquidator or other similar official for Borrower, any other Loan Party or for a substantial part of their assets, and in any such case, such proceeding or petition shall remain undismissed for a period of **sixty (60) days** or an order or decree approving or ordering any of the foregoing shall be entered; or

**(h)** any Loan Party shall become unable to pay, shall admit in writing its inability to pay, or shall fail to pay, its debts as they become due and such failure results in a Material Adverse Effect; or

**(i)** the death or legal incapacity of any Loan Party who is a natural person, *unless, however,* in the case of a guarantor only, within **one hundred eighty (180) days** from the date of death or incapacity of such Loan Party (or such earlier date by which Bank would be barred from asserting a claim under the Note[ or such Loan Party's guaranty in any probate proceeding as to such deceased Loan Party or such Loan Party's estate), a substitute guarantor or guarantors having a reputation, financial standing, liquid assets, net worth and income satisfactory to, and approved in writing by, Bank, in its reasonable discretion, shall have (1) executed and delivered to Bank a written guaranty agreement or agreements in form and substance as then required by Bank and (2) paid all costs, including without limitation Bank's attorneys' fees, incurred by Bank in the preparation of such substitute guaranty agreement or agreements; or

**(j)** an ERISA Event shall have occurred that, in the opinion of Bank after due inquiry, when taken together with other ERISA Events that have occurred, could reasonably be expected to result in liability to any Loan Party in an aggregate amount exceeding $500,000.00; or

**(k)** any judgment, garnishment, seizure, tax lien, levy or order for the payment of money, not fully covered by insurance or a bond, in excess of $500,000.00 in the aggregate shall be rendered against any Loan Party or any assets of a Loan Party; or

**(l)** any non-monetary judgment or order shall be rendered against any Loan Party that could reasonably be expected to have a Material Adverse Effect; or

**(m)** any security interest or Lien purported to be created by any Security Agreement shall cease to be, or shall be asserted by any Loan Party not to be, a valid, perfected, first priority (except as otherwise expressly provided in this Agreement or such Security Agreement) security interest in the securities, assets or properties covered thereby and such event results in a Material Adverse Effect; or

**(n)** Borrower (or, if applicable, any of its Subsidiaries) shall be prohibited or otherwise restrained from conducting the business theretofore conducted by it in any manner that has or could reasonably be expected to have or result in a Material Adverse Effect by virtue of any determination, ruling, decision, decree, ordinance, or order of any court of competent jurisdiction, Governmental Authority, or municipality; or

**(o)** there shall be any evidence received by Bank that reasonably leads it to believe that the Loan Parties may have intentionally directly or indirectly been engaged in any type of criminal activity which would be reasonably likely to result in the forfeiture of a material portion of their assets or properties to any Governmental Authority or which would otherwise result in a Material Adverse Effect; or

**9.02** **Rights Upon Event of Default**. Upon the occurrence of an Event of Default and in every such event (other than an event with respect to the Loan Parties described in subparagraph **(g)** or **(h)** of **Section 9.01**) and at any time thereafter during the continuance of such event, Bank may take, without limitation, any or all of the following actions, at the same or different times: **(i)** declare the principal of and any accrued interest on the Loan, and all other Obligations, to be, whereupon the same shall become, due and payable immediately in full, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties, **(ii)** to the extent that Borrower has any right to receive Advances under the Loan, terminate the Borrower's right to obtain or receive Advances, **(iii)** exercise all rights and remedies contained in the Security Agreements, **(iv)** exercise all rights and remedies contained in any other Loan Document, and **(v)** exercise any other remedies available at law or in equity; and that, if an Event of Default specified in either subparagraph **(g)** or **(h)** of **Section 9.01** shall occur, the principal of the Loan then outstanding, together with accrued interest thereon, and all fees, and all other Obligations shall automatically immediately become due and payable, without presentment, demand, protest or other notice of any kind, all of which are hereby waived by the Loan Parties. Notwithstanding the foregoing, if any note of Borrower to Bank constituting any of the Obligations, including without limitation, any of the Note[s], shall be a demand instrument, however, the recitation of the right of Bank to declare any and all Obligations to be immediately due and payable, whether such recitation is contained in such note or in this Agreement, as well as the recitation of the above events permitting Bank to declare all Obligations due and payable, shall not constitute an election by Bank to waive its right to demand payment under a demand feature at any time and in any event, as Bank in its discretion may deem appropriate.

**9.03** **Application of Proceeds from Collateral.** All proceeds from each sale of, or other realization upon, all or any part of the Collateral by the Bank after an Event of Default arises shall be applied as follows:

**(a)** first, to the reimbursable expenses of the Bank incurred in connection with such sale or other realization upon the Collateral, until the same shall have been paid in full;

**(b)** second, to the fees and other reimbursable expenses of the Bank then due and payable pursuant to any of the Loan Documents, including without limitation attorneys' fees and expenses and other costs of collection or enforcement, until the same shall have been paid in full;

**(c)** third, to interest then due and payable under the terms of the Note[s], until the same shall have been paid in full;

**(d)** fourth, to the outstanding principal amount of the Loan, in such order as Bank shall determine in its sole and absolute discretion;

**(e)** fifth, to all other Obligations until the same shall have been paid in full to Bank; and

**(f)** sixth, to the extent any proceeds remain, to the Borrower or other parties lawfully entitled.

## ARTICLE TEN
## MISCELLANEOUS

**10.01 Notices.**

**(a)** Except in the case of notices and other communications expressly permitted to be given by telephone, all notices and other communications to any party herein to be effective shall be in writing and shall be either (i) sent by United States mail or courier service to the address for the Party listed in the preamble of this Agreement; (ii) hand delivered to the address for the Party listed in the preamble of this Agreement; or (iii) sent by email transmission pursuant to **Section 10.01(c)**.

**(b)** Except in the case of notices and other communications sent by email transmission pursuant to **Section 10.01(c)**, notices and communications shall be deemed to have been received when (i) delivered in person or by courier service and signed for against receipt thereof or (ii) three (3) Business Days after depositing it in the United States mail with postage prepaid and properly addressed; *provided*, that no notice to Bank shall be effective until received by Bank.

**(c)** Notices and other communications sent by email transmission shall be sent to the Email Addresses for Notice Purposes shown below and shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient, such as by the "return receipt requested" function, as available, return email, or other written acknowledgement (an "**Email Receipt Acknowledgment**"); provided, that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient. If the sender does not receive an Email Receipt Acknowledgment, then delivery of notice via email shall not be effective and the sender must utilize a form of notice stated in **Section 10.01(a)**.

Email Addresses for Notice Purposes:

As to the Borrower: Bdynan@aeryaviation.com

As to Guarantor: scott@aeryaviation.com

As to the Bank: mskat@cogentbank.net and ahenderson@cogentbank.net

**(d)** If any Party delivers any notice or other communication pursuant to **Sections 10.01(a) or 10.01(c)**, then the Party shall also deliver a duplicate copy of the notice or communication as follows:

As to the Borrower and Guarantor:

Copy to: Clement O. "Clem" Abrams
Davis Law PLC
555 Belaire Ave
Suite 340
Chesapeake, VA 23320
clem@davislawplc.com

As to the Bank:

Copy to: Sarah Pape, Attorney
Zimmerman, Kiser, & Sutcliffe, P.A.
315 East Robinson St.
Suite 600
Orlando, FL 32801
spape@zkslawfirm.com

**(e)** Any party hereto may change its address or email address for notices and other

communications hereunder by notice to the other parties hereto.

**(f)** Any agreement of the Bank to receive certain notices by telephone or email is solely for the convenience and at the request of the Loan Parties. Bank shall be entitled to rely on the authority of any Person purporting to be a Person authorized by the Loan Parties to give such notice and Bank shall not have any liability to the Loan Parties or other Person on account of any action taken or not taken by Bank in reliance upon such telephonic or email notice. The obligation of the Loan Parties to repay the Loan and all other Obligations hereunder shall not be affected in any way or to any extent by any failure of Bank to receive written confirmation of any telephonic or email notice or the receipt by Bank of a confirmation which is at variance with the terms understood by Bank to be contained in any such telephonic or email notice.

**10.02 Waiver; Amendments**.

No failure or delay by Bank in exercising any right or power hereunder or any other Loan Document, and no course of dealing between the Loan Parties and Bank, shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power or any abandonment or discontinuance of steps to enforce such right or power, preclude any other or further exercise thereof or the exercise of any other right or power hereunder or thereunder. The rights and remedies of Bank hereunder and under the other Loan Documents are cumulative and are not exclusive of any rights or remedies provided by law. No amendment or waiver of any provision of this Agreement or the other Loan Documents, nor consent to any departure by the Loan Parties therefrom, shall in any event be effective unless the same shall be in writing and signed by the Loan Parties and Bank and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given. Without limiting the generality of the foregoing, the making of an Advance under the Loan shall not be construed as a waiver of any Default Condition or Event of Default, regardless of whether the Bank may have had notice or knowledge of such Default Condition or Event of Default at the time.

**10.03 Expenses; Indemnification**.

**(a)** The Loan Parties shall pay **(i)** all reasonable, out-of-pocket costs and expenses of Bank, including the reasonable fees, charges and disbursements of counsel for Bank, in connection with the preparation and administration of the Loan Documents and any amendments, modifications or waivers thereof (whether or not the transactions contemplated in this Agreement or any other Loan Document shall be consummated), and **(ii)** all out-of-pocket costs and expenses (including, without limitation, the reasonable fees, charges and disbursements of outside counsel and the allocated cost of inside counsel) incurred by Bank in connection with the enforcement or protection of its rights in connection with this Agreement, including its rights under this Section, or in connection with the Loan or other Obligations, including all such out-of-pocket expenses incurred during any workout, restructuring or negotiations in respect of the Loan or other Obligations.

**(b)** To the extent permitted by applicable law, the Loan Parties shall indemnify Bank and any of its affiliates, as well as their respective shareholders, directors, officers, employees, agents or (each such Person being called an "**Indemnitee**") against, and hold each Indemnitee harmless from all actual losses, claims, damages, liabilities and related expenses (including the fees, charges and disbursements of any counsel for any Indemnitee), and reasonable fees and time charges and disbursements for attorneys who may be employees of any Indemnitee) incurred by any Indemnitee or asserted against any Indemnitee by any third party or by the Loan Parties arising out of, in connection with, or as a result of **(i)** the execution or delivery of this Agreement, any other Loan Document or any agreement or instrument contemplated hereby or thereby, the performance by the parties hereto of their respective obligations hereunder or thereunder or the consummation of the transactions contemplated hereby or thereby, **(ii)** the Loan or the use or proposed use of the proceeds therefrom, **(iii)** any actual or alleged presence or release of Hazardous Substances on or from, or migrating to or from, any property owned or operated by any Loan Party, or any actual or alleged Environmental Liability related in any way to any Loan Party or any Collateral, **(iv)** any breach of any representation, warranty or covenant contained herein, or **(v)** any actual or prospective claim, litigation, investigation or proceeding relating to any of the foregoing, whether based on contract, tort or any other theory, whether brought by a third party or by any Loan Party, and regardless of whether any Indemnitee is a party thereto, *provided* that such indemnity shall not, as to any Indemnitee, be available to

the extent that such losses, claims, damages, liabilities or related expenses are determined by a court of competent jurisdiction by final and nonappealable judgment to have resulted from the gross negligence or willful misconduct of such Indemnitee.

**(c)** The Loan Parties shall pay, and hold Bank harmless from and against, any and all present and future stamp, documentary, indebtedness, and other similar taxes with respect to this Agreement and any other Loan Documents, any collateral described therein, or any payments due thereunder, and shall defend, indemnify and save the Bank harmless from and against any and all liabilities with respect to, or resulting from any delay or omission to pay such taxes.

**(d)** To the extent permitted by applicable law, the Loan Parties shall not assert, and hereby waives, any claim against any Indemnitee, on any theory of liability, for special, indirect, consequential or punitive damages (as opposed to actual or direct damages) arising out of, in connection with or as a result of, this Agreement or any agreement or instrument contemplated hereby, the transactions contemplated therein, any loan or the use of proceeds thereof.

**(e)** All amounts due under this Section shall be payable promptly after written demand therefor.

**10.04 Multiple Obligors**.

**(a)** Each and every reference to and any and all representations, warranties, covenants and undertakings of, the Loan Parties herein, including but not limited to the Events of Default shall be deemed to apply to each of the Persons comprising the Loan Parties, jointly and separately.

**(b)** The obligations and liabilities of each of the Persons comprising Loan Parties under, and all representations, warranties and covenants in, this Agreement and the other Loan Documents shall be direct and primary and joint and several in all respects whatsoever.

**(c)** Bank may deal with Borrower as if it were the sole obligor, without impairing in any way the liability of any other Loan Party. Without limiting the generality of that right, Bank may in particular release, impair, or fail to perfect an interest in any collateral of any Person comprising Loan Parties, waive defaults by any of them, or extend or compromise the liability of any of them without the consent of the other undersigned obligors.

**(d)** each of the Persons comprising Loan Parties represents that it has carefully considered the alternatives to and the legal consequences of incurring joint and several liability under the Loan and has determined that by such arrangement it is able to obtain financing on terms more favorable than otherwise, and that under a joint and several facility each will realize substantial interest savings over alternative financing arrangements.

**(e)** Bank may bring a separate action or actions under this Agreement and/or the Note against each Loan Party, whether such action is brought against any other Loan Party. Each of the Loan Parties agrees that any compromise or release which may be given to any other Loan Party shall not release any other Loan Party not so released from its obligations hereunder or granted such compromise. The Loan Parties hereby waive any right to assert against Bank any defense (legal or equitable), set off, counterclaim, or claims which any of them individually may now or any time hereafter have against any other Loan Party.

**(f)** Any and all present and future debt and other obligations of any of Loan Party to any other Loan Party is hereby subordinated to the full payment and performance of all Obligations due to Bank, whether under this Agreement, the Note or otherwise.

**(g)** Each of the Loan Parties is presently informed as to the financial condition of every other Loan Party and all other circumstances of each other relating to the Loan, this Agreement, and the other Loan Documents which a diligent inquiry would reveal and which bear upon the risk of nonpayment of the amounts due or to become due hereunder. Each Loan Party hereby covenants that it will continue to keep itself informed as to the financial condition of the other Loan Parties, and all circumstances which bear upon

the risk of nonpayment. Absent written request from a Loan Party to Bank for information, each Loan Party hereby waives any and all rights it may have to require Bank to disclose to any such Loan Party any information which Bank may now or hereafter acquire concerning the condition or circumstances of the other Loan Parties.

**10.05 Successors and Assigns**.

**(a)** The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that the Loan Parties may not assign or otherwise transfer any of their rights or obligations hereunder without the prior written consent of the Bank. Nothing in this Agreement, expressed or implied, shall be construed to confer upon any Person (other than the parties hereto, their respective successors and assigns permitted hereby, and Participants as provided in subparagraph (b) below) any legal or equitable right, remedy or claim under or by reason of this Agreement.

**(b)** Bank may at any time, without the prior consent of, or notice to, the Loan Parties, sell and assign or grant participations to any Person (other than a natural person, the Loan Parties or any of their Affiliates or Subsidiaries) (each, a "**Participant**") all or a portion of Bank's rights and/or obligations under this Agreement.

**10.06 Governing Law; Jurisdiction; Venue**.

This Agreement is made and delivered in the State of Florida and shall be governed by and construed in accordance with the laws thereof without reference to the conflicts of law principles that would cause the application of the laws of another jurisdiction. Borrower and each other Loan Party hereby irrevocably submits and consents to the exclusive personal jurisdiction and venue of any state or federal court in Florida located in the same judicial district as the office of Bank specified in the first paragraph of this Agreement and agrees that all actions or proceedings arising directly, indirectly or otherwise in connection with, out of, related to or from this Agreement shall be litigated only in one of the foregoing described courts. Borrower and each other Loan Party, for themselves, and their respective heirs, successors and its assigns, and for any person claiming under or through any of them, hereby knowingly and voluntarily waives any and all rights to contest the jurisdiction or venue as set forth above and hereby knowingly and voluntarily waives any and all rights to remove this action to, or to transfer, dismiss, or change venue to, any other court. Borrower and each other Loan Party further acknowledge and agree that neither Bank nor any person acting on behalf of Bank has represented to Borrower or such Obligor that the provisions of this paragraph have been waived or will not be fully enforced by Bank. Notwithstanding the foregoing, Bank may initiate necessary judicial actions in any jurisdiction to recover Collateral securing the Loan or any other Obligation.

**10.07 WAIVER OF JURY TRIAL. EACH LOAN PARTY KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS SUCH LOAN PARTY MAY HAVE TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED ON, ARISING OUT OF, OR IN ANY WAY RELATED TO: THIS AGREEMENT; THE OBLIGATIONS; ANY NOTES, LOAN AGREEMENTS, OR ANY OTHER LOAN DOCUMENTS OR AGREEMENT EXECUTED OR CONTEMPLATED TO BE EXECUTED IN CONNECTION WITH ANY OF THE OBLIGATIONS OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. THIS JURY WAIVER ALSO APPLIES TO ANY CLAIM OR, COUNTERCLAIM, CAUSE OF ACTION OR DEMAND ARISING FROM OR RELATED TO (I) ANY COURSE OF CONDUCT, COURSE OF DEALING, OR RELATIONSHIP OF ANY LOAN PARTY, ANY OBLIGOR, OR ANY OTHER PERSON WITH BANK OR ANY EMPLOYEE, OFFICER, DIRECTOR OR ASSIGNEE OF BANK IN CONNECTION WITH THE OBLIGATIONS WITH BANK; OR (II) ANY STATEMENT (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PERSON BY OR ON BEHALF OF BANK TO ANY LOAN PARTY, ANY OBLIGOR, OR ANY OTHER PERSON IN CONNECTION WITH THE OBLIGATIONS OR BANK REGARDLESS OF WHETHER SUCH CAUSE OF ACTION ARISES BY CONTRACT, TORT OR OTHERWISE. EACH LOAN PARTY ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO THE BANK IN EXTENDING CREDIT TO BORROWER, THAT THE BANK WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS JURY TRIAL WAIVER, AND THAT EACH LOAN PARTY HAS BEEN REPRESENTED**

**BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS JURY TRIAL WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER. EACH LOAN PARTY FURTHER CERTIFIES THAT NO PERSON HAS REPRESENTED TO IT, EXPRESSLY OR OTHERWISE, THAT BANK OR ANY OTHER PERSON WOULD NOT, IN THE EVENT OF A LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER.**

**10.08** **Right of Setoff**. In addition to any rights now or hereafter granted under applicable law and not by way of limitation of any such rights, Bank shall have the right, at any time or from time to time upon the occurrence and during the continuance of an Event of Default, without prior notice to the Loan Parties, any such notice being expressly waived by the Loan Parties to the extent permitted by applicable law, to set off and apply against all deposits (general or special, time or demand, provisional or final) of any of the Loan Parties at any time held or other obligations at any time owing by Bank to or for the credit or the account of any of the Loan Parties against any and all Obligations held by Bank, irrespective of whether Bank shall have made demand hereunder and although such Obligations may be unmatured. Bank agree promptly to notify the Loan Parties after any such set-off and any application made by Bank; provided, that the failure to give such notice shall not affect the validity of such set-off and application.

**10.09** **Counterparts**. This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument. Any party to this Agreement may execute a counterpart copy of this Agreement and deliver the same by telecopier, or by an electronically or digitally scanned copy signed counterpart stored in an electronic or digital format (e.g., "**.pdf**" or "**.tft**" format) which preserves the graphical or pictorial appearance of the original and delivered by electronic or digital means, such as electronic mail, so that the same may be printed in a tangible format, which shall be deemed an original for all purposes.

**10.10** **Entire Agreement**. This Agreement, the Note, and the other Loan Documents constitute the entire agreement among the parties hereto and thereto regarding the subject matters hereof and thereof and supersede all prior agreements and understandings, oral or written, regarding such subject matters. No course of dealing, course of performance, usage of trade or evidence of any prior, contemporaneous or subsequent oral agreements or discussions or other extrinsic evidence of any nature shall be used to contradict, vary, supplement or modify any term of this Agreement or the other Loan Documents. There are no oral agreements between the parties.

**10.11** **Survival**. All covenants, agreements, representations and warranties made by the Loan Parties herein and in the certificates or other instruments delivered in connection with or pursuant to this Agreement shall be considered to have been relied upon by Bank and shall survive the execution and delivery of this Agreement and the making of any Advance of the Loan, regardless of any investigation made by any such other party or on its behalf and notwithstanding that Bank may have had notice or knowledge of any Default Condition or incorrect representation or warranty at the time any credit is extended hereunder, and shall continue in full force and effect as long as the principal of or any accrued interest on the Loan or any fee or any other amount payable under this Agreement is outstanding and unpaid and so long as any commitment of Bank to make Advances under the Loan has not expired or terminated. The provision entitled "**Expenses; Indemnification**" above shall survive and remain in full force and effect regardless of the consummation of the transactions contemplated hereby, the repayment of the Loan, the expiration or termination of the Loan or the termination of this Agreement or any provision hereof. All representations and warranties made herein, in the certificates, reports, notices, and other documents delivered pursuant to this Agreement shall survive the execution and delivery of this Agreement and the other Loan Documents, and the making of any Advance by Bank under the Loan.

**10.12** **Severability**. Any provision of this Agreement or any other Loan Document held to be illegal, invalid or unenforceable in any jurisdiction, shall, as to such jurisdiction, be ineffective to the extent of such illegality, invalidity or unenforceability without affecting the legality, validity or enforceability of the remaining provisions hereof or thereof; and the illegality, invalidity or unenforceability of a particular provision in a particular jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

**10.13** **Gender and Number**. In this Agreement, whenever the context so requires, the neuter gender includes the feminine and/or masculine, as the case may be and the singular number includes the plural.

**10.14** **Headings**. Any captions or headings in this Agreement are for convenience and reference and are not to be considered a part hereof and shall not limit or otherwise affect any of the provisions or terms hereof.

**10.15** **Interpretation**. No provision of this Agreement shall be construed against or interpreted to the disadvantage of any party hereto by any court or other governmental or judicial authority by reason of such Person having or being deemed to have structured, written or dictated such provision.

**10.16** **Lack of Duress**. The Loan Parties represent and warrant to Bank that each Loan Party is a sophisticated business Person, having had substantial experience in connection with financing and credit arrangements such as contemplated by this Agreement, was duly represented by or had the opportunity to be represented by an attorney in the negotiation of the documentation to evidence and secure the Loan and bargained with Bank at arm's length and without duress of any kind whatsoever relative to all of the terms and conditions pursuant to which Bank agreed to make available the Loan including, but not limited to, the terms and conditions contained in this section.

**10.17** **Interest Rate Limitation**. The parties hereto stipulate and agree that it is their common and overriding intent to contract in strict compliance with the applicable usury laws. Notwithstanding anything herein to the contrary, if at any time the interest rate or rates applicable to the Loan, together with all fees, charges and other amounts which may be treated as interest on such Loan under applicable law (collectively, the "**Charges**"), shall exceed the maximum lawful rate of interest (the "**Maximum Rate**") which may be contracted for, charged, taken, received or reserved by Bank in accordance with applicable law, the rate of interest payable in respect of Loan, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate. If for any reason the charges paid by any Loan Party exceed the Maximum Rate, Bank shall credit against the principal balance of the Loan (or, if such indebtedness shall have been paid in full, refund to the payor of such charges) such portion of said charges as shall be necessary to ensure that the total charges do not exceed the Maximum Rate.

**10.18** **Patriot Act**. The Bank hereby notifies Loan Parties that pursuant to the requirements of the USA PATRIOT Act (Title III of Pub. L. 107-56 (signed into law October 26, 2001)) (the "**Patriot Act**"), it is required to obtain, verify and record information that identifies Loan Parties, which information includes the name and address of such Person and other information that will allow such Bank to identify such Person in accordance with the Patriot Act. Each of the Loan Parties shall provide such information and take such other actions as are reasonably requested by the Bank in order to assist the Bank in maintaining compliance with the Patriot Act.

[Remainder of Page Intentionally Blank]

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the day and year first above written.

"BANK"

**Cogent Bank**

By: Abbey Henderson
Abbey Henderson
Senior Vice President

"BORROWER"

**Aery Aviation, LLC**

By: ______________________________
NAME: Leslie S. Walton
TITLE: Manager

**Flight Support, Inc.**

By: ______________________________
NAME: Scott Beale
TITLE: President and Secretary

**Electronic Warfare Training Support LLC**
BY: Flight Support, Inc., its Sole Member

By: ______________________________
NAME: Scott Beale
TITLE: President and Secretary

**Strategic Airborne Operations JV, LLC**
BY: AERY AVIATION, LLC, its Sole Member

By: ______________________________
NAME: Leslie S. Walton
TITLE: Manager

"GUARANTOR"

______________________________
**Scott Beale, Individually**

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the day and year first above written.

"BANK"

**Cogent Bank**

By: ____________________________
Abbey Henderson
Senior Vice President

"BORROWER"

**Aery Aviation, LLC**

By: ____________________________
NAME: Leslie S. Walton
TITLE: Manager

**Flight Support, Inc.**

By: ____________________________
NAME: Scott Beale
TITLE: President and Secretary

**Electronic Warfare Training Support LLC**
BY: Flight Support, Inc., its Sole Member

By: ____________________________
NAME: Scott Beale
TITLE: President and Secretary

**Strategic Airborne Operations JV, LLC**
BY: AERY AVIATION, LLC, its Sole Member

By: ____________________________
NAME: Leslie S. Walton
TITLE: Manager

"GUARANTOR"

____________________________
**Scott Beale, Individually**

IN WITNESS WHEREOF, the parties have executed and delivered this Agreement as of the day and year first above written.

"BANK"

**Cogent Bank**

By: ______________________________
Mike Skat
Senior Vice President

"BORROWER"

**Aery Aviation, LLC**

By: [signature] ______________________________
NAME: Leslie S. Walton
TITLE: Manager

**Flight Support, Inc.**

By: ______________________________
NAME: Scott Beale
TITLE: President and Secretary

**Electronic Warfare Training Support LLC**
BY: Flight Support, Inc., its Sole Member

By: ______________________________
NAME: Scott Beale
TITLE: President and Secretary

**Strategic Airborne Operations JV, LLC**
BY: AERY AVIATION, LLC, its Sole Member

By: [signature] ______________________________
NAME: Leslie S. Walton
TITLE: Manager

"GUARANTOR"

______________________________
**Scott Beale, Individually**

"VALIDITY GUARANTORS"

Josh Walton, Individually

Robert Dynan, Individually

EXHIBIT A
to
LOAN AGREEMENT

BORROWING BASE CERTIFICATE

**Cogent Bank**
**BORROWING BASE REPORT**

| Borrower: Aery Aviation LLC | Submit Date: | |
|---|---|---|
| | Report Number: | |
| | Loan and Security agreement date: | |

| *Statement of Collateral* | Commercial Receivables as of: | Government Receivables as of: 4/29/21 | Unbilled as of: 3/31/21 | Aircraft Advances as of: | Equipment Advances as of: | Total |
|---|---|---|---|---|---|---|
| 1 **Gross Collateral from previous borrowing base** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 2 **Less**: Collections | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| **Beginning Collateral** | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 3 **Plus:** New AR/Unbilled/ Equipment | 0.00 | 3,017,196.24 | 2,924,385.72 | 0.00 | 0.00 | |
| 4 **Less**: Adjustments - Previous Unbilled/Equipment | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 5 **Gross collateral value** | **0.00** | **3,017,196.24** | **2,924,385.72** | **0.00** | **0.00** | 3,017,196.24 |
| 6 **Less**: Ineligibles | | | | | | |
| A. Over 90 Days | 0.00 | 714,333.44 | 0.00 | 0.00 | 0.00 | |
| B. Cross Age of 25% | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| C. Other | 0.00 | 0.00 | 0.00 | 0.00 | 0.00 | |
| 7 Total Ineligible | 0.00 | 714,333.44 | 0.00 | 0.00 | 0.00 | 714,333.44 |
| 8 Eligible | 0.00 | 2,302,862.80 | 2,924,385.72 | 0.00 | 0.00 | 5,227,248.52 |
| 9 Percentage of advance | 85% | 90% | 60% | 100% | 80% | |
| 10 Total Eligible | 0.00 | 2,072,576.52 | 1,754,631.43 | 0.00 | 0.00 | |
| 11 Availability (lesser of margined value or cap) | 0.00 | 2,072,576.52 | 956,801.99 | 0.00 | 0.00 | 3,029,378.51 |
| 12 Total Availability | | | | | | 3,029,378.51 |
| 13 Total Payoff | | | | | | 0.00 |
| 14 Other | | | | | | 0.00 |
| 15 Loan availability remaining subject to loan maximum | | | | | | 3,029,378.51 |
| 16 Authorized Loan Maximum | | | | | | 9,000,000.00 |

3,029,378.51

**Footnotes:**

| | Lesser of the Margined Value or Cap | | |
|---|---|---|---|
| | **Margined Amount of Unbilled** | **Dollar Cap** | **25% Reliance** |
| Unbilled calculation: | $ 1,754,631.43 | $ 2,250,000.00 | 956,801.99 |

**If Line 15 is negative, the Borrower must immediately submit a payment to Cogent Bank in an amount sufficient to bring the value of Line 15 to $0.00**

*The undersigned represents and warrants that the foregoing is true, accurate and complete as of the date indicated below and that the information reflected in this Borrowing Base Certificate (Accounts Receivable, Inventory, Other) complies with the representations and warranties set forth in the Loan Agreement between the undersigned and Cogent Bank.*

By: ______________________

Name: ______________________

Title: ______________________

EXHIBIT B
to
LOAN AGREEMENT

ADDITIONAL PERMITTED ENCUMBRANCES

*a)* the Company's existing seller notes for the following aircraft (total debt at 12/31/20 of $2,031,433.91 million with aircraft value of $2,943,116.70

*1. N515JA (Gulfstream IV)*

*2. N31KH (Lear 31A)*

*b)* An equipment financing loan from VFI of $3.0 million for electronic warfare equipment to be installed in 4 Lear jets.

*c)* An aircraft financing loan from NEF for $4.0 million (not to exceed 75% OLV) for the following aircraft with a value of $5.5 million

*1. N432HC (Gulfstream IV)*

*2. N163JW (Gulfstream IV)*

*d)* General Motors Acceptance Corp., vehicle financing for 2018 GMC Yukon XL and 2021 Chevrolet Tahoe.

*e)* Equipment financing loan from CNC Associates, Inc.

*f)* An aircraft financing loan from Canandaigua National Bank for T182T aircraft and (1) engine.

*g)* BB&T deposit for coverage of performance guarantee LOC for government of Pakistan.

*h)* Any aircraft or equipment that Bank chooses not to finance.

*i)* Bay View Funding receivables factoring agreement.

*j)* Pursuant to that Collateral Pledge Agreement between Leslie S. Walton, Scott Beale and Prudent Capital III, LP, in the Event of Default a pledge of certificated membership interest in Aery Aviation, LLC to Prudent Capital III, LP., and the collateral assignment of the life insurance policies insuring the lives of Leslie S. Walton and Scott Beale.

**THIS NOTE WAS EXECUTED AND DELIVERED OUTSIDE OF THE STATE OF FLORIDA AND IS NOT SECURED BY REAL PROPERTY. AS A RESULT, NO DOCUMENTARY STAMP TAXES ARE DUE.**

*REVOLVING LINE OF CREDIT PROMISSORY NOTE*

**$9,000,000.00** **June 23 , 2021**
Orlando, Florida

**FOR VALUE RECEIVED**, the undersigned, **Aery Aviation, LLC, a Virginia limited liability company** having an address of 305 Cherokee Dr., Newport News, VA 23602-4437, **Flight Support, Inc.**, a **Virginia corporation** having an address of 305 Cherokee Dr., Newport News, VA 23602-4437, **Electronic Warfare Training Support, LLC, a Virginia limited liability company** having an address of 700 Corporate Dr., Newport News, VA 23602-4437, and **Strategic Airborne Operations JV, LLC, a Virginia limited liability company** having an address of 305 Cherokee Dr., Newport News, VA 23602-4437 (collectively, the "**Maker**"), unconditionally promises to pay to the order of **Cogent Bank, a State Chartered Bank** ("**Payee**," which shall include any subsequent holder hereof or any interest herein), at **1113 Saxon Blvd, Orange City, FL 32763**, or at such other place as the Payee may from time to time designate in writing, without grace, the principal sum of **NINE MILLION AND 00/100 DOLLARS ($9,000,000.00)**, or so much thereof as shall have been advanced hereunder, together with interest on the unpaid principal balance from time to time outstanding in accordance with the following provisions:

Except in cases where this Note accrues interest at the Default Rate (as defined below), this Note shall bear interest at the Interest Rate.

Definitions: As used in this Note, the following terms shall have the following meanings:

a) "**Aircraft/Equipment Advance**" shall mean an Advance that is made for Eligible Aircraft or Eligible Equipment
b) "**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks located in Orange City, Florida, are not open for business.
c) "**Conversion Date**" shall mean January 1 and July 1 of every year.
d) "**Draw Period**" shall mean the period of time between January 1 and June 30 of each year and the period of time between July 1 and December 31 of each year during the Term.
e) "**Draw Period Total**" shall mean the aggregate of all Aircraft/Equipment Advances made during a particular Draw Period.
f) "**Initial Installment Payment Day**" shall mean the date that is 30 days from the date of this Note.
g) "**Interest Rate**" shall mean a per annum rate of interest equal to the Prime Rate, as from time to time in effect, *plus* **2.25%**, with such rate to change on each day that the Prime Rate changes. Notwithstanding the foregoing, at no time shall the Interest Rate ever be less than 4.0%.
h) "**Loan Agreement**" shall mean that certain Loan Agreement, as may be amended, modified, restated, or supplemented from time to time herein, dated the same date as this Note, which governs the disbursement of proceeds of, and otherwise sets forth terms and conditions relating to, the loan evidenced by this Note
i) "**Loan Documents**" shall mean the Note, Security Agreement, Loan Agreement, and all other documents or instruments now or hereafter executed in connection with any obligation of Maker to Payee.
j) "**Maturity Date**" shall mean the **ON DEMAND.**
k) "**Prime Rate**" shall the Prime Rate published in the "**Money Rates**" table in *The Wall Street Journal*. If two or more Prime Rates are published in the "**Money Rates**" table for the same date, the highest of such rates shall be the Prime Rate. If the date upon which a change in the interest rate is to occur is a date upon which *The Wall Street Journal* is not published or the Prime Rate is not available in the Money Rates table of *The Wall Street Journal* the Prime Rate shall be determined from the immediately preceding edition of *The*



**Exhibit 2**

*Wall Street Journal* in which the Money Rates table and Prime Rate is available. If *The Wall Street Journal* ceases to be published or ceases to publish the Prime Rate in the Money Rates table, the Payee will choose a new index that is reasonably determined by Payee to be based upon comparable information.

l) **"Security Agreement"** shall mean that certain Security Agreement dated the same date as this Note between Maker and Payee, which is a lien on a certain collateral described therein.

m) "**Sub-Note**" shall mean the Sub-Note executed by Maker for each Draw Period Total

n) "**Sub-Note Interest Rate**" shall mean the per annum rate of interest equal to the Prime Rate in effect at the time of a Conversion Date *plus* **2.25%,** which rate shall be fixed for each applicable Sub-Note. Notwithstanding the foregoing, at no time shall the Interest Rate ever be less than 4.0%.

o) "**Sub-Note Maturity Date**" shall mean the date that is determined by the Bank in its sole discretion, which may be up to **84 months** from the date of the applicable Sub-Note.

p) "**Term**" shall mean the period of time between the date of this Note and the Maturity Date.

q) All other capitalized terms not otherwise defined herein shall have the meaning given to them in the Loan Agreement.

Commencing on the Initial Installment Payment Day, and on same day of each and every calendar month thereafter during the Term, Maker shall pay to Payee payments of accrued interest only. Except as otherwise stated herein, the entire outstanding principal balance, together with all accrued interest thereon, as well as all other costs associated with the indebtedness evidenced hereby, shall be due and payable in full on the Maturity Date.

The Maker shall repay each Draw Period Total in monthly payments of principal and interest, which payments shall be based upon an 84-month amortization schedule calculated on the applicable Draw Period Total at the applicable Sub-Note Interest Rate. The Maker shall execute a Sub-Note for each Draw Period Total, which shall govern the repayment terms for the applicable Draw Period Total. For each Draw Period Total, any remaining unpaid interest and outstanding principal balance, as well as all other costs associated with the Draw Period Total, shall be due and payable in full on the Sub-Note Maturity Date.

This Note **(i)** is made pursuant and subject to the terms the Loan Agreement, **(ii)** is secured by, among other things, the Security Agreement, and **(iii)** is governed by and subject to the Loan Documents..

All payments hereunder shall be first applied to interest, then principal with the balance, if any, to late fees and other charges, costs, expenses and fees due hereunder. All interest provided for in this Note shall be calculated on the basis of a three hundred sixty (360) day year, based on the actual number of days elapsed. Payments must be made in legal tender of the United States of America in good, collected funds at the place of payment. Any payment received after 2:00 p.m. (place of payment time) may be credited on the next succeeding Business Day.

Any payment which is not made within ten (10) calendar days of when due, shall be assessed a **"late charge"** of five percent (5%) of such payment, which shall be immediately due and payable to Payee.

Prepayments may be made in whole or in part at any time.

To the extent permitted by law, Maker, any endorser, any guarantor hereof or any other party hereto (individually, an **"Obligor"** and collectively, **"Obligors"**) and each of them jointly and severally: (a) waive presentment, demand, protest, notice of demand, notice of intent to accelerate, notice of acceleration of maturity, notice of protest, notice of nonpayment, notice of dishonor, and any other notice required to be given under the law to any Obligor in connection with the delivery, acceptance, performance, default or enforcement of this Note, any endorsement or guaranty of this Note, or any other documents executed in connection with this Note or any other note or other Loan Documents; (b) consent to all delays, extensions, renewals or other modifications of this Note or the Loan Documents, or waivers of any term hereof or of the Loan Documents, or release or discharge by payee of any of Obligors, or

release, substitution or exchange of any security for the payment hereof, or the failure to act on the part of Payee, or any indulgence shown by Payee (without notice to or further assent from any of Obligors), and agree that no such action, failure to act or failure to exercise any right or remedy by Payee shall in any way affect or impair the obligations of any Obligors or be construed as a waiver by Payee of, or otherwise affect, any of Payee's rights under this Note, under any endorsement or guaranty of this Note or under any of the Loan Documents; and (c) agree to pay, on demand, all costs and expenses of enforcement of the obligations of the Obligors under the Loan Documents, including without limitation, the collection or defense of this Note or of any endorsement or guaranty hereof and/or the enforcement or defense of Payee's rights with respect to, or the administration, supervision, preservation, protection of, or realization upon, any property securing payment hereof, including, without limitation, reasonable attorneys' and paralegals' fees, (whether suit or action be brought or not) including fees related to the enforcement of any of the obligations of any Obligor under the Loan Documents, any suit, mediation or arbitration proceeding, out of court payment or settlement negotiations or agreement, trial, appeal, bankruptcy case, proceedings (including without limitation seeking relief from the stay of 11 U.S.C. §362 and limiting the use of cash collateral under 11 U.S.C. §363), receivership, or other case or proceeding, in such amount as may be determined reasonable by any arbitrator or court, whichever is applicable. The obligation to pay such fees, costs, and expenses shall survive the entry of a final judgment on this Note and the payment of such fees, costs and expenses (whether incurred by the Payee before or after the entry of a judgment) shall not be deemed extinguished by reason of the merger of this Note into a final judgment. Any award or payment of attorneys' or paralegal's fees hereunder or by order of a court of competent jurisdiction shall include as a part thereof any and all sales or use taxes imposed thereon by any appropriate governmental authority.

Any one or more of the following shall constitute an **"Event of Default"** hereunder: **(a)** the failure to make any payment of principal and/or interest under this Note or any other obligation of any Obligor to Payee (i) within ten (10) calendar days of when due, as to any regular payment and/or (ii) when due as to any payment due on demand, at maturity or by acceleration; **(b)** default, which is not cured within the applicable grace or curative period, if any, shall occur in any other obligation, liability or indebtedness of any Obligor to Payee or to any other party; **(c)** if any representation or warranty of any Obligor, or any other person or entity, in any of the Loan Agreement, the Security Agreement, the other Loan Documents, any endorsement, any guaranty, or in any certificate or statement furnished at any time thereunder or in connection therewith proves to be untrue or misleading in any material respect when made or furnished and results in a Material Adverse Effect; **(d)** default which is not otherwise the subject of any other provision of this paragraph shall occur in the performance or violation of any of the covenants or agreements of any Obligor, or any other person or entity, contained in this Note, the Loan Agreement, the Security Agreement, any guaranty, or any other Loan Document and such default is not capable of being cured, or if capable of being cured shall continue uncured to the reasonable satisfaction of Payee for a period of thirty (30) calendar days after written notice thereof from Payee to Maker, or such other lesser or greater period of time, if any, with or without notice as specifically set forth in the applicable document or instrument and such default results in a Material Adverse Effect; **(e)** the commencement of a proceeding by or against any Obligor for dissolution or liquidation, the voluntary or involuntary termination or dissolution of any Obligor or the merger or consolidation of any Obligor with or into another entity, unless the Lender has provided prior written approval of such merger or consolidation; **(f)** the insolvency of, the business failure of, the appointment of a custodian, trustee, liquidator or receiver for or for any of the property of, the assignment for the benefit of creditors by, or the filing of a petition under bankruptcy, insolvency or debtor's relief law or the filing of a petition for any adjustment of indebtedness, composition or extension by or against any Obligor; **(g)** the death or legal incapacity of any Obligor who is a natural person, *unless, however*, in the case of a guarantor only, within one hundred eighty (180) days from the date of death or incapacity of such Obligor (or such earlier date by which Payee would be barred from asserting a claim under the Note or such Obligor 's guaranty in any probate proceeding as to such deceased Obligor or such Obligor 's estate), a substitute guarantor or guarantors having a reputation, financial standing, liquid assets, net worth and income satisfactory to, and approved in writing by, Payee, in its reasonable discretion, shall have (1) executed and delivered to Payee a written guaranty agreement or agreements in form and substance as then required by Payee and (2) paid all actual costs, including without limitation Payee's reasonable attorneys' fees, incurred by Payee in the preparation of such substitute guaranty agreement or agreements; **(h)** the failure of any Obligor, to timely deliver such

financial statements, including tax returns, other statements of condition or other information, as required by the Loan Documents or as Payee shall request from time to time; **(i)** the entry of a judgment against any Obligor which is determined to be of a material nature, in Payee's reasonable determination after written notice to Obligor, which is not released or satisfied within thirty (30) calendar days of the entry thereof; **(j)** the seizure or forfeiture of, or the issuance of any writ of possession, garnishment or attachment, or any turnover order for any property of any Obligor, including without limitation the property encumbered by the Security Agreement and the foregoing results in a Material Adverse Effect; **(k)** should Payee's liens, mortgages or security interests in any of the collateral that is of a material nature for this Note become unenforceable, or cease to be first priority liens, mortgages or security interests for a period of ten (10) business days after written notice to Obligor; **(l)** the determination by Payee that it is insecure for any reason; **(m)** the determination by Payee that a Material Adverse Effect has occurred in the financial condition of any Obligor; **(n)** the failure of Maker's business to comply with any law or regulation controlling its operation and such failure results in a Material Adverse Effect in the Maker's business; or **(o)** the condemnation or taking by eminent domain of all or any material part (as determined by the Payee in its sole discretion) of the property encumbered by the Security Agreement and Obligor is unable to secure comparable property to operate its business operations within a commercially reasonable time after the taking.

Upon the occurrence of an Event of Default, **(a)** Payee shall have the optional right to accelerate and declare as immediately due and payable in full the entire balance (principal, interest and all other charges due hereunder or under the Loan Documents) outstanding hereunder and all other obligations of any Obligor to Payee (however acquired or evidenced) and any obligation of Payee to permit further borrowing, if any, under the Loan Agreement or this Note shall immediately cease and terminate and/or **(b)** to the extent permitted by law, the rate of interest on the unpaid principal shall be increased at Payee's discretion up to the Maximum Rate (as defined below), or if there shall cease to be a Maximum Rate at a simple interest rate of no more than **25%** per annum (the "**Default Rate**"). The provisions herein for a Default Rate shall not be deemed to extend the time for any payment hereunder or to constitute a "**grace period**" giving Obligors a right to cure any default. At Payee's option, any accrued and unpaid interest, fees or charges may, for purposes of computing and accruing interest on a daily basis after the due date of the Note or any installment thereof, be deemed to be a part of the principal balance, and interest shall accrue on a daily compounded basis after such date at the Default Rate provided in this Note until the entire outstanding balance of principal and interest is paid in full. Upon the occurrence an Event of Default, Payee is hereby authorized at any time to set off and charge against any deposit accounts of any Obligor, as well as any money, instruments, securities, documents, chattel paper, credits, claims, demands, income and any other property, rights and interests of any Obligor which at any time shall come into the possession or custody or under the control of Payee or any of its agents, affiliates or correspondents, without notice or demand, any and all obligations due hereunder. Additionally, Payee shall have all rights and remedies available under each of the Loan Documents, including without limitation foreclosure of the Security Agreement, as well as all rights and remedies available at law or in equity. Any judgment rendered on this Note shall bear interest at the highest rate of interest permitted pursuant to Chapter 687, Florida Statutes. If this Note is payable upon demand, then no terms or provisions contained in this paragraph shall be deemed or interpreted to alter or abrogate the demand nature of this Note or the rights of Payee under a demand instrument.

The failure at any time of Payee to exercise any of its options or any other rights hereunder shall not constitute a waiver thereof, nor shall it be a bar to the exercise of any of its options or rights at a later date. All rights and remedies of Payee shall be cumulative and may be pursued singly, successively or together, at the option of Payee. The Maker shall not send the Payee payments marked "paid in full" or "without recourse" or similar language and if the Maker does send Payee payments marked in such a manner the Payee may accept such payments without being held to any such language and without losing any of the Payee's rights under this note or any of the Loan Documents and Maker shall remain liable to pay any further amounts owed to the Payee. The acceptance by Payee of any partial payment shall not constitute a waiver of any default or of any of Payee's rights under this Note. No waiver of any of its rights hereunder, and no modification or amendment of this Note, shall be deemed to be made by Payee unless the same shall be in writing, duly signed on behalf of Payee; each such waiver shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Payee or the obligations of Obligor to Payee in any other respect at any other time.

This Note, the Loan Documents, and the rights and obligations of Maker and Payee shall be governed by and interpreted in accordance with the laws of the State of Florida (without giving effect to Florida' principles of conflicts of law), and the laws of the United States applicable to transactions in such state. In any litigation in connection with or to enforce this Note or any endorsement or guaranty of this Note or any Loan Documents, each Obligor irrevocably consents to and confers personal jurisdiction on the courts of the State of Florida or the United States located within the State of Florida and expressly waives any objections as to venue in any such courts. Nothing contained herein shall, however, prevent Payee from bringing any action or exercising any rights within any other state or jurisdiction or from obtaining personal jurisdiction by any other means available under applicable law. The undersigned does irrevocably consent and agree that the Payee may obtain credit reports on the Maker and any Obligor at any time for a specific and legitimate purpose, at Payee's sole option and expense, in order to determine whether there has been an adverse change in the financial condition of the Maker or any Obligor.

Notwithstanding anything contained in this Note to the contrary, Payee shall never be deemed to have contracted for or be entitled to receive, collect or apply as interest on this Note, any amount in excess of the amount permitted and calculated at the Maximum Rate, and, in the event Payee ever receives, collects or applies as interest any amount in excess of the amount permitted and calculated at the Maximum Rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance of this Note, and, if the principal balance of this Note is paid in full, any remaining excess shall forthwith be paid to Maker. In determining whether or not the interest paid or payable under any specific contingency exceeds the Maximum Rate, Maker and Payee shall, to the maximum extent permitted under applicable law, (i) characterize any non-principal payment (other than payments which are expressly designated as interest payments hereunder) as an expense, fee, or premium, rather than as interest, (ii) exclude voluntary prepayments and the effect thereof, and (iii) spread the total amount of interest throughout the entire contemplated Term of this Note. The term "**Maximum Rate**" shall mean, as to Payee, the maximum nonusurious interest rate, if any, that at any time, or from time to time, may be contracted for, taken, reserved, charged, or received on the indebtedness evidenced by this Note under the laws which are presently in effect of the United States and the State of Florida applicable to Payee and such indebtedness or, to the extent permitted by applicable law, under such applicable laws of the United States and the State of Florida which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

Time is of the essence hereunder.

Payee is authorized to maintain, store and otherwise retain this promissory note in its original, inscribed tangible form or a record thereof in an electronic medium or other non-tangible medium which permits such record to be retrieved in perceivable forms and such retrieved form shall be deemed a duplicate original.

The principal balance hereof may be borrowed and re-borrowed from time to time during the Term hereof in accordance with the terms of the Loan Agreement but may not exceed at any one time an outstanding principal balance of **$9,000,000.00**.

PAYMENT IN FULL OF THIS NOTE SHALL NOT RESULT IN ITS TERMINATION AS LONG AS THE LOAN AGREEMENT IS IN EFFECT.

In this Note, whenever the context so requires, the neuter gender includes the feminine and/or masculine, as the case may be, and the singular number includes the plural.

**MAKER BY ITS EXECUTION HEREOF KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, FOR ITSELF AND ITS HEIRS, SUCCESSORS AND ASSIGNS, ANY RIGHT WHICH IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION, ACTION, SUIT OR PROCEEDING (WHETHER AT LAW OR IN EQUITY) BASED ON THIS NOTE OR ARISING OUT OF, UNDER OR IN CONNECTION WITH ANY OF THE TRANSACTIONS PROVIDED IN THIS NOTE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY OR THEIR RESPECTIVE OFFICERS, PRINCIPALS, PARTNERS, EMPLOYEES, AGENTS OR REPRESENTATIVES IN CONNECTION WITH THE SUBJECT MATTER OF THIS NOTE, WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE AND WHETHER ASSERTED BY WAY OF COMPLAINT, ANSWER, CROSS-CLAIM, COUNTERCLAIM, AFFIRMATIVE DEFENSE OR**

**REPRESENTATIVES IN CONNECTION WITH THE SUBJECT MATTER OF THIS NOTE, WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE AND WHETHER ASSERTED BY WAY OF COMPLAINT, ANSWER, CROSS-CLAIM, COUNTERCLAIM, AFFIRMATIVE DEFENSE OR OTHERWISE. MAKER SHALL NOT SEEK TO CONSOLIDATE ANY SUCH LITIGATION, ACTION, SUIT OR PROCEEDING IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED. THIS PROVISION IS A MATERIAL INDUCEMENT TO PAYEE'S ACCEPTANCE OF THIS NOTE.**

**IN WITNESS WHEREOF**, Maker has caused this Note to be executed in its name as of the day and year first above written.

Address of Maker:

305 Cherokee Dr.
Newport News, VA 23602-4437

"**MAKER**"

**Aery Aviation, LLC**

**By:**________________________
Leslie S. Walton
As Its: Manager

TAXPAYER IDENTIFICATION NUMBER: 81-4838597

**Flight Support, Inc.**

By: [signature]
Scott Beale
As Its: President and Secretary

TAXPAYER IDENTIFICATION NUMBER: 26-0007243

**Electronic Warfare Training Support LLC**
BY: Flight Support, Inc., its Sole Member

By: [signature]
Scott Beale
As Its: President and Secretary

TAXPAYER IDENTIFICATION NUMBER: 35-2487708

**Strategic Airborne Operations JV, LLC**
BY: Aery Aviation, LLC, its Sole Member

By: ________________________
Leslie S. Walton
As Its: Manager

TAXPAYER IDENTIFICATION NUMBER: 83-4555054

**OTHERWISE. MAKER SHALL NOT SEEK TO CONSOLIDATE ANY SUCH LITIGATION, ACTION, SUIT OR PROCEEDING IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED. THIS PROVISION IS A MATERIAL INDUCEMENT TO PAYEE'S ACCEPTANCE OF THIS NOTE.**

**IN WITNESS WHEREOF**, Maker has caused this Note to be executed in its name as of the day and year first above written.

Address of Maker:

305 Cherokee Dr.
Newport News, VA 23602-4437

"**MAKER**"

**Aery Aviation, LLC**

**By:** [signature]
Leslie S. Walton
As Its: Manager

TAXPAYER IDENTIFICATION NUMBER: 81-4838597

**Flight Support, Inc.**

By: ______________________________
Scott Beale
As Its: President and Secretary

TAXPAYER IDENTIFICATION NUMBER: 26-0007243

**Electronic Warfare Training Support LLC**
BY: Flight Support, Inc., its Sole Member

By: ______________________________
Scott Beale
As Its: President and Secretary

TAXPAYER IDENTIFICATION NUMBER: 35-2487708

**Strategic Airborne Operations JV, LLC**
BY: Aery Aviation, LLC, its Sole Member

By: [signature]
Leslie S. Walton
As Its: Manager

TAXPAYER IDENTIFICATION NUMBER: 83-4555054

# Security Agreement

This Security Agreement is made this 23 day of June, 2021, by and between **Aery Aviation, LLC, a Virginia limited liability company, Flight Support, Inc., a Virginia corporation, Electronic Warfare Training Support, LLC**, a Virginia limited liability company, and **Strategic Airborne Operations JV, LLC, a Virginia limited liability company** (hereinafter referred to as "**Grantor**"), all having an address of **305 Cherokee Dr., Newport News, VA 23602-4437** in favor of **Cogent Bank, a State Chartered Bank** having a principal office at **1113 Saxon Blvd, Orange City, FL 32763** (hereinafter termed the "**Secured Party**").

## RECITALS:

(A) The Grantor and the Secured Party desire to enter into the following, all of even date herewith:

(i) Business Loan Agreement (as the same may be amended, restated, or modified from time to time, the "**Loan Agreement**"); and

(ii) Revolving Line of Credit Promissory Note in the amount of $9,000,000.00 (as the same may be amended, restated, or modified from time to time, the "**Note**").

(B) As a condition to Secured Party's extending credit to Grantor, Secured Party requires that Grantor enter into this Security Agreement.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Capitalized terms used herein and not otherwise defined shall have the meaning assigned thereto in the Loan Agreement.

The terms used herein to describe the Collateral shall have the meaning as provided in the Florida Uniform Commercial Code, as the same may be amended or supplemented from time to time (the "**UCC**").

**1.** Grant of Security Interest in Collateral. Except as provided on Exhibit A attached hereto, Grantor hereby pledges, hypothecates, and grants to Secured Party a continuing and first priority security interest in: all of the following, whether now owned or hereinafter acquired: all assets of the Grantor, including but not limited to the following: (i) all tangible and intangible personal property; all Equipment (including, without limitation, all motor vehicles); furniture, Fixtures, and Goods; Accounts (including without limitation, all accounts receivable); Inventory (including, without limitation returned or repossessed goods); Chattel Paper (including, without limitation, Tangible Chattel Paper and Electronic Chattel Paper); General Intangibles (including without limitation all Payment Intangibles and Software); Investment Property (including without limitation all Certificated Securities, Uncertificated Securities, Securities Entitlements, Securities Accounts, Securities Certificates, Commodity Contracts, and Commodity Accounts); Documents; Instruments; Deposit Accounts; money, cash or cash equivalents; Supporting Obligations; Letter-of-Credit Rights; Commercial Tort Claims; Contract Rights; Certificates of Deposit; trademarks, patents, and copyrights, but excluding medical records and patient lists which Grantor may control, own or possess; (ii) together with all additions, replacements,



**Exhibit 3**

substitutions, accessions and improvements, and all supporting obligations, profits, products and proceeds including insurance proceeds, cash proceeds, and noncash proceeds including, but not limited to, all Accounts, Chattel Paper, Documents, Instruments, General Intangibles, Investment Property and Supporting Obligations relating to or arising out of any of the foregoing and all interest, dividends, income, profits, and distributions (including, without limitation, stock splits and stock dividends); and (iii) all proceeds and products of any of the foregoing including, without limitation, insurance proceeds, refunds, and premium rebates that arise out of any of the foregoing (collectively, the "**Collateral**").

**2.** Obligations. The security interests granted pursuant to this Security Agreement shall secure the payment and performance of all Obligations. All Collateral shall remain subject to this Security Agreement until (i) the full and complete payment and performance of all Obligations (other than contingent indemnification obligations as to which no claims have been asserted) and (ii) Secured Party has no obligation to extend further advances or financial accommodations to Grantor (the "**Payment in Full**").

**3.** Authority to File; Further Assurances. Grantor authorizes Secured Party at any time, without further consent or the signature of Grantor, to file (including by any electronic method) in any jurisdiction, financing statements, amendments to financing statements, continuations of financing statements, or other documents covering the Collateral, or any part thereof, including, without limitation, any filings with any County in the Commonwealth of Virginia, the Virginia Secured Transactions Registry, the United States Patent and Trademark Office, the United States Copyright Office, or any other office of any foreign jurisdiction having jurisdiction of the registration of any Intellectual Property (as defined herein) of the Grantor. Grantor also ratifies its authorization for Secured Party to have filed in any Uniform Commercial Code jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof. Grantor further agrees to promptly take such additional actions and to execute such additional documents as Secured Party deems reasonably necessary to perfect, continue the perfection of, maintain the priority of, and otherwise to protect and preserve Secured Party's security interest in, the Collateral and to prevent the accrual of prescription or statute of limitations with respect to the Collateral. Grantor shall execute any endorsements, assignments, and stock powers with respect to the Collateral, in form and substance satisfactory to Secured Party that Secured Party may reasonably request. Grantor will note Secured Party's security interest upon any chattel paper and instruments not delivered to Secured Party. As may be necessary to ensure the attachment, perfection, or priority of, or ability of the Secured Party to enforce its security interest in, the Collateral, Grantor will: **(i)** cause, or allow Secured Party to cause, Secured Party's name to be noted as Secured Party on any certificate of title for any titled goods; **(ii)** comply with any provision of any statute, regulation, or treaty of the United States as to any Collateral; **(iii)** obtain any governmental and other third party consents or approvals; and **(iv)** obtain subordinations and/or waivers from mortgagees or landlords in form and substance satisfactory to Secured Party.

**4.** Representations, Warranties and Covenants. Grantor represents and warrants to, and covenants with, Secured Party as follows, which representations, warranties, and covenants shall survive the execution and delivery of this Security Agreement and remain effective until Payment in Full:

a. Grantor. Grantor's exact legal name, Grantor's place of incorporation or organization, and Grantor's domicile or chief executive office are correctly recited in the opening paragraph of this Security Agreement and the description and identification of Collateral contained herein or on any exhibits hereto is correct and complete. **UNTIL ALL OBLIGATIONS**

**ARE PAID IN FULL GRANTOR SHALL NOT, WITHOUT PROVIDING SECURED PARTY WITH 30 DAYS PRIOR WRITTEN NOTICE: (1) CHANGE GRANTOR'S DOMICILE, NAME, LEGAL FORM, STATE OR JURISDICTION OF ORGANIZATION, TAXPAYER IDENTIFICATION NUMBER OR STATE ORGANIZATIONAL OR IDENTIFICATION NUMBER; (2) TAKE TITLE TO ANY COLLATERAL IN ANY OTHER NAME; OR (3) HOLD OR MOVE ANY THE COLLATERAL IN OR TO A LOCATION OTHER THAN DISCLOSED IN THIS SECURITY AGREEMENT EXCEPT IN ACCORDANCE WITH GRANTOR'S ORDINARY COURSE OF BUSINESS OR UPON 60 DAYS NOTICE.**

b. Title. Grantor owns (and as to any Collateral acquired after the date hereof will own) good and complete title to the Collateral free of any lien, security interest, encumbrance or other claim, right, title, or interest of any person other Permitted Encumbrances (as defined in the Loan Agreement). Subject to the delivery of subordination agreements in form and content reasonably satisfactory to the Security Party, Grantor has the unqualified right and power to grant a security interest in the Collateral without the consent of any other person. There is no financing statement (or similar statement or registration under the law of any jurisdiction) on the date hereof on file in any public office covering any interest in the Collateral, other than in favor of Secured Party or in relation to Permitted Encumbrances, which has not been terminated or released by the secured party named therein. Except for Permitted Encumbrances, Grantor shall not create or permit to exist any lien, claim, or security interest on, or sign or authorize any financing statement or similar statement or registration relating to, the Collateral without the prior written consent of Secured Party, other than in favor of Secured Party, and shall defend the Collateral against all claims and demands of any person adverse to the interests of Secured Party.

c. Control. Except as otherwise provided in the Loan Agreement, with respect to any Collateral consisting of deposit accounts, investment property, letter-of-credit rights, and electronic chattel paper, or any other Collateral of a type in which a security interest is, or may be, perfected by control, Grantor will take such action, enter into such agreements and arrangements, and obtain from third parties such documents and agreements as Secured Party deems reasonably necessary or advisable in order to obtain control over such Collateral to the reasonable satisfaction of Secured Party. The term "**control**" as used herein shall have the meaning provided in the UCC. Secured Party may renew certificates of deposit or other renewable items included in the Collateral.

d. Sale and Use of Collateral. The Grantor will not sell, transfer, assign, or dispose of the Collateral, or any material part thereof (except for sales permitted under the Loan Agreement), without the prior written consent of the Secured Party, except in Grantor's ordinary course of business; provided, however, that the Grantor may sell or otherwise dispose of obsolete or worn out equipment no longer used or useful in the Grantor's business if the Grantor shall, in the case of equipment reasonably necessary for the conduct of the business of the Grantor, promptly replace the same, if needed and by the sole decision of Grantor, with new property of substantially equal value which shall forthwith become subject to the security interest provided for herein. The Grantor will keep the Collateral in good order and repair and will not use the Collateral in violation of any material law, rule, regulation, or ordinance, or any applicable insurance policy. The Grantor will not assert against the Secured Party any claim or defense which the Grantor may have against any seller of the Collateral, or any part thereof, or against any other Person with respect to the Collateral, or any part thereof. Subject to the Loan Agreement, the Grantor will indemnify and hold the Secured Party harmless from and against actual loss, liability, damage, costs, and expenses whatsoever arising from the Grantor's use, operation, ownership, or possession of the Collateral and any part thereof, unless such loss,

liability, damage, costs, or expenses are caused, in whole or in part, by the gross negligence or willful misconduct of the Secured Party.

e. Accounts and Chattel Paper. With respect to any Collateral consisting of accounts or chattel paper:

i. Grantor represents and warrants that as of the time each account or chattel paper arises, each such account or chattel paper contract, and all agreements and documentation relating thereto, are genuine, and in all respects what they purport to be, and that the account or chattel paper constitutes the genuine, legal, valid, and binding obligation of the account debtor enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, and to the best of its knowledge, is in compliance with and will conform with all applicable federal, state, and local laws (including applicable usury laws), and the account debtor has no defense, setoff, or counterclaim effective against the Grantor.

ii. Upon the occurrence of, and during the continuance of an Event of Default which results in a Material Adverse Effect, Secured Party shall have the right to notify the account debtors obligated on any or all accounts and chattel paper included in the Collateral to make payment thereon directly to Secured Party or its agent, and to take control of all proceeds thereof, and shall apply such proceeds to the Loan. Until such time as Secured Party elects to exercise such right by written notice to Grantor, Grantor is authorized and agrees to administer the accounts and chattel paper in a fiduciary capacity as agent for Secured Party, take all actions necessary to collect any amounts due thereon, and immediately deposit all proceeds in precisely the form received into a deposit account of Grantor with Secured Party designated by Grantor and approved by Secured Party for that purpose. Pending such deposit, Grantor will not commingle any such checks or other remittances with any of Grantor's other funds or property, but will hold them separate and apart therefrom and in trust until deposit is made in the designated deposit account. The Grantor will duly fulfill all obligations on the Grantor's part under, or in connection with, the accounts and chattel paper, and will do nothing to impair the rights of the Secured Party therein. Secured Party shall have no obligation to do or perform any obligation of Grantor with respect to any account or chattel paper, but in the Event of Default hereunder, and during the continuance thereof, Secured Party may, at its election, perform some or all of Grantor's obligations, and any liability or expenses incurred in connection therewith shall be payable by Grantor to Secured Party on demand and shall be secured by the Collateral hereunder.

iii. Grantor will use a chattel paper contract, an account agreement, and account receivable invoice form in its dealings with account debtors which bars the account debtor from asserting defenses to payment against the Secured Party.Upon the occurrence of and during the continuance of an Event of Default that results in a Material Adverse Effect, the Grantor will not rescind or cancel any indebtedness evidenced by any account or chattel paper, or modify any term thereof, or make any adjustment with respect thereto, or extend or renew the same, or compromise or settle any dispute, claim, suit, or legal proceeding relating thereto, or sell any account, chattel paper, or interest therein, without the prior written consent of the Secured Party.

iv. Except as expressly permitted by the Loan Agreement Grantor agrees to take such additional actions and execute such additional documents as Secured Party may reasonably deem necessary or advisable to ensure that all moneys due, or to become due,

under any contract subject to the Federal Assignment of Claims Act, or like federal, state, or local statute or rule in respect of the Collateral are assigned and payable to Secured Party and any requirements for notice to any governmental authority is given.

v. The Grantor will keep and maintain at Grantor's cost and expense satisfactory and complete records of the accounts and chattel paper, including, but not limited to, records of the shipment and receipt of goods and/or the performance of any services or obligations related to any such accounts or chattel paper, all payments received, all credits granted thereon, all discounts granted, all merchandise returned, and all other dealings therewith. Upon written request by Secured Party, Grantor will promptly: **(a)** furnish to Secured Party copies, or originals if so requested, of any invoices, contracts, agreements, or other books and records relating to any such Collateral; **(b)** give Secured Party written assignments, in form and substance reasonably acceptable to Secured Party, of specific accounts or chattel paper, or groups thereof; and **(c)** imprint a legend in form and manner reasonably satisfactory to Secured Party stating that the account, chattel paper, and other books and records evidencing or pertaining to said Collateral is subject to a security interest in favor of Secured Party.

vi. Within **ten (10)** Business Days after receiving Secured Party's written request for such, Grantor shall provide to Secured Party listings of all accounts and chattel paper, showing the name, address, and the amount owed by each account debtor and agings of any accounts receivable.

f. Investment Property. To the extent that any stocks, bonds, securities, or other investment property are included in the Collateral, Grantor covenants not to vote any such Collateral in any manner that would adversely affect Secured Party's rights under this Agreement.

g. Intellectual Property With respect to federally registered Intellectual Property, Grantor shall notify the Secured Party on an annual basis, upon the occurrence of each of the following **(i)** Grantor's acquisition, after the date of this Agreement, of any material? General Intangibles consisting of patents, patent rights, patent applications, patent licenses, copyrights, copyrights applications, copyright licenses, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights, applications for registration of trademarks, trade names, and service marks, fictitious names registrations and trademark, trade name and service mark registrations, trademark licenses, and all derivations thereof (collectively, "**Intellectual Property**") and **(ii)** Grantor obtaining knowledge that any application or registration relating to any material Intellectual Property owned by, or licensed to, such Grantor is reasonably likely to become abandoned or dedicated, or of any material adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the United States Copyright Office, the United States Patent and Trademark Office or any court) regarding Grantor's ownership of any material Intellectual Property, its right to register the same, or to keep and maintain the same. In the event that Secured Party shall so reasonably require, Grantor will execute and deliver to the Secured Party, from time to time, any Patent Security Agreement, Copyright Security Agreement, or Trademark Security Agreement, as Secured Party shall reasonably require and as is necessary, and shall execute and deliver to the Secured Party any other document required to acknowledge, register, or perfect the Secured Party's interest in any part of the Intellectual Property, including, without limitation, at Grantor's sole cost and expense filing of any such Patent Security Agreement, Copyright Security Agreement, or Trademark Security Agreement in the United States Patent and Trademark Office, the United States Copyright Office, or any other domestic or foreign jurisdiction in which such filing is necessary or

appropriate as determined by Secured Party. Notwithstanding anything to the contrary contained in this Agreement, the Secured Party shall only require perfection of its security interests in, or other registration with respect to, any Intellectual Property registered, or eligible to be registered, with a country other than the United States or any political subdivision thereof, to the extent that Secured Party determines, in its reasonable discretion, that such Intellectual Property, and the registration thereof, in such other country or political subdivision thereof, is material to the Grantor's business.

h. Landlord, Mortgagee Disclaimer. Upon written request by Secured Party and upon an Event of Default that results in a Material Adverse Effect, the Grantor shall use its best efforts to cause each mortgagee of real property owned by the Grantor, and each landlord of real property leased by the Grantor on which any Collateral is or may be located at any time, to execute and deliver agreements satisfactory in form and substance to the Secured Party by which such mortgagee or landlord waives and disclaims to the extent allowed by applicable law or subordinates any rights such mortgagee or landlord may have, or claim to have, in any Collateral, and consents to the removal thereof by Secured Party or its authorized representatives.

i. Additional Covenants.

i. Should any Collateral materially decline in value after the date of this Security Agreement except for ordinary depreciation shown on the Financial Statements of the Grantor, Grantor shall, within **five (5) Business Days** after receiving written notice from Secured Party of such decline in value, grant a security interest in additional property reasonably satisfactory to Secured Party.

ii. Upon an Event of Default that results in a Material Adverse Effect, Grantor authorizes Secured Party, at any time, and in its reasonable discretion **(a)** to notify the obligor on any Collateral to make payments directly to Secured Party or to otherwise render performance to or for the benefit of Secured Party; **(b)** to collect, receive, and recover any money, proceeds, or other property at any time due with respect to the Collateral, and in connection therewith, to endorse notes, checks, drafts, or other evidence of payments; and **(c)** to enforce, settle, adjust, and compromise, in Secured Party's reasonable discretion, all present and future rights and claims of Grantor with respect to the Collateral.

iii. Upon an Event of Default that results in a Material Adverse Effect, if the Grantor, at any time, holds or acquires a commercial tort claim, the Grantor shall immediately notify the Secured Party in writing of the details thereof and grant to the Secured Party, in writing, in form and substance satisfactory to Secured Party, a security interest therein or lien thereon and in the proceeds thereof.

iv. Grantor hereby agrees that all instruments, documents of title, chattel paper, interest, dividends, income, fruits, returns, accessions, profits, corporate distributions (including, without limitation, stock splits and stock dividends), and proceeds with respect to the Collateral shall, upon receipt in negotiable form, be delivered to Secured Party, with any necessary assignment or endorsement.

**5.** Power of Attorney. To the extent permitted by law, Grantor hereby irrevocably constitutes and appoints the Secured Party, and any officer or agent thereof, with full power of substitution, as its true and lawful attorneysinfact, during the continuation of an Event of Default that results in a Material Adverse Effect, with full irrevocable power and authority in the name, place, and stead of the Grantor, or in Secured Party's own name, for the purpose of carrying out

the terms of this Security Agreement, to take any and all appropriate action, and to execute any and all documents and instruments, that may be necessary to accomplish the purposes of this Security Agreement, including, without limitation, the right to exercise all rights of sale and inspection, deriving from Grantor's ownership of, or other interest in, the Collateral until all Obligations are paid in full. This power of attorney is a power coupled with an interest and shall be irrevocable. To the extent permitted by law, the Grantor hereby ratifies all that such attorneys shall lawfully do, or cause to be done, in accordance with this Security Agreement. The powers conferred on the Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. The Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither Secured Party nor any of its officers, directors, employees, or agents shall be responsible to Grantor for any act or failure to act, except for Secured Party's own gross negligence or willful misconduct.

**6.** Remedies. Upon the occurrence of an Event of Default, and during the continuance thereof that results in a Material Adverse Effect, the Obligations shall, at the option of Secured Party, become immediately due and payable in full without notice of intent to accelerate, notice of acceleration, demand, or protest, and Secured Party shall have all rights and remedies available to it under applicable law, including without limitation, the rights and remedies of a secured party under the UCC, all of which shall be cumulative. In addition and without limitation, Secured Party: **(a)** may require Grantor to, and Grantor hereby agrees that it will, at its expense and upon request of Secured Party, assemble the Collateral, and any related books and records, as directed by Secured Party, and make the same available to Secured Party upon request, at a place to be designated by Secured Party, which is reasonably convenient to both parties; **(b)** may sell, assign, transfer, and effectively deliver all, or any part of, the Collateral at one or more public or private sales, through any exchange or broker (including an online exchange or broker), or by way of one or more contracts, at such prices and on such terms as Secured Party may deem best, for cash or on credit, without recourse to judicial proceedings and without demand, appraisement, or advertisement, all of which are hereby expressly waived by Grantor to the fullest extent permitted by law; and **(c)** may cause all, or any part of, the Collateral to be seized and sold, under writ issued in execution of a judgment obtained upon the Obligations, or under any other pre- or post-judgment legal procedure. Grantor agrees that the sale, or other disposition of, any part of the Collateral shall not exhaust Secured Party's power of sale, but sales or other dispositions may be made from time to time until all of the Collateral has been sold or disposed of, or until all Obligations have been paid in full. Except for any Collateral that is perishable or threatens to decline speedily in value, Secured Party shall give or mail to Grantor, and other persons as required by law, reasonable written notice of the time and place of any public sale thereof, or the time after which any private sale may be made or the Collateral may be sold on a recognized market. The requirement of reasonable written notice shall be met if such notice is mailed, postage-prepaid by ordinary mail addressed to Grantor at the last address Grantor has given Secured Party in writing, at least **fifteen (15)** Business Days before the time of the sale or disposition. All advances, costs, charges, and expenses relating to the disposition of the Collateral, (including retaking, holding, insuring, and preparing the Collateral for sale and reasonable attorney's fees and expenses), shall become part of the Obligations secured by this Security Agreement and shall bear interest from the date of demand at the highest, non-usurious rate of interest applicable to overdue payments of principal and interest of any of the Obligations as in effect from time to time. Grantor agrees that any public sale shall be conclusively deemed to be conducted in a commercially reasonable manner if it is made consistent with the provisions of this Section and applicable law. If the proceeds from the sale or enforcement of the Collateral

are insufficient to satisfy all of the Obligations in full, all parties obligated thereon shall remain fully obligated for any deficiency.

Without limiting any rights of Secured Party under this Security Agreement, if an Event of Default which results in a Material Adverse effect shall have occurred and be continuing, the Secured Party shall have the right to, or upon the request of the Secured Party, the Grantor shall, instruct all account debtors and other obligors liable on any accounts or other payment obligations of any kind that are a part of the Collateral to make all payments thereon either **(a)** directly to the Secured Party (by instructing that such payments be remitted to a post office box which shall be in the name and under the control of the Secured Party), or **(b)** as otherwise allowed by applicable law. In addition to the foregoing, the Grantor agrees that if any proceeds of any Collateral (including payments made in respect of accounts or other payment obligations of any kind) shall be received by the Grantor while an Event of Default exists, the Grantor shall promptly deliver such proceeds in the form received to the Secured Party with all necessary endorsements. Until such proceeds are delivered to the Secured Party, such proceeds shall be held in trust by the Grantor for the benefit of the Secured Party and shall not be commingled with any other funds or property of the Grantor. All proceeds of Collateral received by the Secured Party pursuant to this paragraph may, at the reasonable discretion of the Secured Party, **(i)** be applied to the Obligations, or **(ii)** be deposited to the credit of the Grantor and held as collateral for the Obligations or permitted to be used by the Grantor in the ordinary course of its business.

In the event the Secured Party seeks to take possession of any or all of the Collateral by judicial process, the Grantor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action. In granting Secured Party the power to enforce its rights hereunder without prior judicial process or judicial hearing, Grantor expressly waives, renounces, and knowingly relinquishes any legal right which might otherwise require Secured Party to enforce its rights by judicial process. Grantor recognizes and concedes that non-judicial remedies are consistent with the usage of trade, are responsive to commercial necessity, and are the result of a bargain at arm's length. Nothing herein is intended to prevent Secured Party or Grantor from resorting to judicial process at either party's option. Grantor waives any right to require Secured Party to proceed against any third party, exhaust any Collateral or other security for the Obligations, or to have any third party joined with Grantor in any suit arising out of the Obligations, or pursue any other remedy available to Secured Party. Grantor further waives any defense arising by reason of any disability, or other defense of any third party, or by reason of the cessation from any cause whatsoever of the liability of any third party.

All rights and remedies of Secured Party hereunder are cumulative of each other and of every other right or remedy which Secured Party may otherwise have at law or in equity, and may be exercised singly or concurrently, and the exercise of one or more of such rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of any other rights or remedies.

**7.** Consent. Without releasing or affecting any of its rights, Secured Party may, one or more times, in its sole discretion, without notice to, or the consent of, any Grantor, take any one or more of the following actions: **(a)** release, renew, or modify the obligations of any other obligor for any of the Obligations; **(b)** release, exchange, modify, or surrender, in whole or in part, Secured Party's rights with respect to any collateral for the Obligations; **(c)** with the consent of the maker thereof, modify or alter the term, interest rate, or due date of any payment

of any of the Obligations; **(d)** grant any postponements, compromises, indulgences, waivers, surrenders, or discharges, or modify the terms of its agreements with Grantor or any other person; **(e)** change its manner of doing business with Grantor or any other person; or **(f)** impute payments or proceeds of any collateral furnished for any of the Obligations, in whole or in part, to any of the Obligations, or in the event of a third party claim thereto, retain the payments or proceeds as collateral for the Obligations without applying same toward payment of the Obligations, and Grantor hereby expressly waives any claims or defenses arising from any such actions.

**8.** Amendments; Waivers. No amendment or waiver of any provision of this Security Agreement, or consent to any departure by any party from the terms hereof, shall in any event be effective against the other party unless the same shall be in writing and signed by the other party. No failure on the part of the Secured Party to exercise, and no delay in exercising any right, power, or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, power, or privilege.

**9.** Joint and Several; Successors and Assigns. If this Security Agreement is executed by more than one Grantor, the obligations of Grantor hereunder shall be joint and several. This Security Agreement shall be binding upon Grantor's successors, heirs, and assigns. Secured Party may, with written consent of Grantor or any Guarantor, which consent shall not unreasonably be withheld, assign and transfer the Collateral to an assignee of Secured Party with respect to any of the Obligations, whereupon such transferee shall become vested with all powers and rights granted to Secured Party under this Security Agreement. Grantor shall not assign any of its rights or obligations under this Security Agreement without the prior written consent of Secured Party until all Obligations are paid in full.

**10.** Notices. All notices and other communications provided for in this Security Agreement shall be given in writing and made by facsimile or mailed by certified mail, return receipt requested, or delivered to the intended recipient at the "**Address for Notices**" specified below its name on the signature pages hereof; or, as to any party at such other address as shall be designated by such party in a notice to the other party given in accordance with this Section. Except as otherwise provided in this Security Agreement, all such communications shall be deemed to have been duly given **(a)** when transmitted by facsimile or other electronic means, subject to confirmation of receipt, **(b)** when personally delivered, or **(c)** in the case of a mailed notice, when duly deposited in the mail, postage prepaid; in each case given or addressed as aforesaid.

**11.** Counterparts. This Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Secured Party and Grantor (the "Parties") may, maintain and rely upon a photocopy, electronic copy, or other reproduction of this Security Agreement and the Parties, for themselves, their heirs, successors, and assigns, and any person claiming by or through any of them, hereby waive any and all objections to, and claims or defenses based upon, the failure of the Parties to produce the original hereof for any purpose whatsoever.

**12.** Severability. If any provision of this Security Agreement shall be held to be legally invalid or unenforceable by any court of competent jurisdiction, all remaining provisions of this Security Agreement shall remain in full force and effect.

13. Headings. The descriptive headings of the several Sections of this Security Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Security Agreement.

14. GOVERNING LAW; JURISDICTION; VENUE. **THIS SECURITY AGREEMENT SHALL BE GOVERNED AND CONTROLLED BY FLORIDA LAW; PROVIDED, HOWEVER, THAT WHERE ANY COLLATERAL IS LOCATED IN A JURISDICTION OTHER THAN FLORIDA, RIGHTS AND REMEDIES AVAILABLE TO A SECURED PARTY UNDER THE LAWS OF SUCH OTHER JURISDICTION SHALL ALSO BE AVAILABLE TO SECURED PARTY WITH RESPECT TO SAID COLLATERAL WITHOUT REGARD TO ANY CONTRARY PROVISION OF FLORIDA LAW, AND SUCH RIGHTS AND REMEDIES SHALL BE IN ADDITION TO ANY OTHER RIGHTS OR REMEDIES SECURED PARTY MAY HAVE. GRANTOR HEREBY IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE PERSONAL JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT IN FLORIDA LOCATED IN THE SAME STATE JUDICIAL CIRCUIT OR FEDERAL JUDICIAL DISTRICT, AS APPLICABLE, AS THE OFFICE OF SECURED PARTY SPECIFIED IN THE ADDRESS FOR NOTICES OF THIS SECURITY AGREEMENT. GRANTOR AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING DIRECTLY, INDIRECTLY OR OTHERWISE IN CONNECTION WITH, OUT OF, RELATED TO OR FROM THIS SECURITY AGREEMENT SHALL BE LITIGATED ONLY IN ONE OF THE FOREGOING DESCRIBED COURTS. GRANTOR, FOR ITSELF, ITS HEIRS, SUCCESSORS AND ITS ASSIGNS, AND FOR ANY PERSON CLAIMING UNDER OR THROUGH ANY OF THEM, HEREBY KNOWINGLY AND VOLUNTARILY WAIVES ANY AND ALL RIGHTS TO HAVE THE JURISDICTION AND VENUE OF ANY LITIGATION ARISING DIRECTLY, INDIRECTLY, OR OTHERWISE IN CONNECTION WITH, OUT OF, RELATED TO, OR FROM THIS SECURITY AGREEMENT IN ANY OTHER COURT, AND GRANTOR HEREBY KNOWINGLY AND VOLUNTARILY WAIVES ANY AND ALL RIGHTS TO REMOVE AN ACTION TO, OR TO TRANSFER, DISMISS, OR CHANGE VENUE TO, ANY OTHER COURT. GRANTOR FURTHER ACKNOWLEDGES AND AGREES THAT NEITHER SECURED PARTY, NOR ANY PERSON ACTING ON BEHALF OF SECURED PARTY, HAS IN ANY WAY AGREED WITH OR REPRESENTED TO GRANTOR THAT THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN WAIVED OR WILL NOT BE FULLY ENFORCED BY SECURED PARTY. NOTWITHSTANDING THE FOREGOING, SECURED PARTY MAY INITIATE NECESSARY JUDICIAL ACTIONS IN ANY JURISDICTION TO RECOVER COLLATERAL SECURING THE OBLIGATIONS.**

15. Final Agreement. This Security Agreement represents the final, entire agreement between the parties with respect to the subject matter hereof. No course of dealing, course of performance, usage of trade, or evidence of any prior, contemporaneous, or subsequent oral agreements or discussions, or other extrinsic evidence of any nature, shall be used to contradict, vary, supplement, or modify any term of this Agreement. There are no oral agreements between the parties.

16. No Third Party Benefit. This Security Agreement is made solely for the purpose of setting forth the rights and obligations of the Secured Party and Grantor, and any other obligations of the Secured Party and Grantor, and any other signatories hereto, and no other third party is intended to benefit hereby or to have any rights hereunder.

17. Other Security Agreements. This Security Agreement is additional and supplemental to any and all other security agreements heretofore and hereafter executed by any Grantor for benefit of the Secured Party, whether or not relating to the Obligations and

Collateral, and shall not supersede or be superseded by any other security agreement executed by any Grantor or any other person or entity for any purpose.

18. WAIVER OF JURY TRIAL. GRANTOR AND SECURED PARTY KNOWINGLY, VOLUNTARILY, AND IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS EACH MAY HAVE TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED ON, ARISING OUT OF, OR IN ANY WAY RELATED TO: THIS SECURITY AGREEMENT, THE OBLIGATIONS, THE LOAN AGREEMENT, THE NOTE, OR ANY LOAN DOCUMENT OR AGREEMENT EXECUTED, OR CONTEMPLATED TO BE EXECUTED, IN CONNECTION WITH ANY OF THE OBLIGATIONS, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. THIS JURY WAIVER ALSO APPLIES TO ANY CLAIM, COUNTER CLAIM, CAUSE OF ACTION, OR DEMAND ARISING FROM, OR RELATED TO, (I) ANY COURSE OF CONDUCT, COURSE OF DEALING, OR RELATIONSHIP OF GRANTOR, GRANTOR, OR ANY OTHER PERSON WITH SECURED PARTY, OR ANY EMPLOYEE, OFFICER, DIRECTOR, OR ASSIGNEE OF SECURED PARTY IN CONNECTION WITH THE OBLIGATIONS, OR (II) ANY STATEMENT (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF ANY PERSON BY OR ON BEHALF OF GRANTOR, GRANTOR, OR ANY OTHER PERSON IN CONNECTION WITH THE OBLIGATIONS, REGARDLESS OF WHETHER ANY SUCH CAUSE OF ACTION OR DEMAND ARISES BY CONTRACT, TORT, OR OTHERWISE. GRANTOR HEREBY ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO THE SECURED PARTY IN EXTENDING CREDIT TO THE GRANTOR, THAT THE SECURED PARTY WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS JURY TRIAL WAIVER, AND THAT GRANTOR HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS JURY TRIAL WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER. GRANTOR FURTHER CERTIFIES THAT NO PERSON HAS REPRESENTED TO IT, EXPRESSLY OR OTHERWISE, THAT SECURED PARTY OR ANY OTHER PERSON WOULD NOT, IN THE EVENT OF A LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER.

EXECUTED by the Grantor and the Secured Party as of the date first above written.

"**GRANTOR**":

**Aery Aviation, LLC**

By: ____________________
NAME: Leslie S. Walton
TITLE: Manager

**Flight Support, Inc.**

By: ____________________
NAME: Scott Beale
TITLE: President and Secretary

**Electronic Warfare Training Support LLC**
BY: FLIGHT SUPPORT, INC., its Sole Member

By: ____________________
NAME: Scott Beale
TITLE: President and Secretary

**Strategic Airborne Operations JV, LLC**
BY: AERY AVIATION, LLC, its Sole Member

By: ____________________
NAME: Leslie S. Walton
TITLE: Manager

Address for Notice:
305 Cherokee Dr.
Newport News, VA 23602-4437

"**SECURED PARTY**":

**Cogent Bank**

**By:** ____________________
**Print Name: Michael Skat**
**As Its: Executive Vice President**

Address for Notice:
1113 Saxon Blvd
Orange City, Florida 32763

EXECUTED by the Grantor and the Secured Party as of the date first above written.

"**GRANTOR**":

**Aery Aviation, LLC**

By: ______________________________
NAME: Leslie S. Walton
TITLE: Manager

**Flight Support, Inc.**

By: ______________________________
NAME: Scott Beale
TITLE: President and Secretary

**Electronic Warfare Training Support LLC**
BY: FLIGHT SUPPORT, INC., its Sole Member

By: ______________________________
NAME: Scott Beale
TITLE: President and Secretary

**Strategic Airborne Operations JV, LLC**
BY: AERY AVIATION, LLC, its Sole Member

By: ______________________________
NAME: Leslie S. Walton
TITLE: Manager

Address for Notice:
305 Cherokee Dr.
Newport News, VA 23602-4437

"**SECURED PARTY**":

**Cogent Bank**

**By:** Abbey Henderson
**Print Name: Abbey Henderson**
**As Its: Senior Vice President**

Address for Notice:
1113 Saxon Blvd
Orange City, Florida 32763

EXECUTED by the Grantor and the Secured Party as of the date first above written.

"**GRANTOR**":

**Aery Aviation, LLC**

By: ____________________
NAME: Leslie S. Walton
TITLE: Manager

**Flight Support, Inc.**

By: ____________________
NAME: Scott Beale
TITLE: President and Secretary

**Electronic Warfare Training Support LLC**
BY: FLIGHT SUPPORT, INC., its Sole Member

By: ____________________
NAME: Scott Beale
TITLE: President and Secretary

**Strategic Airborne Operations JV, LLC**
BY: AERY AVIATION, LLC, its Sole Member

By: ____________________
NAME: Leslie S. Walton
TITLE: Manager

Address for Notice:
305 Cherokee Dr.
Newport News, VA 23602-4437

"**SECURED PARTY**":

**Cogent Bank**

**By: ____________________**
**Print Name: Abbey Henderson**
**As Its: Senior Vice President**

Address for Notice:
1113 Saxon Blvd
Orange City, Florida 32763

**EXHIBIT A**

**PERMITTED ENCUMBRANCES**

*a)* the Company's existing seller notes for the following aircraft (total debt at 12/31/20 of $2,031,433.91 million with aircraft value of $2,943,116.70

1. *N515JA (Gulfstream IV)*
2. *N31KH (Lear 31A)*

*b)* An equipment financing loan from VFI of $3.0 million for electronic warfare equipment to be installed in 4 Lear jets.

*c)* An aircraft financing loan from NEF for $4.0 million (not to exceed 75% OLV) for the following aircraft with a value of $5.5 million

1. *N432HC (Gulfstream IV)*
2. *N163JW (Gulfstream IV)*

*d)* General Motors Acceptance Corp., vehicle financing for 2018 GMC Yukon XL and 2021 Chevrolet Tahoe.

*e)* Equipment financing loan from CNC Associates, Inc.

*f)* An aircraft financing loan from Canandaigua National Bank for T182T aircraft and (1) engine.

*g)* BB&T deposit for coverage of performance guarantee LOC for government of Pakistan.

*h)* Any aircraft or equipment that Bank chooses not to finance.

*i)* Bay View Funding receivables factoring agreement.

*j)* Pursuant to that Collateral Pledge Agreement between Leslie S. Walton, Scott Beale and Prudent Capital III, LP, in the Event of Default a pledge of certificated membership interest in Aery Aviation, LLC to Prudent Capital III, LP., and the collateral assignment of the life insurance policies insuring the lives of Leslie S. Walton and Scott Beale.

COGENT BANK

# **BLOCKED ACCOUNT AGREEMENT ("Agreement")**

Control Agreement

1. **Cogent Bank,** ("Lender") is making, or may in the future make, loans in accordance with a Loan Agreement dated as of this 23rd day of June, 2021 (as amended, supplemented or otherwise modified from time to time, the "Loan Agreement") between Lender, and Aery Aviation, LLC, a Virginia limited liability company, Flight Support, Inc., a Virginia corporation, Electronic Warfare Training Support, LLC, a Virginia limited liability company, and Strategic Airborne Operations JV, LLC, a Virginia limited liability company, ("Borrower"). Pursuant to the Loan Agreement and certain other security and related financing documents (as amended, supplemented or otherwise modified from time to time, together with the Loan Agreement, the "Financing Documents"), such loans are secured by, and Borrower has granted to Lender, a security interest in, among other things, certain accounts receivables of Borrower and all proceeds thereof. In connection with the above-referenced financing arrangements, Lender has required, and Borrower has agreed that all collections and proceeds of Borrower's accounts receivables and other remittances made by account debtors in payment of accounts receivable of Borrower be made to a blocked account and remitted in kind to Lender.

2. Borrower hereby confirms to Lender that a special, separate account number, [redacted]0189, (the "Blocked Account") in the name of and under the sole dominion and control of Lender has been established solely for the purpose of receiving deposits made by or on behalf of Borrower and is subject to signing authority in Lender's record of authorized signatures. The account may receive deposits in the form of cash, checks, credit card receipts, electronic funds credits and/or wire transfers from all account debtors and other persons and entities and third-party payors and obligors of any Borrower (collectively, "Payors"). Except as expressly provided herein, Lender shall not bear any responsibility for such amounts. Borrower hereby agrees and confirms that (a) it has no right or ability to direct the documents, amounts, funds, cash or payments held at any time in the Blocked Account, (b) Lender has exclusive dominion and control over the Blocked Account and all funds or amounts in the Blocked accounts in all respects, and (c) it has no dominion or control whatsoever over the Blocked Account or any funds or amounts in the Blocked Account, and Borrower hereby disclaims any and all rights of any nature whatsoever to control or otherwise direct or make any claim against the funds, cash or other amounts in the Blocked Account at any time. Borrower's sole and exclusive right and interest in and to any funds in the Blocked Account is limited to those amounts in the Blocked Account that are in excess of any and all security interest or other rights that Lender has or may have by virtue of the Loan Agreement or any related Security Agreement to which Lender and Borrower are or may become a party to. Borrower hereby represents, warrants and agrees that Lender has a first and priority interest in and to any and all funds in the Blocked Account, which first and priority interest is superior to any interest of Borrower, other party(ies) to or any guarantor(s) of the Loan Agreement, and any other person, entity or party. Any available funds in the Blocked Account that are in excess of Lender's

first and priority interest shall be disbursed to Borrower within twenty-four (24) hours to account number [redacted]0213, which account is maintained by Aery Aviation, LLC with Lender, except that all receipts are subject to the Lender's standard hold requirements.

**3.** (a) Lender shall take the necessary steps to process for the collection and deposit into the Blocked Account of all forms of payment or other cash items that are acceptable for collection through the Federal Reserve System on at least a daily basis on each Business Day. For purposes of this Agreement, a "Business Day" is any day other than a Saturday, Sunday or other day on which Bank is or is authorized or required by law to be closed. Borrower has granted to Lender a first priority lien against and security interest in and to, and Borrower hereby affirms that it grants such lien and security interest to Lender in and to, the Blocked Account and all amounts, cash, funds and other items from time to time in the Blocked Account, and all remittances and the proceeds thereof. In furtherance of the foregoing, Borrower agrees that all Payors have been, or will be, instructed to make all payments directly to Blocked Account. Borrower agrees to immediately forward all payments and amounts that it receives from Payors to the Blocked Account. Each remittance will be processed pursuant to this Agreement.
(b) Borrower shall have no right to issue withdrawal, payment, transfer, delivery, disposition or other instructions or any other right or ability to control, access, pick up, withdraw or transfer, deliver or dispose of items or funds from the Blocked Account without Lender's prior express written consent with respect thereto.

**4.** (a) All funds, amounts, payments and cash received by the Lender in the Blocked Account or otherwise from Payors of Borrower via wire transfer, ACH or otherwise, shall be held for the benefit of and subject to the first priority lien of Lender in such proceeds and other items, and, without limiting any other provision of this Agreement, all such proceeds shall be available for transfer accordance with this Agreement.
(b) The processing of wire transfers by Lender is subject to the same terms and conditions that apply to deposits of funds via wire transfer received directly from business customers for deposit in Lender's regular demand deposit accounts.
(c) Borrower and Lender agree that withdrawals or transfers from the Blocked Account will not at any time exceed the collected or available funds in the Blocked Account. In all instances, Borrower shall remain liable to Lender for any returned or uncollected items, proceeds or funds from Payors.

**5.** Borrower agrees to pay the reasonable charges in effect from time to time of Lender for the performance of the services set forth in this Agreement and for any other charges in connection with this Agreement or in connection with the Blocked Account. Lender's charges shall be billed directly to Borrower in accordance with its normal practice. Charges, fees or other obligations of the Borrower due to the Lender for services provided by the Lender, other than those directly and solely related to the Blocked Account, may not in any event be debited to the Blocked Account.

**6.** Borrower hereby irrevocably makes, constitutes and appoints Lender (and all persons designated by Lender for that purpose) as Borrower's true and lawful attorney and agent-in-fact to endorse Borrower's name as and when required with respect to any payments made to any Borrower (or any reasonable variation of their names) with the endorsement "Credit to the account of within named payee without prejudice." Bank's appointment as agent to make such endorsement is for the specific, limited and restricted purpose of endorsement for deposit as described above and at no time shall be interpreted as authorizing Lender as such agent to commit Borrower to

acceptance of any legend of any kind, nature or description appearing on or with respect to any such payment.

**7.** Lender will exercise ordinary care in the performance of its services under this Agreement and shall be liable to Borrower only for losses caused by the gross negligence or willful misconduct of Lender or its agents or employees. Borrower agrees that Lender shall not be liable for any damage or loss to it for any delay or failure in performance arising out of the acts or omissions of any third parties, including, but not limited to, various communications services, courier services, the Federal Reserve System, any other bank or any third party that may be affected by funds transactions, fire, mechanical, computer or electrical failures or other unforeseen contingencies, strikes or any similar or dissimilar cause beyond the reasonable control of Lender.

IN ANY EVENT, LENDER WILL NOT BE DEEMED TO BE OBLIGATED, LIABLE OR ACCOUNTABLE UPON OR UNDER ANY GUARANTY, REPRESENTATION OR WARRANTY, EXPRESSED OR IMPLIED, ARISING BY OPERATION OF LAW OR OTHERWISE, INCLUDING THE WARRANTY OF FITNESS FOR A PARTICULAR USE, IN ANY MANNER OR FORM BEYOND THE OBLIGATIONS, REPRESENTATIONS AND WARRANTIES EXPRESSLY MADE IN THIS AGREEMENT. BORROWER AGREES THAT IN NO EVENT SHALL LENDER BE LIABLE FOR LOSS OF PROFITS, INDIRECT, SPECIAL OR CONSEQUENTIAL DAMAGES, EVEN IF BANK IS SPECIFICALLY ADVISED OR AWARE OF SUCH POSSIBILITY.

**8.** It is understood that the services contemplated by this Agreement are provided as a convenience to Borrower. In consideration thereof, Borrower agrees to indemnify and hold Lender harmless from all liability, claims, losses, and demands whatsoever, including reasonable legal fees and expenses, however arising or incurred, because of or in connection with Bank's performance of this Agreement and the transfer of funds contemplated under this Agreement. Fees associated with this service are as follows:

One time implementation fee: $1,000.00
Monthly maintenance fee: $200.00

**9.** Borrower hereby irrevocably directs Lender to, and Borrower and Lender hereby agree that, on each Business Day (and without requiring Borrower's further consent) Lender shall deposit on a daily basis all forms of payment, funds, cash and other items made payable to Borrower into the Blocked Account, and Lender shall transfer to the Revolving Line of Credit described in the Loan Agreement in immediately available funds, all funds and amounts on deposit in the Blocked Account, less One Hundred Dollars and No Cents ($100.00), as of the close of the immediately preceding Business Day, including without limitation, all electronic payments received in the Blocked Account from obligors of Borrower via wire or ACH transfer; provided that if there is less than One Hundred Dollars ($100.00) in the Blocked Account at such time on a given Business Day, then Lender shall not make a transfer on such Business Day pursuant to this Section 9.

**10.** This Agreement shall continue in full force and effect until (a) terminated by Lender upon not less than thirty (30) calendar days' written notice to Borrower, or (b) upon full and final satisfaction by Borrower of all terms, commitments and obligations set forth in the Loan Agreement and the Financing Documents, including, but not limited to, the repayment of all sums due to Lender thereunder and the expiration of time such that Lender has no obligation to make loans or other direct or indirect financial accommodations to Borrower under the Loan Agreement or the Financing Documents. Termination of this Agreement shall in no event affect any obligation

incurred under this Agreement before such termination by the parties hereto. This Agreement may be modified from time to time only in a writing executed by each of the parties hereto. The notice shall be sent pursuant to the notice provisions set forth in Section 12 of this Agreement.

**11.** Any notice or request hereunder shall be given to any party at its respective address set forth below or at such other address as such Person may hereafter specify in a notice given in the manner required under this Section 12. Any notice or request hereunder shall be given only by and shall be deemed to have been received upon ("Receipt"): (i) United States mail via the United States Postal Service, (ii) delivery by an overnight courier, or (iii) facsimile or electronic transmission, in each case upon telephone or further electronic communication from the recipient acknowledging receipt (whether automatic or manual from recipient), as applicable.

(i) If to Lender:

**Cogent Bank**
Loan Department
1113 Saxon Blvd.
Orange City, FL 32763
Telephone: 386-774-2001
Fax: 386-774-2010

(ii) If to Borrower:

305 Cherokee Dr.
Newport News, VA 23602-4437
Attention: Robert Dynan, VP Finance
Telephone: (757) 593-6149

E-MAIL: bob@aeryaviation.com

**12.** This Agreement shall be governed by and construed in accordance with the laws of the State of Florida without giving effect to its choice of law provisions. This Agreement: (i) may be signed by facsimile and in any number of counterparts, each of which shall be an original, with the same effect as if the signatures thereto and hereto were upon the same instrument; and (ii) shall become effective when counterparts hereof have been signed and delivered by the parties hereto. There shall be no amendment or modification of any of the terms of this Agreement unless it is reduced to writing and signed by the Parties hereto.

**13.** In the event of any litigation or other legal action in connection with the validity, interpretation or enforcement of this Agreement, jurisdiction and venue for such action shall lie exclusively in Orange County, Florida, and the Parties hereby irrevocably consent to personal jurisdiction in the State of Florida. ALL PARTIES TO THIS AGREEMENT KNOWINGLY, VOLUNTARILY AND IRREVOCABLY WAIVE ANY AND ALL RIGHTS TO A TRIAL BY JURY ON ANY ACTION, SUIT, CLAIM, DISPUTE OR PROCEEDING BASED ON OR IN ANY WAY ARISING OUT OF THIS AGREEMENT OR THE BLOCKED ACCOUNT, WHETHER SOUNDING IN CONTRACT, TORT, EQUITY OR ANY OTHER NATURE.

**14.** In the event a party initiates an action, claim or lawsuit against the other party arising out of or in any way relating to this Agreement or the Blocked Account, then the prevailing party in the action, claim or litigation shall be entitled to an award of its reasonable attorneys' fees and costs (including those incurred pre-suit, at the trial level and at the appellate level) against the non-prevailing party.

**IN WITNESS WHEREOF,** this Agreement has been signed by the parties as of the date written above.

***On Behalf of Customer:***

Customer Name: Aery Aviation, LLC
Address: 305 Cherokee Dr.
City, State Zip: Newport News, VA 23602-4437
Authorized Signature: x S. Walton
Printed Name: Leslie S. Walton
Title: Manager
Date: June ____, 2021

Customer Name: Flight Support, Inc.
Address: 305 Cherokee Dr.
City, State Zip: Newport News, VA 23602-4437
Authorized Signature: x
Printed Name: Scott Beale
Title: President and Secretary
Date: June ____, 2021

Customer Name: Electronic Warfare Training Support, LLC
By: Flight Support, Inc, its Sole Member
Address: 305 Cherokee Dr.
City, State Zip: Newport News, VA 23602-4437
Authorized Signature: x
Printed Name: Scott Beale
Title: President and Secretary
Date: June ____, 2021

Customer Name: Strategic Airborne Operations JV, LLC
By: Aery Aviation, LLC, its Sole Member
Address: 305 Cherokee Dr.
City, State Zip: Newport News, VA 23602-4437
Authorized Signature: x S. Walton
Printed Name: Leslie S. Walton
Title: Manager
Date: June ____, 2021

**IN WITNESS WHEREOF,** this Agreement has been signed by the parties as of the date written above.

***On Behalf of Customer:***

| | |
|---|---|
| Customer Name: | Aery Aviation, LLC |
| Address: | 305 Cherokee Dr. |
| City, State Zip: | Newport News, VA 23602-4437 |
| Authorized Signature: | x |
| Printed Name: | Leslie S. Walton |
| Title: | Manager |
| Date: | June ____, 2021 |

| | |
|---|---|
| Customer Name: | Flight Support, Inc. |
| Address: | 305 Cherokee Dr. |
| City, State Zip: | Newport News, VA 23602-4437 |
| Authorized Signature: | x [signature] |
| Printed Name: | Scott Beale |
| Title: | President and Secretary |
| Date: | June ____, 2021 |

| | |
|---|---|
| Customer Name: | Electronic Warfare Training Support, LLC<br>By: Flight Support, Inc, its Sole Member |
| Address: | 305 Cherokee Dr. |
| City, State Zip: | Newport News, VA 23602-4437 |
| Authorized Signature: | x [signature] |
| Printed Name: | Scott Beale |
| Title: | President and Secretary |
| Date: | June ____, 2021 |

| | |
|---|---|
| Customer Name: | Strategic Airborne Operations JV, LLC<br>By: Aery Aviation, LLC, its Sole Member |
| Address: | 305 Cherokee Dr. |
| City, State Zip: | Newport News, VA 23602-4437 |
| Authorized Signature: | x |
| Printed Name: | Leslie S. Walton |
| Title: | Manager |
| Date: | June ____, 2021 |

***On Behalf of Lender:***

| | |
|---|---|
| Authorized Signature: | x Abbey Henderson |
| Printed Name: | Abbey Henderson |
| Title: | Senior Vice President |
| Date: | June ____, 2021 |

**SECOND AMENDMENT TO LOAN AGREEMENT**

This Second Amendment to Loan Agreement ("**Amendment**") is made and entered into as of **September** 24 **, 2021**, by and among **Cogent Bank**, a **State Chartered Bank**, having an address 1113 Saxon Blvd, Orange City, FL 32763, and its successors and assigns ("**Bank**"), and **Aery Aviation, LLC, a Virginia limited liability company**, having an address of 305 Cherokee Dr., Newport News, VA 23602-4437, **Flight Support, Inc., a Virginia corporation**, having an address of 305 Cherokee Dr., Newport News, VA 23602-4437, **Electronic Warfare Training Support, LLC, a Virginia limited liability company**, having an address of 700 Corporate Dr., Newport News, VA 23602-4437, **Strategic Airborne Operations JV, LLC, a Virginia limited liability company**, having an address of 305 Cherokee Dr., Newport News, VA 23602-4437, and **GH Equipment, LLC, a Delaware limited liability company**, having an address of 305 Cherokee Dr., Newport News, VA 23602-4437 (collectively, "**Borrower**"), and **Scott Beale**, having an address of 6674 Gates Mills Blvd, Gates Mills, OH 44040 ("**Guarantor**"). **Robert Dynan**, having an address of 102 Blue Heron Dr., Yorktown, VA 23692, and **Josh Walton**, having an address of 305 Cherokee Dr., Newport News, VA 23602 (together, the "**Validity Guarantors**"), hereby join in this Amendment for the sole purpose of acknowledging the terms hereof.

RECITALS

A. The Borrower and the Bank entered into a loan (the "**Loan**"), (i) evidenced in part by (among other things) that certain Revolving Line of Credit Promissory Note dated June 23, 2021, in the principal amount of $9,000,000.00, made by the Borrower in favor of the Bank, as amended by that certain First Amendment to Revolving Line of Credit Promissory Note dated July 9, 2021, as amended by that certain Amended and Restated Revolving Line of Credit Promissory Note in the original principal amount of $15,000,000.00 of even date herewith (the "**Note**"), (ii) as secured by that certain Security Agreement dated June 23, 2021, as amended by that certain Global Addendum to Loan Documents dated July 9, 2021 (the "**Security Agreement**"), and (iii) as governed by that certain Business Loan Agreement dated June 23, 2021, as amended by that certain Global Addendum to Loan Documents dated July 9, 2021 (the "**Loan Agreement**").

B. The Borrower and the Guarantor have requested Bank to modify certain terms of the Loan documents, including terms within the Security Agreement and the Loan Agreement.

NOW, THEREFORE, in consideration of the premises and the mutual agreements, covenants, and conditions herein, Borrower, Guarantor, and Bank agree as follows:

1. The above Recitals are hereby incorporated by reference.

2. The amount of the Line of Credit Commitment as stated in **Section 2.01(a)** of the Loan Agreement is hereby changed from $9,000,000.00 to $15,000,000.00.

3. All of the terms, conditions, warranties, representations, and obligations, other than amended hereby, or in conjunction herewith, shall remain unchanged and in full force and effect. Words used in this Amendment in which the initial letter is capitalized shall have the meaning indicated by their initial appearance circumscribed in parenthesis and quotation marks. That all of the other stipulations, terms, provisions, covenants, and agreements as contained in the aforesaid Loan Agreement shall remain in full force and effect except as herein provided to the contrary or modified in conjunction herewith. In the event of an inconsistency or conflict between the provisions of the Loan Agreement and this Amendment, this Amendment shall control.

4. The undersigned parties hereby reaffirm their obligations under the documents relating to the Loan ("**Loan Documents**"), ratify and affirm the Loan Documents in all respects, and acknowledge and agree that the Loan Documents are in full force and effect and are enforceable against them as provided therein. The Borrower and Guarantor confirm that they have no claims, defenses, or setoffs with respect to their obligations pursuant to the Loan Documents, as reaffirmed hereby.

5. This Amendment may be executed in any number of identical counterparts, and the signatures of all signatories hereto need not be contained on any one single counterpart hereof; that, if so executed, each of such counterparts shall be deemed an original for all purposes and all such counterparts shall, collectively, constitute one agreement (but in making proof of these resolutions it shall not be necessary to produce or account for more than one such counterpart); that a facsimile signature (i.e., the transmission by any signatory via facsimile machine, by email or other electronic media of his signature on an original

**Exhibit 5**

of any copy of this instrument) shall be deemed to be the delivery by such signatory of his original signature hereon; and that, if desired, the signature pages from separately executed original counterparts of this instrument may be combined to form one or more fully executed original counterparts.

**(Signatures on following pages)**

**IN WITNESS WHEREOF**, the undersigned parties have executed this Amendment as of the date set forth above.

**"BORROWER"**

**Aery Aviation, LLC**

By: ______________________
Leslie S. Walton Manager

**Flight Support, Inc.**

By: ______________________
Scott Beale
President and Secretary

**Electronic Warfare Training Support LLC, by Flight Support, Inc., its sole member**

By: ______________________
Scott Beale
Manager

**Strategic Airborne Operations JV, LLC, by Aery Aviation, LLC, its sole member**

By: ______________________
Leslie S. Walton
Manager

**GH Equipment, LLC**

By: ______________________
Name: Leslie S. Walton
Title: Managing Member

**"GUARANTOR"**

By: ______________________
Scott Beale, individually

**IN WITNESS WHEREOF**, the undersigned parties have executed this Amendment as of the date set forth above.

"**BORROWER**"

**Aery Aviation, LLC**

By: ______________________________
Leslie S. Walton Manager

**Flight Support, Inc.**

By: ______________________________
Scott Beale
President and Secretary

**Electronic Warfare Training Support LLC, by Flight Support, Inc., its sole member**

By: ______________________________
Scott Beale
Manager

**Strategic Airborne Operations JV, LLC, by Aery Aviation, LLC, its sole member**

By: ______________________________
Leslie S. Walton
Manager

**GH Equipment, LLC**

By: ______________________________
Name: Leslie S. Walton
Title: Managing Member

**"GUARANTOR"**

By: ______________________________
Scott Beale, individually

"**BANK**"

**COGENT BANK**

By:____________________________
Name: Abbey Henderson
Title: Senior Vice President

"**VALIDITY GUARANTORS**"

By:____________________________
**Josh Walton, Individually**

By:____________________________
**Robert Dynan, Individually**

"**BANK**"

**COGENT BANK**

By: Abbey Henderson
Name: Abbey Henderson
Title: Senior Vice President

"**VALIDITY GUARANTORS**"

By:________________________________
**Josh Walton, Individually**

By:________________________________
**Robert Dynan, Individually**

**THIS NOTE WAS EXECUTED AND DELIVERED OUTSIDE OF THE STATE OF FLORIDA AND IS NOT SECURED BY REAL PROPERTY. AS A RESULT, NO DOCUMENTARY STAMP TAXES ARE DUE.**

*AMENDED AND RESTATED REVOLVING LINE OF CREDIT PROMISSORY NOTE*

**$15,000,000.00** **September 24 , 2021**
Orlando, Florida

**FOR VALUE RECEIVED**, the undersigned, **Aery Aviation, LLC, a Virginia limited liability company** having an address of 305 Cherokee Dr., Newport News, VA 23602-4437, **Flight Support, Inc., a Virginia corporation** having an address of 305 Cherokee Dr., Newport News, VA 23602-4437, **Electronic Warfare Training Support, LLC, a Virginia limited liability company** having an address of 700 Corporate Dr., Newport News, VA 23602-4437, **Strategic Airborne Operations JV, LLC, a Virginia limited liability company** having an address of 305 Cherokee Dr., Newport News, VA 23602-4437, and **GH Equipment, LLC, a Delaware limited liability company** having an address of 305 Cherokee Dr., Newport News, VA 23602-4437 (collectively, the "**Maker**"), unconditionally promises to pay to the order of **Cogent Bank, a State Chartered Bank** ("**Payee**," which shall include any subsequent holder hereof or any interest herein), at **1113 Saxon Blvd, Orange City, FL 32763**, or at such other place as the Payee may from time to time designate in writing, without grace, the principal sum of **FIFTEEN MILLION AND 00/100 DOLLARS ($15,000,000.00)**, or so much thereof as shall have been advanced hereunder, together with interest on the unpaid principal balance from time to time outstanding in accordance with the following provisions:

Except in cases where this Note accrues interest at the Default Rate (as defined below), this Note shall bear interest at the Interest Rate.

Definitions: As used in this Note, the following terms shall have the following meanings:

a) "**Aircraft/Equipment Advance**" shall mean an Advance that is made for Eligible Aircraft or Eligible Equipment
b) "**Business Day**" shall mean any day other than a Saturday, Sunday or any other day on which commercial banks located in Orange City, Florida, are not open for business.
c) "**Conversion Date**" shall mean January 1 and July 1 of every year.
d) "**Draw Period**" shall mean the period of time between January 1 and June 30 of each year and the period of time between July 1 and December 31 of each year during the Term.
e) "**Draw Period Total**" shall mean the aggregate of all Aircraft/Equipment Advances made during a particular Draw Period.
f) "**Interest Rate**" shall mean a per annum rate of interest equal to the Prime Rate, as from time to time in effect, *plus* **2.25%**, with such rate to change on each day that the Prime Rate changes. Notwithstanding the foregoing, at no time shall the Interest Rate ever be less than 4.0%.
g) "**Loan Agreement**" shall mean that certain Loan Agreement dated **June 23, 2021**, as modified by that certain Global Addendum to Loan Documents dated **July 9, 2021**, as modified by that certain Second Amendment to Loan Agreement dated of even date herewith, as may be amended, modified, restated, or supplemented from time to time herein, which governs the disbursement of proceeds of, and otherwise sets forth terms and conditions relating to, the loan evidenced by this Note.
h) "**Loan Documents**" shall mean the Note, Security Agreement, Loan Agreement, and all other documents or instruments now or hereafter executed in connection with any obligation of Maker to Payee.
i) "**Maturity Date**" shall mean the **ON DEMAND.**



**Exhibit 6**

j) **"Prime Rate"** shall the Prime Rate published in the **"Money Rates"** table in *The Wall Street Journal*. If two or more Prime Rates are published in the **"Money Rates"** table for the same date, the highest of such rates shall be the Prime Rate. If the date upon which a change in the interest rate is to occur is a date upon which *The Wall Street Journal* is not published or the Prime Rate is not available in the Money Rates table of *The Wall Street Journal* the Prime Rate shall be determined from the immediately preceding edition of *The Wall Street Journal* in which the Money Rates table and Prime Rate is available. If *The Wall Street Journal* ceases to be published or ceases to publish the Prime Rate in the Money Rates table, the Payee will choose a new index that is reasonably determined by Payee to be based upon comparable information.

k) **"Security Agreement"** shall mean that certain Security Agreement dated **June 23,2021**, as amended by that certain Amended and Restated Security Agreement of even date herewith, as may subsequently be amended, which is a lien on a certain collateral described therein.

l) **"Sub-Note"** shall mean the Sub-Note executed by Maker for each Draw Period Total

m) **"Sub-Note Interest Rate"** shall mean the per annum rate of interest equal to the Prime Rate in effect at the time of a Conversion Date *plus* **2.25%,** which rate shall be fixed for each applicable Sub-Note. Notwithstanding the foregoing, at no time shall the Interest Rate ever be less than 4.0%.

n) **"Sub-Note Maturity Date"** shall mean the date that is determined by the Bank in its sole discretion, which may be up to **84 months** from the date of the applicable Sub-Note.

o) **"Term"** shall mean the period of time between the date of this Note and the Maturity Date.

p) All other capitalized terms not otherwise defined herein shall have the meaning given to them in the Loan Agreement.

On the 30th day of each and every calendar month during the Term, Maker shall pay to Payee payments of accrued interest only. Except as otherwise stated herein, the entire outstanding principal balance, together with all accrued interest thereon, as well as all other costs associated with the indebtedness evidenced hereby, shall be due and payable in full on the Maturity Date.

The Maker shall repay each Draw Period Total in monthly payments of principal plus interest, which payments shall be based upon an 84-month amortization schedule calculated on the applicable Draw Period Total at the applicable Sub-Note Interest Rate. The Maker shall execute a Sub-Note for each Draw Period Total, which shall govern the repayment terms for the applicable Draw Period Total. For each Draw Period Total, any remaining unpaid interest and outstanding principal balance, as well as all other costs associated with the Draw Period Total, shall be due and payable in full on the Sub-Note Maturity Date.

This Note **(i)** is made pursuant and subject to the terms the Loan Agreement, **(ii)** is secured by, among other things, the Security Agreement, and **(iii)** is governed by and subject to the Loan Documents..

All payments hereunder shall be first applied to interest, then principal with the balance, if any, to late fees and other charges, costs, expenses and fees due hereunder. All interest provided for in this Note shall be calculated on the basis of a three hundred sixty (360) day year, based on the actual number of days elapsed. Payments must be made in legal tender of the United States of America in good, collected funds at the place of payment. Any payment received after 2:00 p.m. (place of payment time) may be credited on the next succeeding Business Day.

Any payment which is not made within ten (10) calendar days of when due, shall be assessed a **"late charge"** of five percent (5%) of such payment, which shall be immediately due and payable to Payee.

Prepayments may be made in whole or in part at any time.

To the extent permitted by law, Maker, any endorser, any guarantor hereof or any other party hereto (individually, an **"Obligor"** and collectively, **"Obligors"**) and each of them jointly and severally: (a) waive presentment, demand, protest, notice of demand, notice of intent to accelerate, notice of

acceleration of maturity, notice of protest, notice of nonpayment, notice of dishonor, and any other notice required to be given under the law to any Obligor in connection with the delivery, acceptance, performance, default or enforcement of this Note, any endorsement or guaranty of this Note, or any other documents executed in connection with this Note or any other note or other Loan Documents; (b) consent to all delays, extensions, renewals or other modifications of this Note or the Loan Documents, or waivers of any term hereof or of the Loan Documents, or release or discharge by payee of any of Obligors, or release, substitution or exchange of any security for the payment hereof, or the failure to act on the part of Payee, or any indulgence shown by Payee (without notice to or further assent from any of Obligors), and agree that no such action, failure to act or failure to exercise any right or remedy by Payee shall in any way affect or impair the obligations of any Obligors or be construed as a waiver by Payee of, or otherwise affect, any of Payee's rights under this Note, under any endorsement or guaranty of this Note or under any of the Loan Documents; and (c) agree to pay, on demand, all costs and expenses of enforcement of the obligations of the Obligors under the Loan Documents, including without limitation, the collection or defense of this Note or of any endorsement or guaranty hereof and/or the enforcement or defense of Payee's rights with respect to, or the administration, supervision, preservation, protection of, or realization upon, any property securing payment hereof, including, without limitation, reasonable attorneys' and paralegals' fees, (whether suit or action be brought or not) including fees related to the enforcement of any of the obligations of any Obligor under the Loan Documents, any suit, mediation or arbitration proceeding, out of court payment or settlement negotiations or agreement, trial, appeal, bankruptcy case, proceedings (including without limitation seeking relief from the stay of 11 U.S.C. §362 and limiting the use of cash collateral under 11 U.S.C. §363), receivership, or other case or proceeding, in such amount as may be determined reasonable by any arbitrator or court, whichever is applicable. The obligation to pay such fees, costs, and expenses shall survive the entry of a final judgment on this Note and the payment of such fees, costs and expenses (whether incurred by the Payee before or after the entry of a judgment) shall not be deemed extinguished by reason of the merger of this Note into a final judgment. Any award or payment of attorneys' or paralegal's fees hereunder or by order of a court of competent jurisdiction shall include as a part thereof any and all sales or use taxes imposed thereon by any appropriate governmental authority.

Any one or more of the following shall constitute an "**Event of Default**" hereunder: **(a)** the failure to make any payment of principal and/or interest under this Note or any other obligation of any Obligor to Payee (i) within ten (10) calendar days of when due, as to any regular payment and/or (ii) when due as to any payment due on demand, at maturity or by acceleration; **(b)** default, which is not cured within the applicable grace or curative period, if any, shall occur in any other obligation, liability or indebtedness of any Obligor to Payee or to any other party; **(c)** if any representation or warranty of any Obligor, or any other person or entity, in any of the Loan Agreement, the Security Agreement, the other Loan Documents, any endorsement, any guaranty, or in any certificate or statement furnished at any time thereunder or in connection therewith proves to be untrue or misleading in any material respect when made or furnished and results in a Material Adverse Effect; **(d)** default which is not otherwise the subject of any other provision of this paragraph shall occur in the performance or violation of any of the covenants or agreements of any Obligor, or any other person or entity, contained in this Note, the Loan Agreement, the Security Agreement, any guaranty, or any other Loan Document and such default is not capable of being cured, or if capable of being cured shall continue uncured to the reasonable satisfaction of Payee for a period of thirty (30) calendar days after written notice thereof from Payee to Maker, or such other lesser or greater period of time, if any, with or without notice as specifically set forth in the applicable document or instrument and such default results in a Material Adverse Effect; **(e)** the commencement of a proceeding by or against any Obligor for dissolution or liquidation, the voluntary or involuntary termination or dissolution of any Obligor or the merger or consolidation of any Obligor with or into another entity, unless the Lender has provided prior written approval of such merger or consolidation; **(f)** the insolvency of, the business failure of, the appointment of a custodian, trustee, liquidator or receiver for or for any of the property of, the assignment for the benefit of creditors by, or the filing of a petition under bankruptcy, insolvency or debtor's relief law or the filing of a petition for any adjustment of indebtedness, composition or extension by or against any Obligor; **(g)** the death or legal incapacity of any Obligor who is a natural person, *unless, however,* in the case of a guarantor only, within one hundred eighty (180) days from the date of death or incapacity of such Obligor (or such earlier date by which Payee would be barred from asserting a claim under the Note or such Obligor 's guaranty in any probate proceeding as to such

deceased Obligor or such Obligor 's estate), a substitute guarantor or guarantors having a reputation, financial standing, liquid assets, net worth and income satisfactory to, and approved in writing by, Payee, in its reasonable discretion, shall have (1) executed and delivered to Payee a written guaranty agreement or agreements in form and substance as then required by Payee and (2) paid all actual costs, including without limitation Payee's reasonable attorneys' fees, incurred by Payee in the preparation of such substitute guaranty agreement or agreements; **(h)** the failure of any Obligor, to timely deliver such financial statements, including tax returns, other statements of condition or other information, as required by the Loan Documents or as Payee shall request from time to time; **(i)** the entry of a judgment against any Obligor which is determined to be of a material nature, in Payee's reasonable determination after written notice to Obligor, which is not released or satisfied within thirty (30) calendar days of the entry thereof; **(j)** the seizure or forfeiture of, or the issuance of any writ of possession, garnishment or attachment, or any turnover order for any property of any Obligor, including without limitation the property encumbered by the Security Agreement and the foregoing results in a Material Adverse Effect; **(k)** should Payee's liens, mortgages or security interests in any of the collateral that is of a material nature for this Note become unenforceable, or cease to be first priority liens, mortgages or security interests for a period of ten (10) business days after written notice to Obligor; **(l)** the determination by Payee that it is insecure for any reason; **(m)** the determination by Payee that a Material Adverse Effect has occurred in the financial condition of any Obligor; **(n)** the failure of Maker's business to comply with any law or regulation controlling its operation and such failure results in a Material Adverse Effect in the Maker's business; or **(o)** the condemnation or taking by eminent domain of all or any material part (as determined by the Payee in its sole discretion) of the property encumbered by the Security Agreement and Obligor is unable to secure comparable property to operate its business operations within a commercially reasonable time after the taking.

Upon the occurrence of an Event of Default, **(a)** Payee shall have the optional right to accelerate and declare as immediately due and payable in full the entire balance (principal, interest and all other charges due hereunder or under the Loan Documents) outstanding hereunder and all other obligations of any Obligor to Payee (however acquired or evidenced) and any obligation of Payee to permit further borrowing, if any, under the Loan Agreement or this Note shall immediately cease and terminate and/or **(b)** to the extent permitted by law, the rate of interest on the unpaid principal shall be increased at Payee's discretion up to the Maximum Rate (as defined below), or if there shall cease to be a Maximum Rate at a simple interest rate of no more than **25%** per annum (the "**Default Rate**"). The provisions herein for a Default Rate shall not be deemed to extend the time for any payment hereunder or to constitute a "**grace period**" giving Obligors a right to cure any default. At Payee's option, any accrued and unpaid interest, fees or charges may, for purposes of computing and accruing interest on a daily basis after the due date of the Note or any installment thereof, be deemed to be a part of the principal balance, and interest shall accrue on a daily compounded basis after such date at the Default Rate provided in this Note until the entire outstanding balance of principal and interest is paid in full. Upon the occurrence an Event of Default, Payee is hereby authorized at any time to set off and charge against any deposit accounts of any Obligor, as well as any money, instruments, securities, documents, chattel paper, credits, claims, demands, income and any other property, rights and interests of any Obligor which at any time shall come into the possession or custody or under the control of Payee or any of its agents, affiliates or correspondents, without notice or demand, any and all obligations due hereunder. Additionally, Payee shall have all rights and remedies available under each of the Loan Documents, including without limitation foreclosure of the Security Agreement, as well as all rights and remedies available at law or in equity. Any judgment rendered on this Note shall bear interest at the highest rate of interest permitted pursuant to Chapter 687, Florida Statutes. If this Note is payable upon demand, then no terms or provisions contained in this paragraph shall be deemed or interpreted to alter or abrogate the demand nature of this Note or the rights of Payee under a demand instrument.

The failure at any time of Payee to exercise any of its options or any other rights hereunder shall not constitute a waiver thereof, nor shall it be a bar to the exercise of any of its options or rights at a later date. All rights and remedies of Payee shall be cumulative and may be pursued singly, successively or together, at the option of Payee. The Maker shall not send the Payee payments marked "paid in full" or "without recourse" or similar language and if the Maker does send Payee payments marked in such a manner the Payee may accept such payments without being held to any such language and without losing any of the Payee's rights under this note or any of the Loan Documents and Maker shall remain

liable to pay any further amounts owed to the Payee. The acceptance by Payee of any partial payment shall not constitute a waiver of any default or of any of Payee's rights under this Note. No waiver of any of its rights hereunder, and no modification or amendment of this Note, shall be deemed to be made by Payee unless the same shall be in writing, duly signed on behalf of Payee; each such waiver shall apply only with respect to the specific instance involved, and shall in no way impair the rights of Payee or the obligations of Obligor to Payee in any other respect at any other time.

This Note, the Loan Documents, and the rights and obligations of Maker and Payee shall be governed by and interpreted in accordance with the laws of the State of Florida (without giving effect to Florida' principles of conflicts of law), and the laws of the United States applicable to transactions in such state. In any litigation in connection with or to enforce this Note or any endorsement or guaranty of this Note or any Loan Documents, each Obligor irrevocably consents to and confers personal jurisdiction on the courts of the State of Florida or the United States located within the State of Florida and expressly waives any objections as to venue in any such courts. Nothing contained herein shall, however, prevent Payee from bringing any action or exercising any rights within any other state or jurisdiction or from obtaining personal jurisdiction by any other means available under applicable law. The undersigned does irrevocably consent and agree that the Payee may obtain credit reports on the Maker and any Obligor at any time for a specific and legitimate purpose, at Payee's sole option and expense, in order to determine whether there has been an adverse change in the financial condition of the Maker or any Obligor.

Notwithstanding anything contained in this Note to the contrary, Payee shall never be deemed to have contracted for or be entitled to receive, collect or apply as interest on this Note, any amount in excess of the amount permitted and calculated at the Maximum Rate, and, in the event Payee ever receives, collects or applies as interest any amount in excess of the amount permitted and calculated at the Maximum Rate, such amount which would be excessive interest shall be applied to the reduction of the unpaid principal balance of this Note, and, if the principal balance of this Note is paid in full, any remaining excess shall forthwith be paid to Maker. In determining whether or not the interest paid or payable under any specific contingency exceeds the Maximum Rate, Maker and Payee shall, to the maximum extent permitted under applicable law, (i) characterize any non-principal payment (other than payments which are expressly designated as interest payments hereunder) as an expense, fee, or premium, rather than as interest, (ii) exclude voluntary prepayments and the effect thereof, and (iii) spread the total amount of interest throughout the entire contemplated Term of this Note. The term **"Maximum Rate"** shall mean, as to Payee, the maximum nonusurious interest rate, if any, that at any time, or from time to time, may be contracted for, taken, reserved, charged, or received on the indebtedness evidenced by this Note under the laws which are presently in effect of the United States and the State of Florida applicable to Payee and such indebtedness or, to the extent permitted by applicable law, under such applicable laws of the United States and the State of Florida which may hereafter be in effect and which allow a higher maximum nonusurious interest rate than applicable laws now allow.

Time is of the essence hereunder.

Payee is authorized to maintain, store and otherwise retain this promissory note in its original, inscribed tangible form or a record thereof in an electronic medium or other non-tangible medium which permits such record to be retrieved in perceivable forms and such retrieved form shall be deemed a duplicate original.

The principal balance hereof may be borrowed and re-borrowed from time to time during the Term hereof in accordance with the terms of the Loan Agreement but may not exceed at any one time an outstanding principal balance of **$15,000,000.00**.

PAYMENT IN FULL OF THIS NOTE SHALL NOT RESULT IN ITS TERMINATION AS LONG AS THE LOAN AGREEMENT IS IN EFFECT.

In this Note, whenever the context so requires, the neuter gender includes the feminine and/or masculine, as the case may be, and the singular number includes the plural.

**MAKER BY ITS EXECUTION HEREOF KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES, FOR ITSELF AND ITS HEIRS, SUCCESSORS AND ASSIGNS, ANY RIGHT WHICH IT MAY HAVE TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION, ACTION, SUIT OR PROCEEDING**

**(WHETHER AT LAW OR IN EQUITY) BASED ON THIS NOTE OR ARISING OUT OF, UNDER OR IN CONNECTION WITH ANY OF THE TRANSACTIONS PROVIDED IN THIS NOTE, OR ANY COURSE OF CONDUCT, COURSE OF DEALING (WHETHER ORAL OR WRITTEN) OR ACTIONS OF ANY PARTY OR THEIR RESPECTIVE OFFICERS, PRINCIPALS, PARTNERS, EMPLOYEES, AGENTS OR REPRESENTATIVES IN CONNECTION WITH THE SUBJECT MATTER OF THIS NOTE, WHETHER ARISING IN CONTRACT, TORT OR OTHERWISE AND WHETHER ASSERTED BY WAY OF COMPLAINT, ANSWER, CROSS-CLAIM, COUNTERCLAIM, AFFIRMATIVE DEFENSE OR OTHERWISE. MAKER SHALL NOT SEEK TO CONSOLIDATE ANY SUCH LITIGATION, ACTION, SUIT OR PROCEEDING IN WHICH A JURY TRIAL CANNOT BE OR HAS NOT BEEN WAIVED WITH ANY OTHER ACTION IN WHICH A JURY TRIAL HAS BEEN WAIVED. THIS PROVISION IS A MATERIAL INDUCEMENT TO PAYEE'S ACCEPTANCE OF THIS NOTE.**

**IN WITNESS WHEREOF**, Maker has caused this Note to be executed in its name as of the day and year first above written.

Address of Maker:

305 Cherokee Dr.
Newport News, VA 23602-4437

"**MAKER**"

**Aery Aviation, LLC**

**By:** ______________________
Leslie S. Walton
As Its: Manager

TAXPAYER IDENTIFICATION NUMBER: 81-4838597

**Flight Support, Inc.**

By: ______________________
Scott Beale
As Its: President and Secretary

TAXPAYER IDENTIFICATION NUMBER: 26-0007243

**Electronic Warfare Training Support LLC**
BY: Flight Support, Inc., its Sole Member

By: ______________________
Scott Beale
As Its: President and Secretary

TAXPAYER IDENTIFICATION NUMBER: 35-2487708

**Strategic Airborne Operations JV, LLC**
BY: Aery Aviation, LLC, its Sole Member

By: ______________________
Leslie S. Walton
As Its: Manager

TAXPAYER IDENTIFICATION NUMBER: 83-4555054

**GH Equipment, LLC**

By: S Walton

Leslie S. Walton
As Its: Manager

TAXPAYER IDENTIFICATION NUMBER: 87-1525539

## Amended and Restated Security Agreement

This Amended and Restated Security Agreement is made this 24th day of September, 2021, by and between **Aery Aviation, LLC, a Virginia limited liability company**, **Flight Support, Inc., a Virginia corporation**, **Electronic Warfare Training Support, LLC**, a Virginia limited liability company, and **Strategic Airborne Operations JV, LLC, a Virginia limited liability company**, and **GH Equipment, LLC, a Delaware limited liability company** (hereinafter referred to as "**Grantor**"), all having an address of **305 Cherokee Dr., Newport News, VA 23602-4437** in favor of **Cogent Bank, a State Chartered Bank** having a principal office at **1113 Saxon Blvd, Orange City, FL 32763** (hereinafter termed the "**Secured Party**").

**RECITALS:**

(A) The Grantor and the Secured Party have entered into the following:

(i) Business Loan Agreement dated June 23, 2021, as amended by that certain Global Addendum to Loan Documents dated July 9, 2021 (as the same may be amended, restated, or modified from time to time, the "**Loan Agreement**"); and

(ii) Revolving Line of Credit Promissory Note in the amount of $9,000,000.00 made by the Grantor in favor of the Secured Party, as amended by that certain First Amendment to Revolving Line of Credit Promissory Note dated July 9, 2021, as amended by that certain Amended and Restated Revolving Line of Credit Promissory Note in the original principal amount of $15,000,000.00 of even date herewith (as the same may be amended, restated, or modified from time to time, the "**Note**").

(B) As a condition to Secured Party's extending credit to Grantor, Secured Party requires that Grantor enter into this Security Agreement.

**NOW THEREFORE**, in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties hereto agree as follows:

Capitalized terms used herein and not otherwise defined shall have the meaning assigned thereto in the Loan Agreement.

The terms used herein to describe the Collateral shall have the meaning as provided in the Florida Uniform Commercial Code, as the same may be amended or supplemented from time to time (the "**UCC**").

**1.** Grant of Security Interest in Collateral. Except as provided on Exhibit A attached hereto, Grantor hereby pledges, hypothecates, and grants to Secured Party a continuing and first priority security interest in: all of the following, whether now owned or hereinafter acquired: all assets of the Grantor, including but not limited to the following: (i) all tangible and intangible property; all Equipment (including, without limitation, all motor vehicles); furniture, Fixtures, and Goods; Accounts (including without limitation, all accounts receivable); Inventory (including, without limitation returned or repossessed goods); Chattel Paper (including, without limitation, Tangible Chattel Paper and Electronic Chattel Paper); General Intangibles (including without limitation all Payment Intangibles and Software); Investment Property (including without limitation



**Exhibit 7**

all Certificated Securities, Uncertificated Securities, Securities Entitlements, Securities Accounts, Securities Certificates, Commodity Contracts, and Commodity Accounts); Documents; Instruments; Deposit Accounts; money, cash or cash equivalents; Supporting Obligations; Letter-of-Credit Rights; Commercial Tort Claims; Contract Rights; Certificates of Deposit; trademarks, patents, and copyrights, but excluding medical records and patient lists which Grantor may control, own or possess; (ii) together with all additions, replacements, substitutions, accessions and improvements, and all supporting obligations, profits, products and proceeds including insurance proceeds, cash proceeds, and non-cash proceeds including, but not limited to, all Accounts, Chattel Paper, Documents, Instruments, General Intangibles, Investment Property and Supporting Obligations relating to or arising out of any of the foregoing and all interest, dividends, income, profits, and distributions (including, without limitation, stock splits and stock dividends); and (iii) all proceeds and products of any of the foregoing including, without limitation, insurance proceeds, refunds, and premium rebates that arise out of any of the foregoing (collectively, the "**Collateral**").

**2.** Obligations. The security interests granted pursuant to this Security Agreement shall secure the payment and performance of all Obligations. All Collateral shall remain subject to this Security Agreement until (i) the full and complete payment and performance of all Obligations (other than contingent indemnification obligations as to which no claims have been asserted) and (ii) Secured Party has no obligation to extend further advances or financial accommodations to Grantor (the "**Payment in Full**").

**3.** Authority to File; Further Assurances. Grantor authorizes Secured Party at any time, without further consent or the signature of Grantor, to file (including by any electronic method) in any jurisdiction, financing statements, amendments to financing statements, continuations of financing statements, or other documents covering the Collateral, or any part thereof, including, without limitation, any filings with any County in the Commonwealth of Virginia, the Virginia Secured Transactions Registry, the United States Patent and Trademark Office, the United States Copyright Office, or any other office of any foreign jurisdiction having jurisdiction of the registration of any Intellectual Property (as defined herein) of the Grantor. Grantor also ratifies its authorization for Secured Party to have filed in any Uniform Commercial Code jurisdiction any initial financing statements or amendments thereto if filed prior to the date hereof. Grantor further agrees to promptly take such additional actions and to execute such additional documents as Secured Party deems reasonably necessary to perfect, continue the perfection of, maintain the priority of, and otherwise to protect and preserve Secured Party's security interest in, the Collateral and to prevent the accrual of prescription or statute of limitations with respect to the Collateral. Grantor shall execute any endorsements, assignments, and stock powers with respect to the Collateral, in form and substance satisfactory to Secured Party that Secured Party may reasonably request. Grantor will note Secured Party's security interest upon any chattel paper and instruments not delivered to Secured Party. As may be necessary to ensure the attachment, perfection, or priority of, or ability of the Secured Party to enforce its security interest in, the Collateral, Grantor will: **(i)** cause, or allow Secured Party to cause, Secured Party's name to be noted as Secured Party on any certificate of title for any titled goods; **(ii)** comply with any provision of any statute, regulation, or treaty of the United States as to any Collateral; **(iii)** obtain any governmental and other third party consents or approvals; and **(iv)** obtain subordinations and/or waivers from mortgagees or landlords in form and substance satisfactory to Secured Party.

**4.** Representations, Warranties and Covenants. Grantor represents and warrants to, and covenants with, Secured Party as follows, which representations, warranties, and covenants

shall survive the execution and delivery of this Security Agreement and remain effective until Payment in Full:

a. Grantor. Grantor's exact legal name, Grantor's place of incorporation or organization, and Grantor's domicile or chief executive office are correctly recited in the opening paragraph of this Security Agreement and the description and identification of Collateral contained herein or on any exhibits hereto is correct and complete. **UNTIL ALL OBLIGATIONS ARE PAID IN FULL GRANTOR SHALL NOT, WITHOUT PROVIDING SECURED PARTY WITH 30 DAYS PRIOR WRITTEN NOTICE: (1) CHANGE GRANTOR'S DOMICILE, NAME, LEGAL FORM, STATE OR JURISDICTION OF ORGANIZATION, TAXPAYER IDENTIFICATION NUMBER OR STATE ORGANIZATIONAL OR IDENTIFICATION NUMBER; (2) TAKE TITLE TO ANY COLLATERAL IN ANY OTHER NAME; OR (3) HOLD OR MOVE ANY THE COLLATERAL IN OR TO A LOCATION OTHER THAN DISCLOSED IN THIS SECURITY AGREEMENT EXCEPT IN ACCORDANCE WITH GRANTOR'S ORDINARY COURSE OF BUSINESS OR UPON 60 DAYS NOTICE.**

b. Title. Grantor owns (and as to any Collateral acquired after the date hereof will own) good and complete title to the Collateral free of any lien, security interest, encumbrance or other claim, right, title, or interest of any person other than Permitted Encumbrances (as defined in the Loan Agreement). Subject to the delivery of subordination agreements in form and content reasonably satisfactory to the Security Party, Grantor has the unqualified right and power to grant a security interest in the Collateral without the consent of any other person. There is no financing statement (or similar statement or registration under the law of any jurisdiction) on the date hereof on file in any public office covering any interest in the Collateral, other than in favor of Secured Party or in relation to Permitted Encumbrances, which has not been terminated or released by the secured party named therein. Except for Permitted Encumbrances, Grantor shall not create or permit to exist any lien, claim, or security interest on, or sign or authorize any financing statement or similar statement or registration relating to, the Collateral without the prior written consent of Secured Party, other than in favor of Secured Party, and shall defend the Collateral against all claims and demands of any person adverse to the interests of Secured Party.

c. Control. Except as otherwise provided in the Loan Agreement, with respect to any Collateral consisting of deposit accounts, investment property, letter-of-credit rights, and electronic chattel paper, or any other Collateral of a type in which a security interest is, or may be, perfected by control, Grantor will take such action, enter into such agreements and arrangements, and obtain from third parties such documents and agreements as Secured Party deems reasonably necessary or advisable in order to obtain control over such Collateral to the reasonable satisfaction of Secured Party. The term "**control**" as used herein shall have the meaning provided in the UCC. Secured Party may renew certificates of deposit or other renewable items included in the Collateral.

d. Sale and Use of Collateral. The Grantor will not sell, transfer, assign, or dispose of the Collateral, or any material part thereof (except for sales permitted under the Loan Agreement), without the prior written consent of the Secured Party, except in Grantor's ordinary course of business; provided, however, that the Grantor may sell or otherwise dispose of obsolete or worn out equipment no longer used or useful in the Grantor's business if the Grantor shall, in the case of equipment reasonably necessary for the conduct of the business of the Grantor, promptly replace the same, if needed and by the sole decision of Grantor, with new property of substantially equal value which shall forthwith become subject to the security interest provided for herein. The Grantor will keep the Collateral in good order and repair and will not use the Collateral in violation of any material law, rule, regulation, or ordinance, or any applicable insurance policy.

The Grantor will not assert against the Secured Party any claim or defense which the Grantor may have against any seller of the Collateral, or any part thereof, or against any other Person with respect to the Collateral, or any part thereof. Subject to the Loan Agreement, the Grantor will indemnify and hold the Secured Party harmless from and against actual loss, liability, damage, costs, and expenses whatsoever arising from the Grantor's use, operation, ownership, or possession of the Collateral and any part thereof, unless such loss, liability, damage, costs, or expenses are caused, in whole or in part, by the gross negligence or willful misconduct of the Secured Party.

e. Accounts and Chattel Paper. With respect to any Collateral consisting of accounts or chattel paper:

i. Grantor represents and warrants that as of the time each account or chattel paper arises, each such account or chattel paper contract, and all agreements and documentation relating thereto, are genuine, and in all respects what they purport to be, and that the account or chattel paper constitutes the genuine, legal, valid, and binding obligation of the account debtor enforceable in accordance with its terms, except as may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, or similar laws affecting the enforcement of creditors' rights generally and by general principles of equity, and to the best of its knowledge, is in compliance with and will conform with all applicable federal, state, and local laws (including applicable usury laws), and the account debtor has no defense, set-off, or counterclaim effective against the Grantor.

ii. Upon the occurrence of, and during the continuance of an Event of Default which results in a Material Adverse Effect, Secured Party shall have the right to notify the account debtors obligated on any or all accounts and chattel paper included in the Collateral to make payment thereon directly to Secured Party or its agent, and to take control of all proceeds thereof, and shall apply such proceeds to the Loan. Until such time as Secured Party elects to exercise such right by written notice to Grantor, Grantor is authorized and agrees to administer the accounts and chattel paper in a fiduciary capacity as agent for Secured Party, take all actions necessary to collect any amounts due thereon, and immediately deposit all proceeds in precisely the form received into a deposit account of Grantor with Secured Party designated by Grantor and approved by Secured Party for that purpose. Pending such deposit, Grantor will not commingle any such checks or other remittances with any of Grantor's other funds or property, but will hold them separate and apart therefrom and in trust until deposit is made in the designated deposit account. The Grantor will duly fulfill all obligations on the Grantor's part under, or in connection with, the accounts and chattel paper, and will do nothing to impair the rights of the Secured Party therein. Secured Party shall have no obligation to do or perform any obligation of Grantor with respect to any account or chattel paper, but in the Event of Default hereunder, and during the continuance thereof, Secured Party may, at its election, perform some or all of Grantor's obligations, and any liability or expenses incurred in connection therewith shall be payable by Grantor to Secured Party on demand and shall be secured by the Collateral hereunder.

iii. Grantor will use a chattel paper contract, an account agreement, and account receivable invoice form in its dealings with account debtors which bars the account debtor from asserting defenses to payment against the Secured Party. Upon the occurrence of and during the continuance of an Event of Default that results in a Material Adverse Effect, the Grantor will not rescind or cancel any indebtedness evidenced by any account or chattel paper, or modify any term thereof, or make any adjustment with respect thereto, or extend or renew the same, or compromise or settle any dispute, claim, suit, or legal proceeding relating thereto, or sell

any account, chattel paper, or interest therein, without the prior written consent of the Secured Party.

iv. Except as expressly permitted by the Loan Agreement Grantor agrees to take such additional actions and execute such additional documents as Secured Party may reasonably deem necessary or advisable to ensure that all moneys due, or to become due, under any contract subject to the Federal Assignment of Claims Act, or like federal, state, or local statute or rule in respect of the Collateral are assigned and payable to Secured Party and any requirements for notice to any governmental authority is given.

v. The Grantor will keep and maintain at Grantor's cost and expense satisfactory and complete records of the accounts and chattel paper, including, but not limited to, records of the shipment and receipt of goods and/or the performance of any services or obligations related to any such accounts or chattel paper, all payments received, all credits granted thereon, all discounts granted, all merchandise returned, and all other dealings therewith. Upon written request by Secured Party, Grantor will promptly: **(a)** furnish to Secured Party copies, or originals if so requested, of any invoices, contracts, agreements, or other books and records relating to any such Collateral; **(b)** give Secured Party written assignments, in form and substance reasonably acceptable to Secured Party, of specific accounts or chattel paper, or groups thereof; and **(c)** imprint a legend in form and manner reasonably satisfactory to Secured Party stating that the account, chattel paper, and other books and records evidencing or pertaining to said Collateral is subject to a security interest in favor of Secured Party.

vi. Within **ten (10)** Business Days after receiving Secured Party's written request for such, Grantor shall provide to Secured Party listings of all accounts and chattel paper, showing the name, address, and the amount owed by each account debtor and agings of any accounts receivable.

f. Investment Property. To the extent that any stocks, bonds, securities, or other investment property are included in the Collateral, Grantor covenants not to vote any such Collateral in any manner that would adversely affect Secured Party's rights under this Agreement.

g. Intellectual Property With respect to federally registered Intellectual Property, Grantor shall notify the Secured Party on an annual basis, upon the occurrence of each of the following **(i)** Grantor's acquisition, after the date of this Agreement, of any material? General Intangibles consisting of patents, patent rights, patent applications, patent licenses, copyrights, copyrights applications, copyright licenses, trademarks, trademark rights, trade names, trade name rights, service marks, service mark rights, applications for registration of trademarks, trade names, and service marks, fictitious names registrations and trademark, trade name and service mark registrations, trademark licenses, and all derivations thereof (collectively, "**Intellectual Property**") and **(ii)** Grantor obtaining knowledge that any application or registration relating to any material Intellectual Property owned by, or licensed to, such Grantor is reasonably likely to become abandoned or dedicated, or of any material adverse determination or development (including, without limitation, the institution of, or any such determination or development in, any proceeding in the United States Copyright Office, the United States Patent and Trademark Office or any court) regarding Grantor's ownership of any material Intellectual Property, its right to register the same, or to keep and maintain the same. In the event that Secured Party shall so reasonably require, Grantor will execute and deliver to the Secured Party, from time to time, any Patent Security Agreement, Copyright Security Agreement, or Trademark Security Agreement, as Secured Party shall reasonably require and as is necessary, and shall execute and deliver to the Secured Party any other document required to acknowledge, register, or perfect the Secured

Party's interest in any part of the Intellectual Property, including, without limitation, at Grantor's sole cost and expense filing of any such Patent Security Agreement, Copyright Security Agreement, or Trademark Security Agreement in the United States Patent and Trademark Office, the United States Copyright Office, or any other domestic or foreign jurisdiction in which such filing is necessary or appropriate as determined by Secured Party. Notwithstanding anything to the contrary contained in this Agreement, the Secured Party shall only require perfection of its security interests in, or other registration with respect to, any Intellectual Property registered, or eligible to be registered, with a country other than the United States or any political subdivision thereof, to the extent that Secured Party determines, in its reasonable discretion, that such Intellectual Property, and the registration thereof, in such other country or political subdivision thereof, is material to the Grantor's business.

h. Landlord, Mortgagee Disclaimer. Upon written request by Secured Party and upon an Event of Default that results in a Material Adverse Effect, the Grantor shall use its best efforts to cause each mortgagee of real property owned by the Grantor, and each landlord of real property leased by the Grantor on which any Collateral is or may be located at any time, to execute and deliver agreements satisfactory in form and substance to the Secured Party by which such mortgagee or landlord waives and disclaims to the extent allowed by applicable law or subordinates any rights such mortgagee or landlord may have, or claim to have, in any Collateral, and consents to the removal thereof by Secured Party or its authorized representatives.

i. Additional Covenants.

i. Should any Collateral materially decline in value after the date of this Security Agreement except for ordinary depreciation shown on the Financial Statements of the Grantor, Grantor shall, within **five (5) Business Days** after receiving written notice from Secured Party of such decline in value, grant a security interest in additional property reasonably satisfactory to Secured Party.

ii. Upon an Event of Default that results in a Material Adverse Effect, Grantor authorizes Secured Party, at any time, and in its reasonable discretion **(a)** to notify the obligor on any Collateral to make payments directly to Secured Party or to otherwise render performance to or for the benefit of Secured Party; **(b)** to collect, receive, and recover any money, proceeds, or other property at any time due with respect to the Collateral, and in connection therewith, to endorse notes, checks, drafts, or other evidence of payments; and **(c)** to enforce, settle, adjust, and compromise, in Secured Party's reasonable discretion, all present and future rights and claims of Grantor with respect to the Collateral.

iii. Upon an Event of Default that results in a Material Adverse Effect, if the Grantor, at any time, holds or acquires a commercial tort claim, the Grantor shall immediately notify the Secured Party in writing of the details thereof and grant to the Secured Party, in writing, in form and substance satisfactory to Secured Party, a security interest therein or lien thereon and in the proceeds thereof.

iv. Grantor hereby agrees that all instruments, documents of title, chattel paper, interest, dividends, income, fruits, returns, accessions, profits, corporate distributions (including, without limitation, stock splits and stock dividends), and proceeds with respect to the Collateral shall, upon receipt in negotiable form, be delivered to Secured Party, with any necessary assignment or endorsement.

5. Power of Attorney. To the extent permitted by law, Grantor hereby irrevocably constitutes and appoints the Secured Party, and any officer or agent thereof, with full power of substitution, as its true and lawful attorneys-in-fact, during the continuation of an Event of Default that results in a Material Adverse Effect, with full irrevocable power and authority in the name, place, and stead of the Grantor, or in Secured Party's own name, for the purpose of carrying out the terms of this Security Agreement, to take any and all appropriate action, and to execute any and all documents and instruments, that may be necessary to accomplish the purposes of this Security Agreement, including, without limitation, the right to exercise all rights of sale and inspection, deriving from Grantor's ownership of, or other interest in, the Collateral until all Obligations are paid in full. This power of attorney is a power coupled with an interest and shall be irrevocable. To the extent permitted by law, the Grantor hereby ratifies all that such attorneys shall lawfully do, or cause to be done, in accordance with this Security Agreement. The powers conferred on the Secured Party hereunder are solely to protect its interest in the Collateral and shall not impose any duty upon Secured Party to exercise any such powers. The Secured Party shall be accountable only for the amounts that it actually receives as a result of the exercise of such powers, and neither Secured Party nor any of its officers, directors, employees, or agents shall be responsible to Grantor for any act or failure to act, except for Secured Party's own gross negligence or willful misconduct.

6. Remedies. Upon the occurrence of an Event of Default, and during the continuance thereof that results in a Material Adverse Effect, the Obligations shall, at the option of Secured Party, become immediately due and payable in full without notice of intent to accelerate, notice of acceleration, demand, or protest, and Secured Party shall have all rights and remedies available to it under applicable law, including without limitation, the rights and remedies of a secured party under the UCC, all of which shall be cumulative. In addition and without limitation, Secured Party: **(a)** may require Grantor to, and Grantor hereby agrees that it will, at its expense and upon request of Secured Party, assemble the Collateral, and any related books and records, as directed by Secured Party, and make the same available to Secured Party upon request, at a place to be designated by Secured Party, which is reasonably convenient to both parties; **(b)** may sell, assign, transfer, and effectively deliver all, or any part of, the Collateral at one or more public or private sales, through any exchange or broker (including an online exchange or broker), or by way of one or more contracts, at such prices and on such terms as Secured Party may deem best, for cash or on credit, without recourse to judicial proceedings and without demand, appraisement, or advertisement, all of which are hereby expressly waived by Grantor to the fullest extent permitted by law; and **(c)** may cause all, or any part of, the Collateral to be seized and sold, under writ issued in execution of a judgment obtained upon the Obligations, or under any other pre- or post-judgment legal procedure. Grantor agrees that the sale, or other disposition of, any part of the Collateral shall not exhaust Secured Party's power of sale, but sales or other dispositions may be made from time to time until all of the Collateral has been sold or disposed of, or until all Obligations have been paid in full. Except for any Collateral that is perishable or threatens to decline speedily in value, Secured Party shall give or mail to Grantor, and other persons as required by law, reasonable written notice of the time and place of any public sale thereof, or the time after which any private sale may be made or the Collateral may be sold on a recognized market. The requirement of reasonable written notice shall be met if such notice is mailed, postage-prepaid by ordinary mail addressed to Grantor at the last address Grantor has given Secured Party in writing, at least **fifteen (15)** Business Days before the time of the sale or disposition. All advances, costs, charges, and expenses relating to the disposition of the Collateral, (including retaking, holding, insuring, and preparing the Collateral for sale and reasonable attorney's fees and expenses), shall become part of the Obligations secured by this Security Agreement and shall bear interest from the date of demand at the highest, non-usurious rate of interest applicable to overdue payments of principal and interest of any of the Obligations

as in effect from time to time. Grantor agrees that any public sale shall be conclusively deemed to be conducted in a commercially reasonable manner if it is made consistent with the provisions of this Section and applicable law. If the proceeds from the sale or enforcement of the Collateral are insufficient to satisfy all of the Obligations in full, all parties obligated thereon shall remain fully obligated for any deficiency.

Without limiting any rights of Secured Party under this Security Agreement, if an Event of Default which results in a Material Adverse effect shall have occurred and be continuing, the Secured Party shall have the right to, or upon the request of the Secured Party, the Grantor shall, instruct all account debtors and other obligors liable on any accounts or other payment obligations of any kind that are a part of the Collateral to make all payments thereon either **(a)** directly to the Secured Party (by instructing that such payments be remitted to a post office box which shall be in the name and under the control of the Secured Party), or **(b)** as otherwise allowed by applicable law. In addition to the foregoing, the Grantor agrees that if any proceeds of any Collateral (including payments made in respect of accounts or other payment obligations of any kind) shall be received by the Grantor while an Event of Default exists, the Grantor shall promptly deliver such proceeds in the form received to the Secured Party with all necessary endorsements. Until such proceeds are delivered to the Secured Party, such proceeds shall be held in trust by the Grantor for the benefit of the Secured Party and shall not be commingled with any other funds or property of the Grantor. All proceeds of Collateral received by the Secured Party pursuant to this paragraph may, at the reasonable discretion of the Secured Party, **(i)** be applied to the Obligations, or **(ii)** be deposited to the credit of the Grantor and held as collateral for the Obligations or permitted to be used by the Grantor in the ordinary course of its business.

In the event the Secured Party seeks to take possession of any or all of the Collateral by judicial process, the Grantor hereby irrevocably waives any bonds and any surety or security relating thereto that may be required by applicable law as an incident to such possession, and waives any demand for possession prior to the commencement of any such suit or action. In granting Secured Party the power to enforce its rights hereunder without prior judicial process or judicial hearing, Grantor expressly waives, renounces, and knowingly relinquishes any legal right which might otherwise require Secured Party to enforce its rights by judicial process. Grantor recognizes and concedes that non-judicial remedies are consistent with the usage of trade, are responsive to commercial necessity, and are the result of a bargain at arm's length. Nothing herein is intended to prevent Secured Party or Grantor from resorting to judicial process at either party's option. Grantor waives any right to require Secured Party to proceed against any third party, exhaust any Collateral or other security for the Obligations, or to have any third party joined with Grantor in any suit arising out of the Obligations, or pursue any other remedy available to Secured Party. Grantor further waives any defense arising by reason of any disability, or other defense of any third party, or by reason of the cessation from any cause whatsoever of the liability of any third party.

All rights and remedies of Secured Party hereunder are cumulative of each other and of every other right or remedy which Secured Party may otherwise have at law or in equity, and may be exercised singly or concurrently, and the exercise of one or more of such rights or remedies shall not prejudice or impair the concurrent or subsequent exercise of any other rights or remedies.

**7.** Consent. Without releasing or affecting any of its rights, Secured Party may, one or more times, in its sole discretion, without notice to, or the consent of, any Grantor, take any one or more of the following actions: **(a)** release, renew, or modify the obligations of any other obligor for any of the Obligations; **(b)** release, exchange, modify, or surrender, in whole or in part,

Secured Party's rights with respect to any collateral for the Obligations; **(c)** with the consent of the maker thereof, modify or alter the term, interest rate, or due date of any payment of any of the Obligations; **(d)** grant any postponements, compromises, indulgences, waivers, surrenders, or discharges, or modify the terms of its agreements with Grantor or any other person; **(e)** change its manner of doing business with Grantor or any other person; or **(f)** impute payments or proceeds of any collateral furnished for any of the Obligations, in whole or in part, to any of the Obligations, or in the event of a third party claim thereto, retain the payments or proceeds as collateral for the Obligations without applying same toward payment of the Obligations, and Grantor hereby expressly waives any claims or defenses arising from any such actions.

**8.** Amendments; Waivers. No amendment or waiver of any provision of this Security Agreement, or consent to any departure by any party from the terms hereof, shall in any event be effective against the other party unless the same shall be in writing and signed by the other party. No failure on the part of the Secured Party to exercise, and no delay in exercising any right, power, or privilege hereunder, shall operate as a waiver thereof, nor shall any single or partial exercise of any right, power, or privilege hereunder preclude any other or further exercise thereof, or the exercise of any other right, power, or privilege.

**9.** Joint and Several; Successors and Assigns. If this Security Agreement is executed by more than one Grantor, the obligations of Grantor hereunder shall be joint and several. This Security Agreement shall be binding upon Grantor's successors, heirs, and assigns. Secured Party may, with written consent of Grantor or any Guarantor, which consent shall not unreasonably be withheld, assign and transfer the Collateral to an assignee of Secured Party with respect to any of the Obligations, whereupon such transferee shall become vested with all powers and rights granted to Secured Party under this Security Agreement. Grantor shall not assign any of its rights or obligations under this Security Agreement without the prior written consent of Secured Party until all Obligations are paid in full.

**10.** Notices. All notices and other communications provided for in this Security Agreement shall be given in writing and made by facsimile or mailed by certified mail, return receipt requested, or delivered to the intended recipient at the "**Address for Notices**" specified below its name on the signature pages hereof; or, as to any party at such other address as shall be designated by such party in a notice to the other party given in accordance with this Section. Except as otherwise provided in this Security Agreement, all such communications shall be deemed to have been duly given **(a)** when transmitted by facsimile or other electronic means, subject to confirmation of receipt, **(b)** when personally delivered, or **(c)** in the case of a mailed notice, when duly deposited in the mail, postage prepaid; in each case given or addressed as aforesaid.

**11.** Counterparts. This Security Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which together shall constitute one and the same instrument. The Secured Party and Grantor (the "Parties") may, maintain and rely upon a photocopy, electronic copy, or other reproduction of this Security Agreement and the Parties, for themselves, their heirs, successors, and assigns, and any person claiming by or through any of them, hereby waive any and all objections to, and claims or defenses based upon, the failure of the Parties to produce the original hereof for any purpose whatsoever.

**12.** Severability. If any provision of this Security Agreement shall be held to be legally invalid or unenforceable by any court of competent jurisdiction, all remaining provisions of this Security Agreement shall remain in full force and effect.

13. Headings. The descriptive headings of the several Sections of this Security Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Security Agreement.

**14. GOVERNING LAW; JURISDICTION; VENUE. THIS SECURITY AGREEMENT SHALL BE GOVERNED AND CONTROLLED BY FLORIDA LAW; PROVIDED, HOWEVER, THAT WHERE ANY COLLATERAL IS LOCATED IN A JURISDICTION OTHER THAN FLORIDA, RIGHTS AND REMEDIES AVAILABLE TO A SECURED PARTY UNDER THE LAWS OF SUCH OTHER JURISDICTION SHALL ALSO BE AVAILABLE TO SECURED PARTY WITH RESPECT TO SAID COLLATERAL WITHOUT REGARD TO ANY CONTRARY PROVISION OF FLORIDA LAW, AND SUCH RIGHTS AND REMEDIES SHALL BE IN ADDITION TO ANY OTHER RIGHTS OR REMEDIES SECURED PARTY MAY HAVE. GRANTOR HEREBY IRREVOCABLY SUBMITS AND CONSENTS TO THE EXCLUSIVE PERSONAL JURISDICTION AND VENUE OF ANY STATE OR FEDERAL COURT IN FLORIDA LOCATED IN THE SAME STATE JUDICIAL CIRCUIT OR FEDERAL JUDICIAL DISTRICT, AS APPLICABLE, AS THE OFFICE OF SECURED PARTY SPECIFIED IN THE ADDRESS FOR NOTICES OF THIS SECURITY AGREEMENT. GRANTOR AGREES THAT ALL ACTIONS OR PROCEEDINGS ARISING DIRECTLY, INDIRECTLY OR OTHERWISE IN CONNECTION WITH, OUT OF, RELATED TO OR FROM THIS SECURITY AGREEMENT SHALL BE LITIGATED ONLY IN ONE OF THE FOREGOING DESCRIBED COURTS. GRANTOR, FOR ITSELF, ITS HEIRS, SUCCESSORS AND ITS ASSIGNS, AND FOR ANY PERSON CLAIMING UNDER OR THROUGH ANY OF THEM, HEREBY KNOWINGLY AND VOLUNTARILY WAIVES ANY AND ALL RIGHTS TO HAVE THE JURISDICTION AND VENUE OF ANY LITIGATION ARISING DIRECTLY, INDIRECTLY, OR OTHERWISE IN CONNECTION WITH, OUT OF, RELATED TO, OR FROM THIS SECURITY AGREEMENT IN ANY OTHER COURT, AND GRANTOR HEREBY KNOWINGLY AND VOLUNTARILY WAIVES ANY AND ALL RIGHTS TO REMOVE AN ACTION TO, OR TO TRANSFER, DISMISS, OR CHANGE VENUE TO, ANY OTHER COURT. GRANTOR FURTHER ACKNOWLEDGES AND AGREES THAT NEITHER SECURED PARTY, NOR ANY PERSON ACTING ON BEHALF OF SECURED PARTY, HAS IN ANY WAY AGREED WITH OR REPRESENTED TO GRANTOR THAT THE PROVISIONS OF THIS PARAGRAPH HAVE BEEN WAIVED OR WILL NOT BE FULLY ENFORCED BY SECURED PARTY. NOTWITHSTANDING THE FOREGOING, SECURED PARTY MAY INITIATE NECESSARY JUDICIAL ACTIONS IN ANY JURISDICTION TO RECOVER COLLATERAL SECURING THE OBLIGATIONS.**

15. Final Agreement. This Security Agreement represents the final, entire agreement between the parties with respect to the subject matter hereof. No course of dealing, course of performance, usage of trade, or evidence of any prior, contemporaneous, or subsequent oral agreements or discussions, or other extrinsic evidence of any nature, shall be used to contradict, vary, supplement, or modify any term of this Agreement. There are no oral agreements between the parties.

16. No Third Party Benefit. This Security Agreement is made solely for the purpose of setting forth the rights and obligations of the Secured Party and Grantor, and any other obligations of the Secured Party and Grantor, and any other signatories hereto, and no other third party is intended to benefit hereby or to have any rights hereunder.

17. Other Security Agreements. This Security Agreement is additional and supplemental to any and all other security agreements heretofore and hereafter executed by any Grantor for benefit of the Secured Party, whether or not relating to the Obligations and Collateral,

and shall not supersede or be superseded by any other security agreement executed by any Grantor or any other person or entity for any purpose.

18. WAIVER OF JURY TRIAL. GRANTOR AND SECURED PARTY KNOWINGLY, VOLUNTARILY, AND IRREVOCABLY WAIVE, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, ANY AND ALL RIGHTS EACH MAY HAVE TO TRIAL BY JURY IN ANY LEGAL PROCEEDING BASED ON, ARISING OUT OF, OR IN ANY WAY RELATED TO: THIS SECURITY AGREEMENT, THE OBLIGATIONS, THE LOAN AGREEMENT, THE NOTE, OR ANY LOAN DOCUMENT OR AGREEMENT EXECUTED, OR CONTEMPLATED TO BE EXECUTED, IN CONNECTION WITH ANY OF THE OBLIGATIONS, OR ANY OF THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. THIS JURY WAIVER ALSO APPLIES TO ANY CLAIM, COUNTER CLAIM, CAUSE OF ACTION, OR DEMAND ARISING FROM, OR RELATED TO, (I) ANY COURSE OF CONDUCT, COURSE OF DEALING, OR RELATIONSHIP OF GRANTOR, GRANTOR, OR ANY OTHER PERSON WITH SECURED PARTY, OR ANY EMPLOYEE, OFFICER, DIRECTOR, OR ASSIGNEE OF SECURED PARTY IN CONNECTION WITH THE OBLIGATIONS, OR (II) ANY STATEMENT (WHETHER VERBAL OR WRITTEN), OR ACTIONS OF ANY PERSON BY OR ON BEHALF OF GRANTOR, GRANTOR, OR ANY OTHER PERSON IN CONNECTION WITH THE OBLIGATIONS, REGARDLESS OF WHETHER ANY SUCH CAUSE OF ACTION OR DEMAND ARISES BY CONTRACT, TORT, OR OTHERWISE. GRANTOR HEREBY ACKNOWLEDGES THAT THIS WAIVER OF JURY TRIAL IS A MATERIAL INDUCEMENT TO THE SECURED PARTY IN EXTENDING CREDIT TO THE GRANTOR, THAT THE SECURED PARTY WOULD NOT HAVE EXTENDED SUCH CREDIT WITHOUT THIS JURY TRIAL WAIVER, AND THAT GRANTOR HAS BEEN REPRESENTED BY AN ATTORNEY OR HAS HAD AN OPPORTUNITY TO CONSULT WITH AN ATTORNEY IN CONNECTION WITH THIS JURY TRIAL WAIVER AND UNDERSTANDS THE LEGAL EFFECT OF THIS WAIVER. GRANTOR FURTHER CERTIFIES THAT NO PERSON HAS REPRESENTED TO IT, EXPRESSLY OR OTHERWISE, THAT SECURED PARTY OR ANY OTHER PERSON WOULD NOT, IN THE EVENT OF A LEGAL PROCEEDING, SEEK TO ENFORCE THE FOREGOING WAIVER.

EXECUTED by the Grantor and the Secured Party as of the date first above written.

"**GRANTOR**":

**Aery Aviation, LLC**

By: ____________________
NAME: Leslie S. Walton
TITLE: Manager

**Flight Support, Inc.**

By: ____________________
NAME: Scott Beale
TITLE: President and Secretary

**Electronic Warfare Training Support LLC**
BY: FLIGHT SUPPORT, INC., its Sole Member

By: ____________________
NAME: Scott Beale
TITLE: President and Secretary

**Strategic Airborne Operations JV, LLC**
BY: AERY AVIATION, LLC, its Sole Member

By: ____________________
NAME: Leslie S. Walton
TITLE: Manager

**GH Equipment, LLC**

By: ____________________
Name: Leslie S. Walton
Title: Managing Member

Address for Notice:
305 Cherokee Dr.
Newport News, VA 23602-4437

"**SECURED PARTY**":

**Cogent Bank**

**By:** ____________________
Name: Abbey Henderson
TITLE: Senior Vice President

Address for Notice:
1113 Saxon Blvd
Orange City, Florida 32763

#.|180683v2

EXECUTED by the Grantor and the Secured Party as of the date first above written.

"**GRANTOR**":

**Aery Aviation, LLC**

By: ____________________________
NAME: Leslie S. Walton
TITLE: Manager

**Flight Support, Inc.**

By: ____________________________
NAME: Scott Beale
TITLE: President and Secretary

**Electronic Warfare Training Support LLC**
BY: FLIGHT SUPPORT, INC., its Sole Member

By: ____________________________
NAME: Scott Beale
TITLE: President and Secretary

**Strategic Airborne Operations JV, LLC**
BY: AERY AVIATION, LLC, its Sole Member

By: ____________________________
NAME: Leslie S. Walton
TITLE: Manager

**GH Equipment, LLC**

By: ____________________________
Name: Leslie S. Walton
Title: Managing Member

Address for Notice:
305 Cherokee Dr.
Newport News, VA 23602-4437

"**SECURED PARTY**":

**Cogent Bank**

**By:** Abbey Henderson
Name: Abbey Henderson
TITLE: Senior Vice President

Address for Notice:
1113 Saxon Blvd
Orange City, Florida 32763

**EXHIBIT A**
**PERMITTED ENCUMBRANCES**

*a)* the Company's existing seller notes for the following aircraft (total debt at 12/31/20 of $2,031,433.91 million with aircraft value of $2,943,116.70

*1. N515JA (Gulfstream IV)*

*2. N31KH (Lear 31A)*

*b)* An equipment financing loan from VFI of $3.0 million for electronic warfare equipment to be installed in 4 Lear jets.

*c)* An aircraft financing loan from NEF for $4.0 million (not to exceed 75% OLV) for the following aircraft with a value of $5.5 million

*1. N432HC (Gulfstream IV)*

*2. N163JW (Gulfstream IV)*

*d)* General Motors Acceptance Corp., vehicle financing for 2018 GMC Yukon XL and 2021 Chevrolet Tahoe.

*e)* Equipment financing loan from CNC Associates, Inc.

*f)* An aircraft financing loan from Canandaigua National Bank for T182T aircraft and (1) engine.

*g)* BB&T deposit for coverage of performance guarantee LOC for government of Pakistan.

*h)* Any aircraft or equipment that Bank chooses not to finance.

*i)* Bay View Funding receivables factoring agreement.

*j)* Pursuant to that Collateral Pledge Agreement between Leslie S. Walton, Scott Beale and Prudent Capital III, LP, in the Event of Default a pledge of certificated membership interest in Aery Aviation, LLC to Prudent Capital III, LP., and the collateral assignment of the life insurance policies insuring the lives of Leslie S. Walton and Scott Beale.

[redacted]

# UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

| |
|---|
| A. NAME & PHONE OF CONTACT AT FILER (optional)<br>**Sarah Pape** |
| B. E-MAIL CONTACT AT FILER (optional)<br>**breid@zkslawfirm.com** |
| C. SEND ACKNOWLEDGEMENT TO: (Name and Address)<br>**Sarah Pape**<br>**315 E. Robinson St. #600**<br>**Orlando, FL 32801 USA** |

**Office of the Clerk**
**Virginia State Corporation Commission**

**Filing Number: 20210624064910**
**Filing Date and Time: 06/24/2021 03:37 PM**
**Total Number of Pages: 2**
**(Document filed electronically)**

**THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY**

1. DEBTOR'S NAME: Provide only one Debtor name (1a or 1b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 1b, leave all of item 1 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| 1a. ORGANIZATION'S NAME<br>**Flight Support, Inc.** | | | | | |
| OR 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 1c. MAILING ADDRESS<br>**305 Cherokee Drive** | CITY<br>**Newport News** | STATE<br>**VA** | POSTAL CODE<br>**23602 4437** | | COUNTRY<br>**USA** |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC1Ad)

| | | | | | |
|---|---|---|---|---|---|
| 2a. ORGANIZATION'S NAME<br>**Aery Aviation, LLC** | | | | | |
| OR 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 2c. MAILING ADDRESS<br>**305 Cherokee Drive** | CITY<br>**Newport News** | STATE<br>**VA** | POSTAL CODE<br>**23602 4437** | | COUNTRY<br>**USA** |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one Secured Party name (3a or 3b)

| | | | | | |
|---|---|---|---|---|---|
| 3a. ORGANIZATION'S NAME<br>**COGENT BANK** | | | | | |
| OR 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 3c. MAILING ADDRESS<br>**1113 Saxon Blvd. None** | CITY<br>**Orange City** | STATE<br>**FL** | POSTAL CODE<br>**32763** | | COUNTRY<br>**USA** |

4. COLLATERAL: This financing statement covers the following collateral:

Debtor hereby pledges, hypothecates, and grants to Secured Party a continuing and first priority security interest in: all of the following, whether now owned or hereinafter acquired: (i) all tangible and intangible personal property; all Equipment (including, without limitation, all motor vehicles); furniture, Fixtures, and Goods; Accounts (including without limitation, all accounts receivable and all Healthcare Insurance Receivables); Inventory (including, without limitation returned or repossessed goods); Chattel Paper (including, without limitation, Tangible Chattel Paper and Electronic Chattel Paper); General Intangibles (including without limitation all Payment Intangibles and Software); Investment Property (including without limitation all Certificated Securities, Uncertificated Securities, Securities Entitlements, Securities Accounts, Securities Certificates, Commodity Contracts, and Commodity Accounts); Documents; Instruments; Deposit Accounts; money, cash or cash equivalents; Supporting Obligations; Letter-of-Credit Rights; Commercial Tort Claims; Contract Rights; Certificates of Deposit; trademarks, patents, and copyrights; (ii) together with all additions, replacements, substitutions, accessions and improvements, and all supporting obligations, profits, products and proceeds including insurance proceeds, cash proceeds, and non-cash proceeds including, but not limited to, all Accounts, Chattel Paper, Documents, Instruments, General Intangibles, Investment Property and Supporting Obligations relating to or arising out of any of the foregoing and all interest, dividends, income, profits, and distributions (including, without limitation, stock splits and stock dividends); and (iii) all proceeds and products of any of the foregoing including, without limitation, insurance proceeds, refunds, and premium rebates that arise out of any of the foregoing (collectively, the “Collateral”).

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and Instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☐ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:
**Virginia State Corporation Commission**



**Exhibit 8**

## UCC FINANCING STATEMENT ADDITIONAL PARTY

FOLLOW INSTRUCTIONS

18. NAME OF FIRST DEBTOR: Same as line 1a or 1b on Financing Statement; if line 1b was left blank because Individual Debtor name did not fit, check here ☐

| | |
|---|---|
| 18a. ORGANIZATION'S NAME | Flight Support, Inc. |
| OR 18b. INDIVIDUAL'S SURNAME | |
| FIRST PERSONAL NAME | |
| ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

19. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (19a or 19b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | | | |
|---|---|---|---|---|---|
| 19a. ORGANIZATION'S NAME: **Electronic Warfare Training Support LLC** | | | | | |
| OR 19b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | | SUFFIX |
| 19c. MAILING ADDRESS **700 Corporate Drive** | CITY **Newport News** | STATE **VA** | POSTAL CODE **23602** | | COUNTRY **USA** |

20. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (20a or 20b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | | |
|---|---|---|---|---|
| 20a. ORGANIZATION'S NAME | | | | |
| OR 20b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 20c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

21. ADDITIONAL DEBTOR'S NAME: Provide only one Debtor name (21a or 21b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

| | | | | |
|---|---|---|---|---|
| 21a. ORGANIZATION'S NAME | | | | |
| OR 21b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 21c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

22. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (22a or 22b)

| | | | | |
|---|---|---|---|---|
| 22a. ORGANIZATION'S NAME | | | | |
| OR 22b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 22c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

23. ☐ ADDITIONAL SECURED PARTY'S NAME or ☐ ASSIGNOR SECURED PARTY'S NAME: Provide only one name (23a or 23b)

| | | | | |
|---|---|---|---|---|
| 23a. ORGANIZATION'S NAME | | | | |
| OR 23b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |
| 23c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |

24. MISCELLANEOUS:

[redacted]

# UCC FINANCING STATEMENT AMENDMENT

FOLLOW INSTRUCTIONS

Office of the Clerk
Virginia State Corporation Commission

Filing Number: 20210723069854
Filing Date and Time: 07/23/2021 03:34 PM
Total Number of Pages: 1
(Document filed electronically)

A. NAME & PHONE OF CONTACT AT FILER (optional)
**Sarah Pape**

B. E-MAIL CONTACT AT FILER (optional)
**breid@zkslawfirm.com**

C. SEND ACKNOWLEDGEMENT TO: (Name and Address)

**Sarah Pape**
**315 E. Robinson St. #600**
**Orlando, FL 32801 USA**

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1a. INITIAL FINANCING STATEMENT FILE NUMBER
**20210624064910**

1b. ☐ This FINANCING STATEMENT AMENDMENT is to be filed [for record] (or recorded) in the REAL ESTATE RECORDS
Filer: attach Amendment Addendum (Form UCC3Ad) and provide Debtor's name in item 13

2. ☐ TERMINATION: Effectiveness of the Financing Statement identified above is terminated with respect to the security interest(s) of Secured Party authorizing this Termination Statement

3. ☐ ASSIGNMENT (full or partial): Provide name of Assignee in item 7a or 7b, and address of Assignee in item 7c and name of Assignor in item 9
For partial assignment, complete items 7 and 9 and also indicate affected collateral in item 8

4. ☐ CONTINUATION: Effectiveness of the Financing Statement identified above with respect to the security interest(s) of Secured Party authorizing this Continuation Statement is continued for the additional period provided by applicable law

5. ☑ PARTY INFORMATION CHANGE:
Check one of these two boxes:
This Change affects ☑ Debtor or ☐ Secured Party of record
AND Check one of these three boxes to:
☐ CHANGE name and/or address: Complete item 6a or 6b; and item 7a or 7b and item 7c
☑ ADD name: Complete item 7a or 7b, and item 7c
☐ DELETE name: Give record name to be deleted in item 6a or 6b

6. CURRENT RECORD INFORMATION: Complete for Party Information Change - provide only one name (6a or 6b)

6a. ORGANIZATION'S NAME

OR

| 6b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

7. CHANGED OR ADDED INFORMATION: Complete for Assignment or Party Information Change - provide only one name (7a or 7b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name)

7a. ORGANIZATION'S NAME
**GH EQUIPMENT, LLC**

OR 7b. INDIVIDUAL'S SURNAME

INDIVIDUAL'S FIRST PERSONAL NAME

INDIVIDUAL'S ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX

| 7c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| **305 CHEROKEE DRIVE** | **Newport News** | **VA** | **23602** | **USA** |

8. ☐ COLLATERAL CHANGE: Also check one of these four boxes: ☐ ADD collateral ☐ DELETE collateral ☐ RESTATE covered collateral ☐ ASSIGN collateral
Indicate collateral:

9. NAME OF SECURED PARTY OF RECORD AUTHORIZING THIS AMENDMENT: Provide only one name (9a or 9b) (name of Assignor, if this is an Assignment)
If this is an Amendment authorized by a DEBTOR, check here ☐ and provide name of authorizing Debtor

9a. ORGANIZATION'S NAME
**COGENT BANK**

OR

| 9b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | SUFFIX |
|---|---|---|---|
| | | | |

10. OPTIONAL FILER REFERENCE DATA:

## INVOICE

**Aery Aviation, LLC**
1009 Providence Blvd
Newport News, VA 23602

info@aeryaviation.com
+1 (757) 271-1600
www.aeryaviation.com

CCF:CCF Cleveland, Ohio

**Bill to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Ship to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Invoice details**
Invoice no.: 4735
Terms: Net 30
Invoice date: 04/24/2025
Due date: 05/24/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 04/23/2025 | **CCF Box Run** | UNOS ID# AMDV498<br>Recipient/Organ - [redacted]<br>Coordinator [redacted]<br>Passengers: N/A<br>Aircraft Tail#N972PF<br>Routing: BKL-RDU-BKL<br>Nautical Miles : N/A<br>Fuel Surcharge: $ N/A<br>Misc. Other: N/A<br>Catering:$ N/A<br>Departing Airport - BKL Cleveland, OH<br>EDT:06:00<br>Arrival Airport: RDU - Raleigh/Durham, NC<br>Arriving FBO: Signature<br>EAT: 07:46<br>Wait Time: 05:31 | 1 | $3,000.00 | $3,000.00 |

**Total** **$3,000.00**

**Exhibit 9**

# INVOICE

**Aery Aviation, LLC**
1009 Providence Blvd
Newport News, VA 23602

info@aeryaviation.com
+1 (757) 271-1600
www.aeryaviation.com

## CCF:CCF Cleveland, Ohio

**Bill to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Ship to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Invoice details**
Invoice no.: 4734
Terms: Net 30
Invoice date: 04/24/2025
Due date: 05/24/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 04/23/2025 | **CCF Teams Run** | UNOS ID# AMDS046<br>Recipient/Organ - [redacted]<br>Coordinator: [redacted]<br>Passengers: [redacted]<br>Aircraft Tail# N171AR<br>Routing: BKL-ISP-BKL<br>Nautical Miles : 973<br>Fuel Surcharge: $ N/A<br>Misc. Other: N/A<br>Catering:$ N/A<br>Departing Airport - BKL Cleveland, OH<br>EDT: 06:54<br>Arrival Airport: ISP - Islip, NY<br>Arriving FBO: Modern Aviation<br>EAT: 01:57<br>Wait Time: 05:39 | 1 | $20,162.34 | $20,162.34 |

**Total** **$20,162.34**

## Note to customer

This charter flight was procured under a 3rd party operator. Pursuant to Section 2(a) the Dedicated Aircraft Charter Agreement, Aery Aviation may select another operator in which case flight costs will be passed through from Operator to Charterer, the Cleveland Clinic Foundation.

# INVOICE

**Aery Aviation, LLC**
1009 Providence Blvd
Newport News, VA 23602

info@aeryaviation.com
+1 (757) 271-1600
www.aeryaviation.com

## CCF:CCF Cleveland, Ohio

**Bill to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Ship to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Invoice details**
Invoice no.: 4731
Terms: Net 30
Invoice date: 04/22/2025
Due date: 05/22/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 04/21/2025 | **CCF Teams Run** | UNOS ID# AMDR444<br>Recipient/Organ - [redacted]<br>Coordinator: [redacted]<br>Passengers: [redacted]<br>Aircraft Tail# N340B<br>Routing: BKL-DAY-BKL<br>Nautical Miles : 379<br>Fuel Surcharge: $ N/A<br>Misc. Other: N/A<br>Catering:$ N/A<br>Departing Airport - BKL Cleveland, OH<br>EDT: 02:55<br>Arrival Airport: DAY - Dayton, OH<br>Arriving FBO: Aviation Sales<br>EAT: 08:03<br>Wait Time: 04:23 | 1 | $13,775.47 | $13,775.47 |

**Total** **$13,775.47**

## Note to customer

This charter flight was procured under a 3rd party operator. Pursuant to Section 2(a) the Dedicated Aircraft Charter Agreement, Aery Aviation may select another operator in which case flight costs will be passed through from Operator to Charterer, the Cleveland Clinic Foundation.

# INVOICE

**Aery Aviation, LLC**
1009 Providence Blvd
Newport News, VA 23602

info@aeryaviation.com
+1 (757) 271-1600
www.aeryaviation.com

## CCF:CCF Cleveland, Ohio

**Bill to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Ship to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Invoice details**
Invoice no.: 4730
Terms: Net 30
Invoice date: 04/22/2025
Due date: 05/22/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 04/21/2025 | **CCF Box Run** | UNOS ID# AMDP277<br>Recipient/Organ [redacted]<br>Coordinator: [redacted]<br>Passengers: N/A<br>Aircraft Tail# N340SR<br>Routing: BKL-PDK-BKL<br>Nautical Miles : 1,148<br>Fuel Surcharge: $ 368.40<br>Misc. Other: $ 110.00<br>Catering:$ N/A<br>Departing Airport - BKL Cleveland, OH<br>EDT: 12:01<br>Arrival Airport: PDK - Atlanta, GA<br>Arriving FBO: Signature<br>EAT: 02:16<br>Wait Time: 00:40 | 1 | $14,642.20 | $14,642.20 |

**Total** **$14,642.20**

# INVOICE

**Aery Aviation, LLC**
1009 Providence Blvd
Newport News, VA 23602

info@aeryaviation.com
+1 (757) 271-1600
www.aeryaviation.com

CCF:CCF Cleveland, Ohio

**Bill to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Ship to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Invoice details**
Invoice no.: 4728
Terms: Net 30
Invoice date: 04/21/2025
Due date: 05/21/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 04/19/2025 | **CCF Box Run** | UNOS ID# AMDP179<br>Recipient/Organ [redacted]<br>Coordinator: [redacted]<br>Passengers: N/A<br>Aircraft Tail# N972PF<br>Routing: BKL-PHL-BKL<br>Nautical Miles : 760<br>Fuel Surcharge: $ 1,063.44<br>Misc. Other: GPU $ 180.00<br>Catering:$ 62.26<br>Departing Airport - BKL Cleveland, OH<br>EDT: 06:49<br>Arrival Airport: PHL - Philadelphia, PA<br>Arriving FBO: Atlantic<br>EAT: 08:57<br>Wait Time: 17:00 | 1 | $12,326.70 | $12,326.70 |

**Total** **$12,326.70**

# INVOICE

**Aery Aviation, LLC**
1009 Providence Blvd
Newport News, VA 23602

info@aeryaviation.com
+1 (757) 271-1600
www.aeryaviation.com

## CCF:CCF Cleveland, Ohio

**Bill to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Ship to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Invoice details**
Invoice no.: 4727
Terms: Net 30
Invoice date: 04/21/2025
Due date: 05/21/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 04/18/2025 | **CCF Teams Run** | UNOS ID# AMDQ291<br>Recipient/Organ - [redacted]<br>Coordinator: [redacted]<br>Passengers: [redacted]<br>Aircraft Tail# N972PF<br>Routing: BKL-DAB-BKL<br>Nautical Miles : 1,480<br>Fuel Surcharge: $ 880.80<br>Misc. Other: GPU $ 66.95; Call Out $ 226.60<br>Catering:$ N/A<br>Departing Airport - BKL Cleveland, OH<br>EDT:05:35<br>Arrival Airport: DAB - Daytona Beach, FL<br>Arriving FBO: Sheltair<br>EAT: 12:44<br>Wait Time: 04:05 | 1 | $18,027.35 | $18,027.35 |

**Total** **$18,027.35**

# INVOICE

**Aery Aviation, LLC**
1009 Providence Blvd
Newport News, VA 23602

info@aeryaviation.com
+1 (757) 271-1600
www.aeryaviation.com

## CCF:CCF Cleveland, Ohio

**Bill to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Ship to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Invoice details**
Invoice no.: 4726
Terms: Net 30
Invoice date: 04/19/2025
Due date: 05/19/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 04/17/2025 | **CCF Box Run** | UNOS ID# AMDL024<br>Recipient/Organ [redacted]<br>Coordinator: [redacted]<br>Passengers: N/A<br>Aircraft Tail# N651WB<br>Routing: ABE- BKL-ABE<br>Nautical Miles : 672<br>Fuel Surcharge: $ N/A<br>Misc. Other: N/A<br>Catering:$ N/A<br>Departing Airport - ABE - Allentown, PA<br>EDT: 10:04<br>Arrival Airport: BKL- Cleveland, OH<br>Arriving FBO: Signature<br>EAT: 12:02<br>Wait Time: 00:30 | 1 | $10,308.20 | $10,308.20 |

**Total** **$10,308.20**

## Note to customer

This charter flight was procured under a 3rd party operator. Pursuant to Section 2(a) the Dedicated Aircraft Charter Agreement, Aery Aviation may select another operator in which case flight costs will be passed through from Operator to Charterer, the Cleveland Clinic Foundation.

# INVOICE

**Aery Aviation, LLC**
1009 Providence Blvd
Newport News, VA 23602

info@aeryaviation.com
+1 (757) 271-1600
www.aeryaviation.com

## CCF:CCF Cleveland, Ohio

**Bill to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Ship to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Invoice details**
Invoice no.: 4725
Terms: Net 30
Invoice date: 04/18/2025
Due date: 05/18/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 04/11/2025 | **CCF Box Run** | UNOS ID# AMDJ468<br>Recipient/Organ - [redacted]<br>Coordinator: [redacted]<br>Passengers: N/A<br>Aircraft Tail# N3938G<br>Routing: PNE-BKL-PNE<br>Nautical Miles : N/A<br>Fuel Surcharge: $ N/A<br>Misc. Other: N/A<br>Catering:$ N/A<br>Departing Airport - PNE - Philadelphia, PA<br>EDT: 11:00<br>Arrival Airport: BKL - Cleveland, OH<br>Arriving FBO: Signature<br>EAT: 04:00<br>Wait Time: N/A | 1 | $3,000.00 | $3,000.00 |

**Total** **$3,000.00**

### Note to customer

This charter flight was procured under a 3rd party operator. Pursuant to Section 2(a) the Dedicated Aircraft Charter Agreement, Aery Aviation may select another operator in which case flight costs will be passed through from Operator to Charterer, the Cleveland Clinic Foundation.

# INVOICE

**Aery Aviation, LLC**
1009 Providence Blvd
Newport News, VA 23602

info@aeryaviation.com
+1 (757) 271-1600
www.aeryaviation.com

## CCF:CCF Cleveland, Ohio

**Bill to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Ship to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Invoice details**
Invoice no.: 4724
Terms: Net 30
Invoice date: 04/18/2025
Due date: 05/18/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 04/17/2025 | **CCF Box Run** | UNOS ID# AMDO257<br>Recipient/Organ - [redacted]<br>Coordinator: [redacted]<br>Passengers: N/A<br>Aircraft Tail# N8GU<br>Routing: UZA-BKL-UZA<br>Nautical Miles : 788<br>Fuel Surcharge: $ N/A<br>Misc. Other: N/A<br>Catering:$ N/A<br>Departing Airport - UZA - Little Rock, SC<br>EDT: 08:54<br>Arrival Airport: BKL - Cleveland, OH<br>Arriving FBO: Signature<br>EAT: 11:30<br>Wait Time: 00:30 | 1 | $11,327.43 | $11,327.43 |

**Total** **$11,327.43**

## Note to customer

This charter flight was procured under a 3rd party operator. Pursuant to Section 2(a) the Dedicated Aircraft Charter Agreement, Aery Aviation may select another operator in which case flight costs will be passed through from Operator to Charterer, the Cleveland Clinic Foundation.

# INVOICE

**Aery Aviation, LLC**
1009 Providence Blvd
Newport News, VA 23602

info@aeryaviation.com
+1 (757) 271-1600
www.aeryaviation.com

## CCF:CCF Cleveland, Ohio

**Bill to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Ship to**
CCF Cleveland, Ohio
Attention: Diane Topougis
9500 Euclid Ave.
A100 Transplant Center
Cleveland, OH 44195 USA

**Invoice details**
Invoice no.: 4721
Terms: Net 30
Invoice date: 04/18/2025
Due date: 05/18/2025

| # | Date | Product or service | Description | Qty | Rate | Amount |
|---|---|---|---|---|---|---|
| 1. | 04/17/2025 | **CCF Teams Run** | UNOS ID# SMDO431<br>Recipient/Organ - [redacted]<br>Coordinator: [redacted]<br>Passengers: [redacted]<br>Aircraft Tail# N171AR<br>Routing: BKL-ORF-BKL<br>Nautical Miles : 754<br>Fuel Surcharge: $ N/A<br>Misc. Other: N/A<br>Catering:$ N/A<br>Departing Airport - BKL Cleveland, OH<br>EDT: 04:00<br>Arrival Airport: ORF - Norfolk, VA<br>Arriving FBO: Signature<br>EAT: 10:17<br>Wait Time: 05:45 | 1 | $19,865.28 | $19,865.28 |

**Total** **$19,865.28**

## Note to customer

This charter flight was procured under a 3rd party operator. Pursuant to Section 2(a) the Dedicated Aircraft Charter Agreement, Aery Aviation may select another operator in which case flight costs will be passed through from Operator to Charterer, the Cleveland Clinic Foundation.