**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF FLORIDA**
**PENSACOLA DIVISION**

TALENTSCALE, INC., )
)
Plaintiff, ) Case No: 5:25-mc-00001-TKW
)
v. ) Pensacola, Florida, Florida
) May 23, 2025
) 9:38 a.m.
AERY AVIATION, LLC, )
)
Defendant. )
)

**TRANSCRIPT OF TELEPHONIC HEARING**
**BEFORE THE HONORABLE T. KENT WETHERELL, II**
**UNITED STATES DISTRICT JUDGE**
**(Pages 1 through 49)**

APPEARANCES:

For Talentscale, Inc.: Chase Law & Associates
by: **ERIC J. PONS**
951 Yamato Road
Suite 280
Boca Raton, Florida 33431
(305) 402-9800
*epons@chaselaw.com*

For Aery Aviation: Davis, Burch & Abrams
by: **ERIN C. MCDANIEL**
555 Belaire Avenue
Suite 340
Chesapeake, Virginia 23320
(757) 410-2293
*erin@davisba.com*

For Aery Aviation: Vires Law Group
by: **RACHEL L.T. RODRIGUEZ**
515 N. Flagler Drive
Suite 350
West Palm Beach, Florida 33401
(561) 370-7383
*rrodriguez@vireslawgroup.com*

For the Cogent Bank: Greenberg Traurig
by: **COURTNEY M. KELLER**
**SAVANNAH YOUNG**
450 South Orange Avenue
Suite 650
Orlando, Florida 32801
(407) 254-2610
*Kellerc@gtlaw.com*

For the HSBC Bank USA: Carlton Fields
by: **MERRICK L. "RICK" GROSS**
2 Miami Central
700 NW 1st Avenue
Suite 1200
Miami, Florida 33136
(305) 530-4046
*mgross@carltonfields.com*

For Cleveland Clinic Foundation: Stearns Weaver Miller
by: **DARRIN J. QUAM**
Truist Place
401 East Jackson Street
Suite 2100
Tampa, Florida 33602
(813) 222-5109
*dquam@stearnsweaver.com*

**P R O C E E D I N G S**

*(Call to Order of the Court.)*

*(Proceedings commenced at 10:00 a.m.)*

THE COURT: All right. Good morning. This is Case Number 5:25mc1, Talentscale versus Aery.

Why don't we begin with appearances, and I'll run through the list.

For Talentscale, who do we have?

MR. PONS: Eric Pons on behalf of plaintiff. Thank you, Your Honor.

THE COURT: All right. And for Aery, who do we have?

MS. MCDANIEL: Erin McDaniel.

MS. RODRIGUEZ: Rachel Rodriguez.

THE COURT: So McDaniel and Rodriguez, correct?

MS. MCDANIEL: Yes, Your Honor.

MS. RODRIGUEZ: Yes, Your Honor.

THE COURT: And then for Cogent, who is here?

MS. KELLER: Good morning, Your Honor. This is Courtney Keller with Greenberg Traurig. One of my colleagues, Savannah Young, may also be on the line. I'm not sure if she was on before I joined.

MS. YOUNG: Yes. Savannah Young is here also on behalf of Cogent. Thank you.

THE COURT: All right. And is somebody from -- I think there were some other folks as well. HSBC, somebody I

believe appeared?

MR. GROSS: Yes. Yes, Your Honor. Good morning. Rick Gross with Carlton Fields.

THE COURT: All right. And then the last one I think I heard was somebody from the Cleveland Clinic Foundation.

MR. QUAM: Yes, Your Honor. Darrin Quam with Stearns Weaver Miller for them.

THE COURT: All right. Was there anybody who appeared on behalf of anyone else that I missed?

*(No response.)*

THE COURT: Mr. Gross, you're certainly welcome to attend and participate as you need it, but as I would understand it, you really don't have a dog in this fight, do you?

MR. GROSS: That's correct, Your Honor. I just wanted to make sure nothing came out of the hearing that affected us, but we do not have a dog in the fight.

THE COURT: All right. Then I will probably ignore you, unless you get my attention and say you need to be heard about something, okay?

MR. GROSS: Absolutely, Your Honor. Thank you.

THE COURT: All right. And Mr. Quam, from the Cleveland Clinic's Foundation, you obviously have a dog in the fight because the garnishment writ has been issued to you, you've answered it, you filed an amended answer to it, but from your perspective, all you need to know is where to send the

money, right?

MR. QUAM: Correct. We're just waiting for the Court's instruction on what to do.

THE COURT: Okay. But you don't anticipate having any argument related to the Motions to Dissolve and things of that nature, correct?

MR. QUAM: Correct, Your Honor. We have nothing to say on that.

THE COURT: All right. So I guess the bulk of the argument will be between Talentscale and Cogent, I guess primarily; but Aery, since at some level this is or is not your money, I assume you have something to weigh in on as well, and I guess you filed a motion.

So why don't we do this. As I understand what we have pending at the moment, so the Cleveland Clinic filed an answer and then an amended answer to the writ of garnishment identifying at this point about $976,000 that they have that they owe to Aery.

There's been a Motion to Quash that writ filed by Aery and Cogent, and one of the two of you -- looks like Cogent -- supplemented it, your Motion to Quash.

I was waiting for a response to the Motion to Quash, and instead I got a Motion for Extension of Time to respond to the motion, and then a response to that. And then in the meantime, there's also a motion to compel discovery which I

guess was referred to in the response.

So we've got a lot to talk about. Maybe the first -- we'll start with what we're primarily here on, I guess, is the Request for Extension of Time to Respond to the Motions to Quash -- or Motions to Dissolve because as I understand kind of the essence of the argument on the Motion to Dissolve is that the money that Cleveland Clinic has owes to Aery actually is spoken for by Cogent Bank through some priority interest.

And from what I understand, Mr. Pons, you don't think you have enough information to know whether that's true or not. So I'll start with that. And if I misstated the background, you can correct me, and then you can make whatever argument you want to make on your Motion for Extension of Time.

MR. PONS: Thank you, Your Honor. And if it's okay with you, I just prefer getting to the Motion for Extension of Time. I would just like to provide you with a brief background of the case since this is our first appearance before you.

THE COURT: Sure.

MR. PONS: So Talentscale -- is that okay, Your Honor?

THE COURT: Yeah, go ahead.

MR. PONS: Thank you.

So Talentscale holds a $1.1 million federal judgment against Aery Aviation LLC for unpaid staffing services. That judgment was entered by the United States District Court for the Eastern District of Virginia. To date, Aery has not paid a

single dollar on that judgment.

Shortly after Talentscale began providing services and while Aery was already falling behind on its invoices, Cogent Bank extended a $9 million revolving line of credit to Aery to provide working capital. That line was later increased to 15 million. None of those funds were used to pay my client's overdue and unpaid invoices.

We initially sought to force the judgment in the Eastern District of Virginia but after Cogent Bank responded to a garnishment there and challenged the court's jurisdiction, we registered the judgment here in the Northern District of Florida where Aery has additional contractors and financial connections.

So as part of the collections process, we issued subpoenas to third parties holding Aery's assets including Cogent Bank. The subpoena to Cogent is in the record as docket entry 78-3 if you'd like to take a look at it.

In response, Cogent asserted a bunch of objections and we conferred and then they agreed to produce some bank records, loan documents and agreements. And then, however, Cogent Bank did refuse to produce records, what is known as the blocked account, an account where Aery effectively has agreed to deposit all of its receivables to date.

And so initially Cogent Bank withheld accounting records showing Aery's loan payment obligations and amortization table showing what Aery owes Cogent each month.

Yesterday Cogent's counsel agreed to produce the accounting records and amortization tables. We were able to narrow the dispute to a single issue. Cogent is effectively refusing to produce bank records and correspondences for what is known as the blocked account.

And as I mentioned earlier, under the blocked account agreement the -- under the blocked account agreement with Cogent, Aery is required to deposit all of its receivables into that account.

And so the disputed request that relate to that -- to those bank records, if Your Honor would like to take a look, are 1, 2, 6 and 7 in docket entry 78-3. Request 1, 2 and 7 request standard bank records, account statements, wire confirmations and delayed correspondences concerning accounts held by for the benefit of Aery.

Request 6 asks for documents identifying Aery's assets held by Cogent. These records are critical to determine what -- how exactly Aery's -- how much Aery is collecting, where the money is going and whether there have been any transfers --

THE COURT: All right. Let me -- let me stop you for a second. Because I think you're getting into your motion to compel. And I understand why you're getting into that to try to answer my question of why you can't -- why you don't --

MR. PONS: Yeah.

THE COURT: -- know now that this money is already

spoken for. And I guess I'm -- I think you might very well be entitled to all that information to try to track down where Aery has money that's not spoken for, but I'm not sure that any of that information changes the fact that this Cleveland Clinic money is subject to all of these loan documents and security agreements and in effect is Cogent's money at this point.

So how does all that information -- would any of that information change that seemingly undisputed fact?

MR. PONS: So Cogent's taking the position that it's entitled to the full amount of the 900,000 or so from -- from Cleveland Clinic to pay for its outstanding debts. But we're taking the position that they're only entitled to what is actually owed per month. So to the extent it's less than the 900,000 and change, our client is entitled to that difference. And so we need documentation, like the amortization tables and the actual bank statements, to show, okay, what's actually in that account and what can be paid for as what's owed and, you know, what's the surplus.

THE COURT: Well, let me interrupt you.

MR. PONS: That's why we need the documents.

THE COURT: Hold on, let me stop you again. As I understand, and maybe I'm just not understanding, but as I understand the business loan agreement, there are two different types of advances that Aery and its other groups associated with it are the borrowers. And I guess that's another issue here,

borrower is defined to include all four of these agencies not just Aery.

But in any event, the borrower can take two different kinds of advances. One are -- just look like operating type advances. And I'm looking specifically at Section 2.01(c), Roman numeral (i) looks to me to colloquially as kind of operating advances and then (ii) is advances when they're buying aircraft or aircraft equipment.

And as I kind of pieced all these things together, all of those sub loans and amortization tables and everything else that you're talking about, only are dealing with (ii) when they're buying aircraft, that their day-to-day money that's -- they're pulling out against that $15 million isn't subject to any sort of amortization. It's just -- it's due immediately.

And when money comes in, like these Cleveland Clinic dollars, the balance that they owe goes down. When they draw money out pursuant to their subsection (i), the balance they owe goes up. And every month the observable thing they're obligated to pay is an interest payment on just the routine -- the total balance of this.

Am I misunderstanding what's going on here?

MR. PONS: Which page are you referring to, Your Honor? I was trying to run over to it.

THE COURT: I'm looking at the -- I don't have the document number but it's the business loan agreement, page 8 of

35, it's under Section 2.01(c), procedure for advances. And it takes about two different types of advances.

And then if you want to dig a little further, if you look at the note, and this is the -- it has a bottom Exhibit 6. I don't know what it's Exhibit 6 to, but it's the amended and restated revolving line of credit. Page 2 of that talks about what they pay every month, and it's essentially interest only. And then they talk about the repayment of those draws under the 84-month amortization schedule separately. But unless I'm missing something, that only relates to aircraft purchases, not to their operations.

So again my ultimate question is how does anything you're asking for -- and again you may very well be entitled to it, because there's obviously money they've got coming in to pay the interest at least and the annual fee that they have to pay for this resolving line of credit. It's got to be coming from somewhere and you probably have a right to find out where it's coming from and try to attach it.

But I'm struggling to understand how any of that information is going to answer the question or is going to change the answer to the question that the Cleveland Clinic money is already spoken for.

MR. PONS: So in the last sentence on that page you're referencing in paragraph 2.01(a), it says that the line of credit shall be evidenced by the revolving line of credit

promissory note. And so, you know, we're traveling under the terms in that note for purposes of when the actual payments or any of the advances were due.

And then in -- in the actual revolving line of credit promissory note, it says that the major shall be paid each draw period total in monthly payments of principal and interest, which payment shall be based upon 84-month amortization schedule calculated on the applicable draw period.

THE COURT: Right, but --

MR. PONS: Based off of that --

THE COURT: But when you look at draw period total, that's a defined term that's the aggregate of all aircraft equipment advances, which is a defined term, which is an advance made for eligible aircraft or aircraft equipment. And that's a defined term back in the business loan agreement which takes us back into sub (ii), (c)(ii), which again unless I'm missing something, the only thing they're required to actually pay principal on pursuant to that amortization schedule is when they buy aircrafts or aircraft equipment, that they're not actually paying any principal on the rest of that loan, whatever that number is, that's based on the operational draws that they're -- advances that they're taking. All they're paying is that monthly interest.

And somebody gave me a balance summary, billing summary from Cogent Bank that said as -- on March 30th, which is

the last -- presumably last business day of that month, consistent with the business loan agreement, they owe $176,232.18, which I guess is interest.

MR. PONS: So I guess the issue that we're having is I -- I'm not sure exactly what Cogent is traveling under when it's seeking that amount and that would -- you know, if we could have Cogent weigh in on that, that would be very helpful.

THE COURT: Okay. Well, let's do that and I'll --

MR. PONS: We can better -- better understand. Yeah.

THE COURT: By the time we finish today everybody will have had the opportunity to say everything they want to say, but I'm just still trying to understand these loan documents that I'm looking at. And we'll go to Cogent, so that is Ms. Keller.

So Ms. Keller, I guess the --

MS. KELLER: Yes, Your Honor.

THE COURT: -- first question I have for you, am I reading these advances correctly that there's two kinds of advances and the only thing they're paying principal on pursuant to any sort of amortization schedule is when they buy eligible aircraft or equipment?

MS. KELLER: Yes, Your Honor. I think you're reading that right, and the -- the sub notes are tied only to the individual aircraft draws. And each aircraft secures the draw. It's got a corresponding chattel mortgage which isn't really relevant here, but -- and then each sub note has its own

amortization schedule. But you're reading -- you are reading the agreement right.

THE COURT: Okay. So then take me to that, and it looks like it's Document 67-2. And I'm not sure who filed it, but it's a -- looks like an account statement that, please return the bottom portion with payment to Cogent Bank. And on May 30th, it said that there's $176,232.18.

My assumption was that that is the interest only payment that's required based on the balance of the line of credit. Is that a correct or incorrect understanding?

MS. KELLER: Let me get to that document. That wasn't filed by Cogent. I think that -- it looks like that's probably an affidavit that was filed by Aery. And maybe Aery's counsel would be best to discuss that. But let me get to it first. Okay, this is 68-2.

THE COURT: Yes, ma'am.

MS. MCDANIEL: Yes, it was attached to our Motion to Dissolve the Writ just to show that was -- that is interest only payment as I understand it as well. You can also see that the principal balance on that is 11 million. I mean, there's not -- it's far more than $176,000 due to Cogent at the moment.

THE COURT: And that was Ms. --

MS. KELLER: Yeah, that was --

THE COURT: -- McDaniel?

MS. KELLER: -- (unintelligible) of the interest.

MS. MCDANIEL: Yes, Your Honor.

THE COURT: Okay. Before I get off, Ms. McDaniel, then the other numbers on that, it shows a couple of different numbers. One is an $11.1 million principal balance and then there's some other principal balances of 425,000 and 3.3 million. What is the difference there? I'm assuming the 11 million is the total amount of line of credit that's drawn out. What are the other numbers?

MS. MCDANIEL: That's a great question, and that's -- I think those are just under a different account, but it's still loans. These are loan balances that are owed under a separate account that total altogether I believe. That's why it was all put on one statement.

THE COURT: And --

MS. KELLER: Your Honor, if I may, I believe --

THE COURT: Go ahead, Ms. Keller.

THE WITNESS: I believe that the top line there for the $11 million balance is the revolving line of credit -- well, I think all of these are balances under the revolving line of credit. The two bottom ones, I believe the 425 and the 3 million, relate to the sub notes. The revolving line of credit is fully funded right now in the amount of about $15 million.

So I think if I'm reading that correctly, that's what that is. And I'm not a hundred percent sure because I haven't

spoken to my client directly about this particular document, but I think that that -- that's what is going on with it.

THE COURT: And just doing the math, it looks like that 11 million plus the 3.88 million gets you to that 14.9 million number, if my quick math is right. So that would make sense.

MS. KELLER: Yeah.

THE COURT: So the representation is that there's $11.1 million of draw or advances just for operations and that there's $3.8 million of draws for aircraft equipment that are subject to sub notes.

Is that a fair understanding, Ms. Keller?

MS. KELLER: That is what my understanding is. Again without having actually discussed this document with my client, that's what my understanding is.

THE COURT: Okay. And again we may be getting a little far afield of where we are at this particular moment, but just to help me understand things, Ms. Keller, there's -- looking at the business loan agreement, Section 5.12 requires the borrower to establish an account with Cogent that has a minimum average daily cash balance of half a million dollars.

And my assumption is based on the responses that you filed to the discovery and whatever else that you've responded to, that there is no such account.

MS. KELLER: There is an operating account, but it

has -- it does not have $500,000 in it. It's either -- I don't know what the balance in it is today. I can't say that, but I know at the time that we served the -- at the time that we -- we were served with the writ of garnishment is the time we answered the writ of garnishment. It either had a zero balance or a negative balance.

THE COURT: So if that's the case, they're in breach of the agreement at this point because they don't have that and they're supposed to?

MS. KELLER: Yes, that's -- I think that would be accurate. I don't know that Cogent has told them they're in breach because of that yet but that -- that provision of the loan agreement certainly has not -- is not being complied with right now.

THE COURT: And the other thing that's a little bit confusing about all this is the -- all of these agreements define borrower to be four different entities. I assume they're all related in some way. But is the representation that not only does Aery not have a $500,000 account sitting at Cogent Bank, but neither of these other three related entities have it either? Is that the representation?

MS. MCDANIEL: And, Your Honor, can I -- Your Honor, if I might jump in here real quick regarding the other entities just for purposes of clarity.

THE COURT: Is this Ms. McDaniel again?

MS. MCDANIEL: Yes, Your Honor.

THE COURT: Okay, go ahead.

MS. MCDANIEL: Flight Support, Inc. and Electronic Warfare Training Support were individual separate entities that several years ago were acquired by Aery, but they must have been still existing at the time of the loan agreement, but they were fully acquired by Aery. They do not any longer have any independent operating. And then Strategic Airborne Operations JV, LLC, the joint -- was a joint venture agreement between Aery and another aerospace company for the purposes of bidding on and performing on a contract for the United States Navy.

Aery has since bought out the other entity in that joint venture, and the contract on which it was performing ended as of May 12. So as of May 12 there are no longer any operations under Strategic Airborne Operations although at the time it was still wholly owned by Aery. So just to clarify all that, for what that's worth.

THE COURT: Okay. So I think what you're telling me at this point is even though there are four borrowers named on all these documents, at this point the only surviving entity of those group is Aery. Is that what you're telling me?

MS. MCDANIEL: That's -- yes, Your Honor, that's correct.

THE COURT: Okay. I guess the other question I have, and again maybe little far afield of where we need to be at this

point, but there was a bill that we've been talking about for $176,000 of interest. This was back on March 30th. Was that bill paid?

MS. KELLER: I think I can answer that, Your Honor. Let me -- I think my client just let me know something yesterday, unless Ms. McDaniel may know off the top of her head.

MS. MCDANIEL: I do not know off the top of my head.

MR. PONS: This is the kind of information that we're seeking, Your Honor, by the end of discovery just to get clarity on these points to properly view and oppose these motions so.

THE COURT: Yeah, okay.

MS. KELLER: Okay. Yesterday my client had let me know and -- and by the way, I mean, this wasn't something we could have produced in discovery because it wasn't -- we responded to that subpoena before, you know, today. But we did -- I did send Mr. Pons a schedule of the payments and of -- of the payments due and the payments made under the loans I sent him that yesterday. It was in the form of like an Excel spreadsheet because that -- it's my understanding that -- and -- and I'm glad that I just saw that interest statement that was -- that Aery had attached to it, affidavit, because now I can use that with the client. But I did send him a schedule that shows, you know -- yesterday that shows the payments that were due under the loans and the payments that were made.

And as of yesterday what my client had informed me was

that as of April, 2025, Aery was 30 days past due on their loan payments for all three of the facilities. And so that was as of April. So I am guessing that March payment has not been made.

THE COURT: Okay.

MS. KELLER: (Unintelligible.)

THE COURT: All right. Here's I guess where I'm coming from and where I'm going here. I'm struggling to see -- and again, Mr. Pons, I'll certainly give you an opportunity to try to persuade me, but I'm not sure that any of this information that you're seeking is going to change what appears to be an undisputed fact that the amount that Aery owes on this line of credit just for their operation side far exceeds the amount of money that Cleveland Clinic owes, and that that money would then all go to Cogent Bank. It's already been spoken for to pay down the operational draw. And so I just -- I'm struggling to understand how anything you're asking for is going to change that fact.

That said --

MR. PONS: No.

THE COURT: Hold on and then you can respond.

That said, it does seem like they had to at some point be paying interest on that account from somewhere. They've got to be -- the money doesn't grow on trees, and unless they're just drawing down the -- or pulling advances to pay the interest, which seems kind of like we're -- a death loop, but in

the event that they were finding money somewhere to pay the 176,000, for example, and I know that one may not have been paid but those monthly interest payments, I think you're probably entitled to get the information to find out where that money was coming from because that money, presumably at least, wasn't spoken for because it's coming from outside of an account receivable, it's coming from outside money that Cogent Bank has an interest in.

So help me understand why that's not the right answer, the answer being these writs would be dissolved so that money can go to Cogent Bank to pay down the line of credit, but you may very well get the discovery you're looking for to try to track down where, if anywhere, there's a pot of money that hasn't been spoken for.

MR. PONS: So you may very well be right, Your Honor, and I won't dispute that it's what everybody's representing here today is correct. Then -- then that is likely -- you know, that's (unintelligible) which should take place.

My concern is that, you know, everyone is saying, oh, I have to speak to my clients, you know, we're not entirely sure. So we're just asking for, you know, just a short amount of time to be able to get whatever documentation to definitively establish these numbers.

And then to the extent, you know, there's a valid basis to seek to dissolve, then we would within, I don't know,

five days of when we get those documents we'd be able to oppose it to the extent we have a basis to do so.

That's all we're asking for, Your Honor. Like obviously if everyone's -- like I was saying, if what everyone is saying here is correct then I agree.

THE COURT: All right. Let me ask another question here. And, Mr. Quam, just to be sure you're still awake, you listed in your answer about $126,000 worth of invoices that you want to pay to Aery through Cogent Bank. Then in the amended answer it bumped up to 921,000. The inference that I took from that is that there's a fairly regular ongoing business relationship between Aery and Cleveland where Aery is doing a lot of work for you and you're incurring a lot of costs that this is a regular ongoing thing.

Is that a fair inference or is this 924 -- 21,000 the end of the relationship, and there's not going to be any more invoices coming down the road?

MR. QUAM: It's a fair invoice -- fair inference that they do regular business with each other, Cleveland Clinic and Aery, but it bumped from 100,000 to 900,000. It's not there because under the law we're -- we just have to -- it's cut off at the time that the writ was served. So we're not going beyond that, Your Honor.

So the thing wasn't -- the hundred thousand was just inaccurate. The initial calculation of how much they were

holding at a hundred thousand was just inaccurate. The correct number was 921,000 or whatever the amended answer reflected. So that was the -- that's the explanation there.

THE COURT: Okay. And I guess the -- where I'm going with the question is if this writ is dissolved, if another one was issued a week from now, would there be another $900,000 or what is the volume of business that's being done?

I mean, I guess if there's an income stream that I say today I'm persuaded is Cogent's, but additional evidence develops and I become unpersuaded of that fact, is there an income stream coming in from Cleveland Clinic that we could have this debate down the road, or is it unlikely that it's going to be that large of a number?

MR. STPHAO: It depends, Your Honor. Aery -- the helicopter service that provides services connected with organ donors so it's hard to predict, you know -- we know that there is a usual course of business that is regularly providing those services, but we don't know exactly how much that's going to be.

For example, if Your Honor dissolved the writ then Cleveland Clinic would be obligated to release the funds to Cogent Bank or Aery or wherever they've been spending it. And then if they serve another writ of garnishment that would just start the process again.

THE COURT: Okay. All right. That's fair enough.

And before I kind of get back to --

MS. MCDANIEL: My understanding --

THE COURT: Who is this?

MS. MCDANIEL: I'm sorry. My understanding -- this is Erin McDaniel. My understanding, Your Honor, is that Cleveland Clinic pays these invoices directly into that blocked account with the understanding that that money doesn't actually belong to Aery.

MR. QUAM: That would comport with the terms of blocked account agreement.

THE COURT: All right. I guess the other kind of big picture question I have, and again it's a little beyond where we are today, but why hasn't -- why hasn't this debt been paid or some portion of it? I mean, it seems like this is a going concern business. Maybe they're a little behind on their bills, but they've got a pretty substantial line of credit that in very short order may get paid down by $921,000. Why isn't this judgment creditor getting a portion of the money?

Ms. McDaniel or Ms. Rodriguez, why aren't you paying your debt here?

MS. RODRIGUEZ: Your Honor, I understand -- I certainly understand and I think your question and part of the confusion here for us is that we've been trying to have some conversations with about reaching -- potentially reaching a settlement. But we've been very candid, and Aery just doesn't have it. If they had it, they would be trying to pay it. It's

just not -- they just don't have it.

Cogent is a first priority lienholder on all of Aery's accounts receivables, but they're the only ones. And Talentscale isn't the only one either. And unfortunately what -- Aery was in a position where they were performing on a Navy contract and due to, you know, changes in the way that we had our military deployed, the operations under that contract were substantially cut down, about 75 percent cut down, reducing the cash flow that Aery had to -- you know, by about 75, 80 percent which is huge.

It's just not something that Aery has pulled out of yet. That's been a couple of years now that Aery's been kind of trying to stay afloat, but we're in a -- I mean, Aery is definitely toeing the line at this point of potentially restructuring. It's not -- it's not lack of desire to pay a debt. It's lack of ability to do so. Notwithstanding, it doesn't mean that the -- you know, the account sales and how it owes some money that is owed to other priority creditors.

THE COURT: And I -- I understand that and accept that, and particularly if the representation is accurate that they're 30 days behind on their loan agreements, that may be -- that reality may be coming sooner rather than later because I'm sure Cogent Bank doesn't like having a $15 million liability sitting out there with it not being paid.

But if the number is 15 million right now and this

writ of garnishment is dissolved, there's 921,000 that gets paid down immediately and so you're -- you've got $921,000 on your line of credit to play with that you didn't have before. And it just seems to me that you may have other creditors out there, but this one appears to be the one that's agitating, at least most loudly and at least most loudly in front of me, and it seems like there would be an opportunity to figure out how to weave them into the operations because looking at the business loan agreement -- you know, the purpose of line of credit is to provide for ongoing working capital to support current and future contracts and provide the funding for purchase of new aircraft.

And I don't see any reason why this debt which was incurred in the course of this judgment, which was incurred in the course of supporting their business, why that wouldn't fall within the scope of a proper use of the money.

So there's a lot of smart people on this phone call and I'm sure if you put your heads together, you could figure out a way to start getting these folks paid so they stop bothering you, stop bothering your client, stop bothering everybody else, and you can move on with trying to dig yourself out of the hole.

So that's just a nickel's worth of free advice, but I think that's probably pretty good advice. Otherwise, somebody needs to pull this company into bankruptcy and get all of this

sorted out, get them a fresh start and move on with life. But it certainly seems a little -- I understand what you're saying, but it -- you know, a little bit of an alligator tears if, in fact, they're doing hundreds of millions of dollars of government contracting and I'm sure these executives aren't working for free, it certainly seems like that there's a way to solve this problem. But that's for y'all to figure out, not me.

So Mr. Pons, I'll give you the last opportunity to persuade me that I shouldn't do what I think I'm going to do.

MR. PONS: Your Honor --

MS. MCDANIEL: Your Honor --

THE COURT: Okay. Hold on.

MS. MCDANIEL: I don't mean to interrupt.

THE COURT: Yes, ma'am, go ahead.

MS. MCDANIEL: I don't mean interrupt but I just wanted to briefly ask for an opportunity to say one thing. I can wait till after Mr. Pons goes or go now but I didn't want you to hang up.

THE COURT: Go ahead. You can have it. We'll give Mr. Pons the last word.

MS. MCDANIEL: Okay. I just wanted to clarify one thing. I was able while we were sitting here looking through my files -- and we did produce that, the billing summary that was -- we were talking about that was attached to the affidavit of Aery. And we've produced that and the unredacted version

that I'm looking at which I believe was produced to opposing counsel that way -- or to Talentscale counsel shows that that top line account, that $11 million balance relates to the account number that is associated with the operating line of credit.

The two on the bottom are relating to the accounts associated with the sub notes. So that $11 million balance based on the records we have produced to Talentscale earlier in this case is -- does reflect that that $11 million balance relates to the line of credit.

THE COURT: All right. Thank you for that clarification.

All right. Mr. Pons, go ahead.

MR. PONS: Your Honor, so as I mentioned before -- thank you. We're not -- to the extent that what everyone's representing here today is true, then we're not disputing where the garnishment funds should go. We're just seeking documentation or briefing -- you know, sort of tying everything together so that we can actually, you know, see what is actually the case or not. Right now we're just kind of making verbal representations.

And we also -- and we don't have, you know, all the documents. Like, for example, we still don't have the amortization tables. I know that only makes up a small portion if it, but that's something that, you know, we were seeking.

And so to the extent that, you know, we're -- a ruling is going to be made on the Motions to Dissolve, we would again just request a short amount of time to sort of innerduct on our own the documents to kind of figure out okay, what is it actually owed.

THE COURT: All right. Let me ask you this. In light of what Ms. McDaniel just confirmed, which was the assumption we had -- or at least I had -- in our conversation and she says you have that unredacted billing statement. Why isn't that enough to show me that the amount that's owed irrespective of sub loans, irrespective of amortization tables, that the amount that is owed on the line of credit to Cogent Bank secured by the accounts receivable is greater than the amount that is owed to Aery by Cleveland Clinic?

In other words, your premise, as I understand it, seems to be is I need these additional documents to confirm that the amount that Cogent Bank is entitled to is greater than the amount that Cleveland Clinic is going to pay. And it seems to me that the information I currently have conclusively establishes that. And so these other documents, there's nothing about them that's going to change that. I mean, why is that not where we are?

MR. PONS: I don't believe that's attached to the Motion to Dissolve and to the extent it is -- I mean, I'm not sure exactly what document is being referred to.

THE COURT: I'm referring to document --

MR. PONS: If you could provide a case number.

THE COURT: -- document 68-2. And it's the combined billing summary from Cogent Bank to Aery from March of 2025 that shows the principal balance on the operating line of credit being $11.1 million and it shows a principal balance of two separate -- what's been represented to be sub notes, being 425,000 and 3.75 million.

And the representation that was made to me by Ms. McDaniel is that that document was produced to you in an unredacted form and it provides the information that you need to show that the blocked -- excuse me, the operating account line of credit far exceeds the 925,000. So, in other words, when that 925,000 comes in, not a penny of it is going to be bumped back into Aery's unspoken for operating account. That seemed to be the premise of your motion. I need to -- I need to be sure because money that comes in might not all go to pay down the loan. Some of it may get bumped --

MR. PONS: Right.

THE COURT: -- back out to Aery and that just seems to be demonstrably shown to not be the case.

MR. PONS: So this is a statement for March of 2025. To the extent, you know -- obviously we're talking about to the present. We would ask for the statements for April of 2025 and May of 2025 to know actually what is currently owned.

MS. MCDANIEL: Except the --

MS. KELLER: And, Your Honor, just to verify --

THE COURT: Hold on. Hold on. One at a time. Ms. Keller, as I understand, that's something you have produced?

MS. KELLER: This is something we produced. We only produced up through the date of our last production. So if there's a statement that's not, you know -- that's this month, I'll certainly -- we can certainly provide that but that -- I just wanted to clarify that I, Ms. Keller, was the one who indicated that we had produced those, not Ms. McDaniel. I don't know -- I didn't announce myself and I apologize.

THE COURT: Okay, I'm sorry. Go ahead. Somebody else was trying to speak as well.

MS. MCDANIEL: The only other thing I would add to that, Your Honor -- this is Erin McDaniel on behalf of Aery -- is that the -- we produced -- we attached that as an exhibit to our Motion to Dissolve because of the date on the writ. So the writ was for the end of March of 2025 and so what was owed at the time of the writ is what determines whether or not -- that money was being held at that time, right. So that's the reason that it was produced.

And again, I don't think I can -- I can certainly represent to you that Aery has not had an influx of $11 million since the last month and a half. But I don't think that has any bearing necessarily on whether or not the money that was

withheld at that time was under our first (unintelligible).

MR. PONS: Your Honor, if I may, we don't know -- as mentioned earlier, we don't know what happened with the funds in the blocked account while we had this one writ of garnishment served on Cleveland Clinic. So we don't know what's actually owed until we can actually see those statements. So we either need the bank statements for purposes of the Motion to Dissolve which, you know, it's been -- you know, to be over that or the actual -- or this particular statement itself.

MS. KELLER: We have these -- this is Ms. Keller. We have these particular statements that we're willing to provide. What the blocked account statements, they're not going to show -- I mean, that's going to show the money in the blocked account which really isn't relevant. You know, that's going to show the funds coming into the blocked account, but not what's owed on the loan.

THE COURT: Okay. All right. I've heard enough to know what I want to do. The bottom line here is that the -- between the business loan agreement, the revolving line of credit, promissory note, and the blocked account agreement and the security interest, all of that establishes to my satisfaction that the account receivable that we're talking about owed by Cleveland Clinic is spoken for and has been spoken for by Cogent Bank through all of its perfected interest, and so that money is not available to be garnished.

And so the writ of garnishment directed to that money will be dissolved and that money can go where it would in the ordinary course of business, which would be to the blocked account to be done with as it would be in the ordinary course of business, pay down the amounts owed on the line of credit, which far exceeds that amount, so none of that money would go back into Aery's hands, and so it's where it needs to be.

And so I don't think -- I mean -- so obviously I've denied your motion for extension of time just because you haven't persuaded me that any of the documents that you don't believe you were -- that you haven't received or say you haven't received in response to your subpoenas would change those facts.

That said, I do think there might be some information that you have requested that you -- that could help you determine if there are other sources of money, where the money's coming from that they're using to pay, for example, the interest payment that we've been talking about on that account statement, maybe they haven't paid that one, but they paid ones previously, you could find out what account they're using to do that.

Additionally there's a $22,000, or 500 or $37,000, depending upon how it's calculated, annual fee that's charged on this line of credit, .25 percent of the line of credit. I think you're entitled to figure out where they're getting the money to pay that.

And so to the extent your Motion to Compel deals with

that, I would think you could -- you should get it. And I'm going to give you kind of some ideas of rulings here and then ultimately I'm going to send this Motion to Compel to a magistrate judge if you all can't sort it out.

As to the statements of the revolving -- or excuse me, the statements from the blocked account, I'm struggling to understand how that will help answer any questions. I guess the marginal relevance I see is that if there's -- if those accounts show that these accounts receivable are coming in and contrary to the representations we've heard today, they're simply being used to pay down the line of credit and instead they're being funneled into this 954-dollar account or what's supposed to be out there is a half-a-million-dollar account. I think that would be potentially relevant.

So I do see some potential relevance to the information in that blocked account beyond, it appears, what you've gotten already. And so to the extent your Motion to Compel is seeking that kind of information or information relating to where money is coming from Aery to Cogent Bank to pay these various fees and interests, I think you're probably entitled to that.

Beyond that, if that doesn't answer --

MR. PONS: That's what we're seeking, Your Honor.

THE COURT: If that didn't answer all of the questions in the Motion to Compel, then that -- I'll send that down to the

magistrate judge and you can spend some time with him explaining that. But if that answers the Motion to Compel, I will ask somebody to memorialize that if there's confusion or disagreement about it rather than me having to try to write an order telling you to do what I've just told you to do.

So Mr. --

MR. PONS: So just --

THE COURT: -- Pons, do you understand the ruling, one of them against you and one of them seemingly for you?

MR. PONS: So just to understand the last part of what you said, Your Honor -- and thank you for explaining them.

We -- generally speaking, you would find that or you see that we do have entitlement to the statements pertaining to -- the bank statements pertaining to the blocked account. Because the reason we're seeking that is because -- obviously for the reasons you stated and obviously the identity of Aery's contractors that are sending -- they're -- they're actively paying them or contracting with them. So not only they were actively -- like their identities be important but, you know, potentially any information they have and any other leads that they have for us to be able to collect on our judgment.

THE COURT: Well, help me understand that because from my perspective the most important thing for you to be able to see is money coming in and where the money's going out to. Whether it's going out to some internal Cogent account that's a

debit on the loan or whether it's going into Aery's pockets or its principals pockets. That kind of information.

I'm a little more concerned about the idea that you start sending these same type of letters to every single customer when it -- I'm fairly convinced that the money that those customers are paying, particularly the way you'd see it, if they are in the blocked account, that money is spoken for. So why would you be entitled to go harass them about money that they're paying into the blocked account?

So, I mean, the identity of who's -- where the money's coming from is less important I think, from my perspective, than that money is coming in and where it's going.

So help me understand what I'm missing there.

MR. PONS: I mean, so -- the money's not definitely spoken for and that's -- and that's sort of the issue here. And so like we would like to -- you know, since as you mentioned earlier, Your Honor, we're very proactively trying to collect on our judgment. We'd like to know who they are and, you know, we are entitled, generally speaking, like wide latitude to get that kind of discovery.

And so as far as the concern is the judgment debtor, I mean, this is really -- it's only spoken for for a certain period of time. I mean, I don't -- we don't know the full universe of income that's being received so I can't see how long and for when. And that's part of reason why we want those

statements. But we're just trying to be made whole. We want these identities to be able to know, okay, like what -- what's the foreseeable future going to look like and when are we going to get paid and how can we collect on this. So that's -- that's the second piece --

MS. KELLER: Your Honor --

MR. PONS: -- I would like to make, Your Honor.

MS. KELLER: -- I would like to respond when Mr. Pons is done. I didn't mean to interrupt. I thought he had finished.

THE COURT: All right, Ms. McDaniel.

MR. PONS: I had finished my argument there.

THE COURT: All right. Ms. McDaniel, go ahead.

MS. KELLER: This is Ms. Keller.

THE COURT: Oh, I'm sorry, Ms. Keller. Go ahead.

MS. KELLER: Yeah. So, Your Honor, the concern that you've raised is precisely the concern that Cogent has if it's going to be forced to produce the statements for the blocked account. Talentscale has filed three different garnishment actions in the State of Florida. One in the Northern District, one in the Middle District and one in the Southern District. It has issued dozens of writs of garnishment out of those accounts.

And if we produced those blocked account statements and -- and all of those funds coming into the blocked account are subject to Cogent's first priority security interest. But

if we produce those blocked account statements and Talentscale starts garnishing all of these creditors -- I'm sorry, all of these companies that are -- that are paying these receivables, Cogent is going to be unfairly harmed because it's going to have to defend all of those if it knows about them. There's a good chance that Cogent may never even know about them because the actions are being filed without Cogent's knowledge. And the writs of garnishment are being issued without Cogent's knowledge.

I just so happen to run across one in the Southern District and now I have to monitor that case in case if there's a writ of garnishment that's going to be issued. We're not a party to that case. We're not -- we haven't been served in that case with a writ of garnishment or anything.

So if we have to do this all over the United States, number one, it's going to be impossible; and, number two, it's going to subject Cogent to a very unfair burden and expense. And that's what I fear is going to happen when we produce those account statements.

To the Court's concern about determining where the money is going, Cogent did produce all of the account statements relating to all of the other accounts held by Aery with Cogent. It produced the account statements related to the operating account. It produced account statements relating to a payroll account that Aery has. And it's produced account statements

relating to another account that was closed last December.

So it has produced the account statements and counsel can see that there have not been deposits into those accounts from the line of -- or I'm sorry, from the blocked accounts, and the statements that were produced clearly show that.

Cogent has also --

THE COURT: Let me ask you this.

MS. KELLER: I --

THE COURT: Let me ask you something. What I'm anticipating or what I think would be relevant information is if -- there's got to be some account document, whether it's a ledger or something, that shows money coming into that account -- and put aside the source of it for the time being -- money coming into that account, and that money -- there's something done with that money. And I think that's the information that I see potential relevance to.

If what is done with that money is simply every day, as the loan agreement seems to talk about, there's a sweep that's done every day and a debit entry occurs in their loan balance account or line of credit account, then that's what they would see. But if it turns out that that money's coming in and every day there's two things that happen, one, a ledger entry is made that draws -- addresses a portion of the line of credit and then there is another entry that goes into the pocket of Mr. Beale, I think that would be relevant information.

I'm not saying that did happen but don't they have a right to confirm that the money that is going into that account that they otherwise could garnish is being used for what the loan documents say it's supposed to be used for, which is the blocked account is to pay down the amount that they've borrowed from you?

MS. KELLER: Yes, and we did produce a ledger yesterday. And I know that -- and this was something that I didn't consider as being encompassed by the subpoena which is why it wasn't produced earlier. But I did produce a ledger yesterday and -- or I sent it to counsel yesterday. We're going to be producing it today with Bates Numbers and everything, but that shows the flow of funds. If that doesn't -- I don't know if counsel has had a chance to even review that yet because I sent it to him last night.

If that is not sufficient, one thing that I might suggest is we -- how about we produce the blocked account statements that redact the names of the -- those companies who are depositing the funds in there.

MR. PONS: So, Your Honor, as long as we can agree that only the contractors that are sending receivables are redacted, we would be amenable to those statements being produced in that form for the time being.

THE COURT: Well, I guess Cogent's concern, which seems to be legitimate, is wherever that's coming from, whether

it's a contractor, whether it's -- I mean, I assume that's primarily where accounts receivables are coming from. But I guess I could conceive of a situation where they've done something, they're entitled to money for it, that money is spoken for through all these documents, and so wherever that's coming from, the concern is if all of those people keep getting hit with writs of garnishment and a court has to adjudicate all that money's being held, in the meantime they're not able to draw down that balance that they're owed, and I do share some of that concern.

So here's what we're going to do. It sounds like there's been some additional production that have been made that may address at least my concern. What I'm going to do at this point because I've resolved the -- the Motions to Dissolve, I'm going to require the parties to confer about the Motion to Compel with the guidance that I've provided today and file a report within -- and y'all can tell me the time frame -- within an X time frame to let me know whether you've been able to resolve it or whether there is a crystallized dispute.

And at that point I'll determine whether I want to fool with that or whether I want to let the magistrate judge deal with that. And I think I've provided enough guidance about what I think they're definitely entitled to and what I'm concerned about them getting ahold of.

And so with that guidance, my hope is that after

Mr. Pons looks at what he has, evaluates that, y'all have some conversations about what he doesn't have and thinks he still wants, and if you can't reach an agreement on that, we will then have a crystallized dispute that I can resolve better than I'm doing now with more briefing to explain more precisely what the concern is about the information y'all can't agree on.

Does that sound reasonable, Mr. Pons?

MR. PONS: Your Honor, I have actually the document in front of me and it's somewhat helpful, but there's terminology here that's just like very vague, it doesn't show where the money's moving from.

THE COURT: Okay. Well, that's --

MR. PONS: That's the concern that we have, yeah.

THE COURT: All right. Well, that's --

MR. PONS: It doesn't show, for example, it would go to a Scott Beale or whatever principal, you know.

THE COURT: Well, that's -- that's part of the guidance --

MR. PONS: -- (unintelligible) -- okay.

THE COURT: That's part of guidance for y'all to try to resolve that.

Ms. Keller, do you understand what I'm asking and expecting?

MS. KELLER: Yes, I do, Your Honor.

THE COURT: All right.

MS. KELLER: Yes.

THE COURT: What time frame do y'all want to have that conversation and try to come to resolution on that Motion to Compel, from your perspective, Ms. Keller?

MR. PONS: 14.

THE COURT: I'm sorry, 14 days is Mr. Pon's suggestion. Ms. Keller, is that suitable?

MS. KELLER: That's fine, yes.

THE COURT: All right.

One other question and I think, Ms. Keller, you've kind of raised this indirectly, but one question I've had is why is this case here? As I understand, Cogent Bank is not here. Cleveland Clinic is not here. And when I say here, I mean in the Northern District of Florida. I don't think there's a jurisdictional issue because everybody has sought affirmative relief, so any jurisdictional concerns that they had they've waived.

But I'm just wondering as a practical matter, why is this garnishment action, all this going on in the Northern District of Florida, Mr. Pons?

MR. PONS: So the reason that we're doing that, Your Honor, is there's multi -- the Court has jurisdiction over multiple entities and parties that we've subpoenaed. And so it's just as a practical matter we've issued them through this court.

THE COURT: Are there also -- and I guess I saw in some document I looked at before today that there's a pending proceeding in the Middle District of Florida that garnishment action is -- or at least post-judgment discovery is going on with respect to Cogent Bank. Is that accurate?

MR. PONS: Yes. We -- since -- since Cogent Bank basically entertained it didn't have any -- little to no assets in the account that it reported, we didn't proceed with that action.

THE COURT: And so that's essentially the same thing that we've been talking about just now, right?

MR. PONS: Correct, Your Honor.

THE COURT: And so why was that down in the Middle District? Is that where Cogent is located?

MS. KELLER: Yes, Your Honor.

MR. PONS: Initially -- yes, so initially we filed here and then Cogent disputed jurisdiction so then we filed over there.

THE COURT: Okay. Okay. And from Ms. Keller, is -- at this point I guess you may not be happy you're here, but you're here, right?

MS. KELLER: Yeah. I think, Your Honor, when we answered the writ of garnishment -- Cogent has been served with writs of garnishment in this action, also up in the Eastern District of Virginia, and at some point they just want to be

done, you know. And the Middle District case was actually filed after this case.

And there were several attempts for -- Talentscale moved for issuance of several writs of garnishment. The Court there *sua sponte* denied those motions for lack of jurisdiction. So I think, you know, that's part of the reason why all of the writs are being sought out of this district. There are some, like I said, out of the Southern District as well that we've been monitoring, and gosh knows where else around the United States. I hope that's it but...

MR. PONS: Your Honor, if I may -- I don't want to -- it seems like everybody's painting themselves as a victim here. We have a debt. We have a judgment that was entered by a federal court. We're entitled to collect on this judgment. And the reason that those were dismissed because the Court saw that the registered -- which is the only permission they could have used, they saw the registered agent wasn't within that district and so they just *sua sponte* did deny those. But there was no discovery conducted on that.

THE COURT: And I am very sympathetic --

MR. PONS: So a separate issue.

THE COURT: I am very sympathetic to the fact that you have a debt that you're entitled to recover, and I've made very clear that I think that y'all can figure out a way to get that done. I haven't paid maybe as close of attention as the judge

in the Middle District did in evaluating whether I have the authority to issue these writs of garnishment as many as were issued. I have typically, you know, looked at them, you've asked for them and I figure that if somebody responding to them wants to tell me I don't have jurisdiction then we'll have that debate.

But I guess just moving forward, I don't want to be issuing writs of garnishment to folks that I don't have some sort of jurisdiction over. And so I would just urge you to be more circumspect in evaluating whether I'm the proper court to be issuing these writs, and don't want you to assume moving forward that simply because I have as a matter of course without doing the due diligence that I guess that district judge in the Middle District did, that that will be how we proceed.

But for the folks that are here today, they're all here, and I think have not challenged my jurisdiction to do whatever I'm doing, and so we'll proceed ahead in that regard. But I just -- I don't want to become the collection agent court for Talentscale, as sympathetic as I am to the fact that you ought to be able to collect this money from a company that appears to be a going concern and at least may be teetering on the edge of bankruptcy but haven't gotten into it yet.

So with that, any final comments, Mr. Pons?

MR. PONS: None, Your Honor. Thank you so much for your time.

THE COURT: All right. Mr. Daniels --

A MALE VOICE: Your Honor.

THE COURT: Hold on, I'm going around the room.

MS. MCDANIEL: No, Your Honor. Thank you.

THE COURT: Ms. Rodriguez, anything you want to add?

MS. RODRIGUEZ: No, Your Honor. Thank you.

THE COURT: Ms. Keller, anything you want to add?

MS. KELLER: No, Your Honor. Thank you for your time.

THE COURT: All right. Mr. Gross, you happy you've been here?

THE WITNESS: Yes, Your Honor, it's an education. Thank you.

THE COURT: All right.

And, Mr. Quam, anything you want to add?

MR. QUAM: Yes, I just want to clarify, Your Honor, that the Court is going to be dissolving the writ against Cleveland Clinic.

THE COURT: Yes, I'm going to get an order entered after today that does a couple of things. It grants the various Motions to Dissolve the Writ, it denies the Motion for Extension of Time, and it defers ruling on the Motion to Compel with the direction that the parties report back in 14 days.

From your perspective, Mr. Quam, do I need to do anything more than say the writ of garnishment is dissolved? Do you need to be told where to send the money or does the

dissolution of the writ allow you to just act in the normal course of business now?

MR. QUAM: So, yes, the dissolution then will just release the hold on the funds that we've been holding since the writ was issued.

THE COURT: All right. Very well.

All right. Well, thank you all for your time and I'll get that order out as quickly as I can today. And in the event that y'all aren't able to resolve any lingering issues with respect to the discovery production, I'll see the report and I'll at that point decide whether I want to address it directly or whether consistent with my standard practice and what I've been doing in this case, referring discovery disputes down to the magistrate judge.

So either we'll be together again or you'll get to talk to the magistrate judge.

So with that I hope everyone has a nice afternoon, a nice long weekend and we are adjourned.

*(Proceedings adjourned at 11:13 a.m.)*

* * * * * * * * *

I hereby certify that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter, pursuant to the provisions of Section 753, Title 28, United States Code.

Jul

June 4, 2025

Julie A. Wycoff, RMR, CRR
Official U.S. Court Reporter

Date