## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA

Case No. 5:25-mc-00001-TKW-MJF

TALENTSCALE, INC.,

     Plaintiff / Judgment-Creditor,

v.

AERY AVIATION, LLC,

     Defendant / Judgment-Debtor.

and

CAPITAL BANK, N.A.,

     Garnishee.

_____/

## PLAINTIFF'S OMNIBUS MEMORANDUM IN SUPPORT OF GARNISHMENT RELIEF AND IN OPPOSITION TO MOTIONS TO QUASH AND TO DISSOLVE WRITS OF GARNISHMENT, INCLUDING COGENT BANK'S MOTION TO DISSOLVE CLEVELAND CLINIC WRIT, ECF NO. 195

Plaintiff Talentscale, Inc. ("Talentscale") submits this omnibus memorandum in support of its requests for (1) denial of the motions to quash and to dissolve writs of garnishment filed by Cogent Bank ("Cogent") and Prudent Capital III, LP ("Prudent"); (2) entry of final judgments in garnishment on the Capital Bank and Cleveland Clinic writs of garnishment; and (3) such other legal or equitable relief as the Court deems just and proper. In support, Talentscale states as follows:

## **INTRODUCTION**

Cogent has a garden-variety security interest and nothing more. It holds only a lien in Aery's receivables, and even in its own Motion to Dissolve Writ of Garnishment Issued to Cleveland Clinic Foundation, Cogent describes the at-issue funds as "funds owed by CCF to Aery Aviation, LLC" and the "CCF Receivables" as Aery's accounts receivable encumbered by Cogent's first-priority security interest, not as property owned by Cogent. Florida Statute § 77.16 requires a third-party movant to claim ownership of the garnished property, not merely a security interest, and Cogent has never satisfied that statutory predicate.

The factual record has materially changed since May 2025. As detailed in Section V, Cogent's statements at the May 23, 2025 hearing about recent payments and the size of the line of credit were directly contradicted by its own ledger and loan documents (ECF Nos. 93-3, 105, 153, 193).

Aery's inequitable conduct is pervasive. While Aery claimed to both Talentscale and the Court that it "just doesn't have" the ability to pay, its controlling member Scott Beale orchestrated more than $11.7 million in transfers from Aery to himself, to entities he owns or controls, and into assets that benefited him personally, all while leaving Talentscale unpaid. Every one of those transfers flowed through Cogent's credit facility and blocked-account structure, and Cogent continued to

permit Aery to draw on the facility and to pay insiders and litigation counsel instead of Talentscale.

The blocked account agreement does not transform Cogent's garden-variety security interest into an ownership interest. The agreement is a mechanical device that requires Aery's customers, including CCF, to remit Aery's receivables into an account titled "Cogent Bank FBO Aery Aviation LLC," after which Cogent sweeps the balance to reduce the line of credit and may re-advance funds to Aery. This structure does not alter the underlying legal relationships: CCF remains indebted to Aery, the CCF receivables remain Aery's accounts receivable, and Cogent's interest remains a security interest in collateral, not ownership of the garnished property.

Cogent is reaping the lucrative benefits of a highly profitable lending relationship while failing to abide by the terms of the very agreements that grant it those rights. Its fee structure layers a 1.5% draw fee on every dollar advanced, a prime plus 2.25% rate on the outstanding balance, fees to boot, and a mechanical facility that sweeps essentially all of Aery's operating revenue. Yet Cogent has allowed Aery to ignore loan covenants requiring payment of obligations before they become delinquent, has continued to extend discretionary advances after Talentscale's garnishment liens arose, and has never declared a default, even as it invokes its status as a secured creditor to thwart Talentscale's garnishments.

Cogent and Prudent lack standing to move to dissolve a writ under § 77.16 because those banks are merely secured parties, and not owners, of the collateral. Neither bank claims that the CCF receivables are its property; Cogent affirmatively characterizes them as Aery's accounts receivable and as Cogent's "Collateral," and CCF's Answer states that CCF is "indebted to Aery," not to Cogent. On this record, and in light of the changed circumstances and the pervasive inequitable conduct detailed below, the Court should deny Cogent's motion to dissolve the Cleveland Clinic writ (Doc. 195), deny the related motions filed by Cogent and Prudent, and grant Talentscale's requested garnishment and equitable relief.

## SUMMARY OF THE ARGUMENT

In this omnibus memorandum, Plaintiff addresses threshold legal deficiencies that render Cogent's and Prudent's motions to quash and to dissolve writs of garnishment fatally flawed as a matter of law, documents the extensive pattern of inequitable conduct and misrepresentations to the tribunal, and requests equitable relief that independently bars the relief sought by Cogent and Prudent. (See generally ECF Nos. 184, 189, 192, 193, 195.).

### A. Cogent Has a Garden Variety Security Interest and Nothing More.

Cogent holds a security interest, i.e., a lien, not ownership. Under Florida law, a "security interest" is "an interest in personal property or fixtures which secures payment or performance of an obligation." Fla. Stat. § 671.201(37). Article 9's

attachment provision likewise presupposes that the debtor, not the secured party, has "rights in the collateral" when the security interest attaches. Fla. Stat. § 679.2031(2)(b). These provisions confirm that a security interest is an encumbrance that secures an obligation, not a transfer of title.

Florida Statute § 77.16, by contrast, requires a third-party claimant to aver that "the debt due by a garnishee is due to that person and not to the defendant," or that "the property in the hands or possession of any garnishee is that person's property," and to proceed on that ownership theory. Fla. Stat. § 77.16(1)(a). Cogent does not do so. In its Motion to Dissolve Writ of Garnishment Issued to Cleveland Clinic Foundation, Cogent states that the motion "involves competing claims over funds owed by CCF to Aery Aviation, LLC ('Aery')," not to Cogent. (ECF No. 195 at 1.) It further asserts that the "CCF Receivables" are "amounts that CCF owes Aery" which "constitute Aery's 'accounts receivable' under the Loan Documents," are "encumbered by Cogent's first priority security interest," and constitute Cogent's "Collateral." (ECF No. 195 at 3–4, 7.) CCF's Answer to Writ of Garnishment likewise states that CCF "was indebted to Aery in the amount of $11,897.00" and that CCF "may also be indebted to Aery in the amount of $34,552.44." (ECF No. 183 at 1.) None of these filings states that CCF is indebted to Cogent, or that the receivables are Cogent's property. They consistently describe CCF's obligation as running to Aery, with Cogent holding a lien.

Moreover, Cogent has never declared Aery in default or accelerated the loan. Cogent's January 27, 2026 affidavit confirms that Cogent continues to extend credit, continues to permit Aery to draw on the line, and treats Aery as a borrower in good standing. (ECF No. 193 ¶¶ 10–11, 22.) Under *American Home Assurance Co. v. Weaver Aggregate Transport, Inc*., 84 F. Supp. 3d 1314, 1323-27 (M.D. Fla. 2015), a secured creditor that declines to declare a default and to exercise its remedies cannot simultaneously use its unexercised security interest to defeat a judgment creditor's garnishment lien. *Weaver*, relying in part on *Frierson v. United Farm Agency, Inc*., 868 F.2d 302, 305 (8th Cir. 1989), holds that a lender may not "refuse to exercise its rights under the security agreement, thereby maintaining [the debtor] as a going concern, while it impairs the status of other creditors by preventing them from exercising valid liens." 84 F. Supp. 3d at 1326 (internal quotation marks omitted). Cogent's own choice to treat Aery as a performing borrower, rather than a defaulted one, reinforces that Cogent's interest is a lien on Aery's property and does not displace Aery's ownership for purposes of § 77.16.

**B. The Factual Record Has Materially Changed Since May 2025.**

The Court's May 23, 2025 order dissolving the prior Cleveland Clinic writ was entered on representations by Cogent and Aery about Aery's payment history and borrowing capacity that are flatly contradicted by Cogent's own internal records. At that hearing, Cogent's counsel told the Court that Aery had made no payments

"in approximately 60 days" and that the line of credit was "fully funded" at "about $15 million." (ECF No. 93-3 at 15:1–3, 19:6–16.) Five days later, Cogent's ledgers and loan documents showed 46 payments in March and April 2025 totaling $5,923,136.08 and a May 5, 2025 amendment increasing the credit line to $18 million. (ECF No. 105 at 5–6; ECF No. 193 ¶ 11; id. Ex. 3.) For the detailed chronology and its effect on the prior order, Talentscale incorporates Section V below.

## C. Aery's Inequitable Conduct is Pervasive.

Aery's inequitable conduct is pervasive. While representing to Talentscale and to the Court that it lacked the ability to pay the judgment, Aery's controlling member, Scott Beale, directed more than $11.7 million in transfers from Aery to himself, to entities he owns or controls, and to assets that benefitted him personally. Talentscale's prior filings catalog these transfers, including: (1) $2,403,357.90 in direct distributions and tax payments to Beale personally; (2) $4,784,496.00 to GH Equipment, LLC (Beale 55% owner) for aircraft purchases; (3) $1,263,870.00 to Aerodrome Properties, LLC (Beale owner) for hangar construction; (4) $874,296.77 to Aviation Capital Partners, LLC (wholly owned by Beale) for aircraft lease payments; (5) $470,000.00 to Aviation Capital Partners II, LLC (Beale 50% owner) after entry of the judgment; (6) $238,448.00 to Fast Bird, LLC (Beale 50% owner) after service of garnishments; and (7) $727,103.65 to Davis Law for legal fees,

which includes fees spent delaying and obfuscating Talentscale's collection efforts. (See, e.g., ECF No. 189 at 6–9; ECF No. 194 at 3–4.)

Every one of these payments passed through the structure Cogent designed and controls. Cogent confirms in its affidavit that all of Aery's receivables are directed to the Cogent-titled blocked account and swept daily to reduce Aery's line of credit. (ECF No. 193 ¶¶ 15–17, 20–21; id. Ex. 3 § 2.01(f)(ii); Ex. 7 §§ 2–3, 9.) Cogent's senior vice president, Abbey Henderson, testified that Cogent understood Aery's obligations to Talentscale and nevertheless elected not to require payment of the federal judgment so long as debt remained outstanding to Cogent. (See ECF No. 189 at 10–12 (quoting Henderson deposition excerpts).) Against that backdrop, Aery's self-serving claim that it "just doesn't have it" (ECF No. 93-3 at 25:16–19) is not credible, and Cogent's decision to allow insider payments and outsized transfers to counsel while Talentscale remained unpaid is part of the inequitable conduct that underpins the equitable relief Talentscale seeks.

**D. The Blocked Account Agreement Does Not Transform Cogent's Garden-Variety Security Interest Into An Ownership Interest.**

The Blocked Account Agreement is a mechanics-of-collection document, not a conveyance of ownership. Under that agreement, Aery is required to direct its customers, including CCF, to remit payments to a "Blocked Account" at Cogent "titled in the name of Cogent Bank," but "FBO Aery Aviation LLC." (ECF No. 193 ¶ 17; id. Ex. 7 §§ 1–2.) Cogent has "exclusive dominion and control" over the

blocked account and a first-priority security interest in the account and the receivables deposited into it, and Cogent is required, on each business day, to sweep essentially all funds in the account to reduce the revolving line of credit, leaving a de minimis balance. (ECF No. 193 ¶¶ 17, 20–21; id. Ex. 7 §§ 2, 4, 9.)

These provisions do not change who owns the receivable before payment is made. Under the Loan Documents, the CCF receivables are expressly treated as Aery's "accounts receivable," and Cogent describes them as part of the "Collateral" that secures Aery's indebtedness. (ECF No. 193 ¶ 24; id. Ex. 3 § 2.01(f)(ii); Ex. 5 § 1; Ex. 6.) Cogent likewise states in its motion to dissolve that "the CCF Receivables constitute Aery's 'accounts receivable' under the Loan Documents" and are "encumbered by Cogent's first priority security interest," and that "the CCF Receivables thus constitute Cogent's 'Collateral.'" (ECF No. 195 at 7–8.) CCF's Answer mirrors that description, stating that CCF is "indebted to Aery" on specified invoices. (ECF No. 183 at 1.) The fact that Aery has contractually agreed to route its receivables into a Cogent-controlled account for purposes of repayment does not, without more, divest Aery of ownership or transfer title to Cogent prior to payment. If Cogent truly owned the receivables in the first instance, there would be no need for a "Cogent Bank FBO Aery Aviation LLC" account; CCF would simply pay Cogent in its own name. (See ECF No. 195 at 3–4, 7–8; ECF No. 193 Ex. 7.)

### E. Cogent Is Reaping the Lucrative Benefits of a Highly Profitable Lending Relationship While Failing To Abide By the Terms of the Very Agreements That Grant It Those Rights.

Cogent's own affidavit and loan documents show that the Aery facility is structured to generate substantial recurring fee income. Under the revolving line of credit and related agreements, Aery pays a 1.5 percent "draw fee" on each advance, ongoing basis-point fees on outstanding balances, and interest at rates as high as prime plus 2.25 percent. (ECF No. 193 ¶¶ 9–10, 22; id. Ex. 3 §§ 2.01(a), 2.03.) Aery's federal contracts generated gross receipts of approximately $109 million in 2024, and Cogent's ledgers reflect at least $6,336,853.46 in new advances between March 31 and May 21, 2025 alone. (ECF No. 189 at 4–6; ECF No. 105 at 4–5.) On that volume of activity, the 1.5 percent draw fee alone yields hundreds of thousands of dollars annually, before interest and other fees are taken into account.

Yet the same Amended and Restated Loan Agreement requires Aery to "pay and discharge at or before maturity, all of their respective obligations and liabilities … before the same shall become delinquent or in default." (ECF No. 193 Ex. 3 § 5.08.) Cogent has allowed Aery to violate that covenant with respect to Talentscale for years without declaring a default, accelerating the loan, or requiring compliance. (ECF No. 193 ¶¶ 10–11.) Cogent has also continued to extend discretionary, non-committed advances, and expansions of credit, after Talentscale's garnishment liens attached, including the $6.3 million in advances between March 31 and May

21, 2025 that were not made pursuant to any binding obligation predating the lien. (ECF No. 105 at 4–5; ECF No. 193 ¶ 11; Ex. 3 § 2.01(d).) Under Fla. Stat. § 679.323(2), such future advances are subordinate to the rights of a lien creditor unless they are made pursuant to a prior commitment entered into without knowledge of the lien and within the statutory window. Cogent has not shown that its post-lien advances satisfy that standard. On these facts, Cogent is enjoying the economic upside of a profitable facility while urging the Court to disregard the very contractual and statutory constraints that would otherwise require Aery to pay Talentscale's judgment.

## F. Cogent And Prudent Lack Standing to Move to Dissolve a Writ Under § 77.16 Because Those Banks Are Merely Secured Parties, and Not Owners, of the Collateral.

As noted, § 77.16 authorizes a person "other than the defendant" to intervene where that person "claims that the debt due by a garnishee is due to that person and not to the defendant, or that the property in the hands or possession of any garnishee is that person's property." Fla. Stat. § 77.16(1)(a). The statute's focus is on ownership of the garnished property, not on the existence of a lien or security interest.

Cogent does not claim that the CCF receivables are its property. In Doc. 195, Cogent expressly characterizes the funds as "funds owed by CCF to Aery Aviation, LLC," and repeatedly describes the CCF receivables as Aery's "accounts

receivable" that are part of Cogent's collateral package and are subject to a first-priority security interest. (ECF No. 195 at 1, 3–4, 7–8.) CCF's Answer to the CCF writ states that CCF "was indebted to Aery" on two invoices and "may also be indebted to Aery" on two additional invoices. (ECF No. 183 at 1.) Cogent's affidavit likewise frames Cogent's rights in terms of a perfected Article 9 security interest in collateral, not in terms of Cogent owning the receivables. (ECF No. 193 ¶¶ 15–17, 20–24.)

Prudent's position is even weaker. Prudent holds only a subordinated security interest in certain membership interests in Aery pursuant to a pledge and subordination agreement. (ECF No. 184-2 ¶¶ 1–5, 8–11; ECF No. 189-1 at 13.) Under that agreement, Prudent agreed to stand behind Cogent and to forbear from exercising remedies while Cogent's debt remains outstanding. (ECF No. 189-1 at 13.) Prudent's own declaration acknowledges that it did not receive any payments on its note from October 31, 2023 through at least June 30, 2025, when the note matured, and that it continued to negotiate payment terms into January 2026 without declaring a default. (ECF No. 184-2 ¶¶ 14–16.) When Prudent did effectuate a withdrawal at Capital Bank in December 2025, it removed approximately $1.9 million and left approximately $1.1 million in the account, an amount nearly equal to Talentscale's judgment. (ECF No. 184-2 ¶ 17.) If Prudent believed those funds

were its property within the meaning of § 77.16, there is no principled reason it would have left that balance untouched.

On this record, Cogent and Prudent are secured creditors asserting lien interests in Aery's property, not owners of the garnished funds. They have not satisfied the statutory requirement of claiming that the CCF receivables are "their" property rather than Aery's. As a result, they lack standing to obtain dissolution of Talentscale's writs under § 77.16. Their motions to dissolve must be denied.

## ARGUMENT

### I. COGENT HOLDS ONLY A SECURITY INTEREST, NOT OWNERSHIP, AND IT LACKS STANDING TO DISSOLVE A WRIT OF GARNISHMENT UNDER FLORIDA STATUTE § 77.16.

#### A. Security Interest vs. Ownership: The Distinction Is Fundamental.

A secured party is not an owner of collateral. This is a bedrock principle of secured transactions law under the Uniform Commercial Code (UCC) and Florida law. The very term "collateral" presupposes that the debtor owns the property and has granted a security interest in it to secure an obligation. If the secured party owned the property outright, it would not be "collateral" at all.

Under Florida Statute § 679.2031, "[a] security interest attaches to collateral when it becomes enforceable against the debtor with respect to the collateral." Fla. Stat. § 679.2031(1). For a security interest to be enforceable, the debtor must have "rights in the collateral or the power to transfer rights in the collateral to a secured

party." Fla. Stat. § 679.2031(2)(b). The UCC defines "collateral" as "the property subject to a security interest or agricultural lien." Fla. Stat. § 679.102(12). Critically, the UCC defines a "debtor" as including "a person who owes payment or other performance of the obligation secured, whether or not the person owns or has rights in the collateral." Fla. Stat. § 679.102(28). This definitional structure makes clear that the debtor is the owner of the collateral, not the secured party.

## B. "Assignment" Terminology Does Not Confer Ownership.

The terminology of "assignment" in the context of the granting of a security interest is not tantamount to an assignment of ownership of the receivables to the secured party. It is an assignment of a security interest, not an ownership interest. See U.C.C. § 1-201(b)(35) (defining "security interest" as "an interest in personal property ... which secures payment or performance of an obligation"); *Bender v. Shatz*, 300 So. 3d 193, 196 (Fla. 4th DCA 2020) (Warner, J., concurring specially) (third-party claimant under § 77.16 bears burden to establish an ownership interest in the property that renders it not subject to garnishment).

In *Lauren Kyle Holdings, Inc. v. Heath-Peterson Construction Corp.*, 864 So. 2d 55, 58 (Fla. 5th DCA 2003), the Fifth District explained the effect of an assignment: "An assignment is a transfer of all the interests and rights to the thing assigned.... Because an assignment vests in the assignee the right to enforce the

contract, an assignor retains no rights to enforce the contract after it has been assigned."

Nothing in the contractual agreements effects an assignment of ownership. There is a grant of a security interest, a garden-variety security interest. Moreover, there has not been a declaration of default under the 2025 agreement.

Even if characterized as an "absolute assignment," the transaction remains subject to Article 9's priority rules, not ownership principles. *Sun Bank, N.A. v. Parkland Design & Dev. Corp.*, 466 So. 2d 1089, 1091 (Fla. 5th DCA 1985) ("the fact that the assignment ... was apparently an absolute one, and not made for security purposes, does not place it beyond the reach of Article 9").

If indeed those receivables had already been assigned per the parties' contractual agreement and indeed were "owned" by Cogent Bank before Cleveland Clinic sends payment, then payments would not be made to a "blocked" account, payments would be made directly to Cogent Bank. They are not paid in that manner because, as all parties have attested in their sworn statements, the Cleveland Clinic receivables are owed to Aery, not Cogent. Doc. 200-1, ¶ 5 (Aery admitting Cleveland Clinic owes Aery). An assignment of ownership did not occur. Aery's daily or automatic cadence of repayment of loaned funds does not transform its receivables into property owned by Cogent before the sweep.

**C. The Blocked Account Agreement Does Not Confer Ownership.**

Cogent and its counsel have repeatedly emphasized the existence of a blocked account agreement in an attempt to elevate Cogent's security interest to something more than what it is. This is a red herring. The blocked account agreement is a mechanical arrangement governing the flow of funds. It does not change the legal character of Cogent's interest.

Under the blocked account agreement, Aery's receivables are deposited into an account titled "Cogent Bank FBO Aery Aviation LLC." Cogent sweeps those funds daily to reduce Aery's loan balance, and then re-advances credit to Aery for operations. But this mechanical process does not transform Cogent's security interest into ownership. The funds deposited into the blocked account are Aery's receivables, generated by Aery's business operations. Aery is the account debtor's obligor; Aery is the party that issues invoices and W-9 forms; Aery is the party that reports the income for tax purposes and issues Form 1099s to its contractors. Cogent is simply a secured party that requires its borrower to direct its clients to send funds to a specially named account.

The timing and context of the blocked-account arrangement confirm that it is a collection mechanism layered onto Aery's existing receivables, not an ownership device that supersedes pre-existing trade creditors. On June 23, 2021, the date Cogent and Aery executed the original Security Agreement and Blocked Account

Agreement, Aery already owed Talentscale $423,434 in unpaid invoices pursuant to the Talentscale-Aery contract dated January 7, 2021. (See ECF No. 189 at 3–4; Talentscale demand correspondence, ECF No. 69-1 at 2–3.) Cogent thus entered the relationship with full knowledge that Aery carried a significant past-due trade debt to Talentscale. The stated purpose of the facility was to "provide ongoing working capital to support Aery's current and future contracts," which in practice includes paying trade vendors and service providers. (ECF No. 193 Ex. 3 § 2.01(d).) Nothing in the Blocked Account Agreement purports to retroactively divest Aery of ownership of receivables already arising from those contracts or to extinguish Talentscale's ability to garnish them as Aery's property.

In short, the Blocked Account Agreement is a mechanical arrangement that centralizes Aery's incoming receivables for Cogent's benefit. It does not rewrite the underlying obligations, which remain "funds owed by CCF to Aery," and it does not convert Aery's accounts receivable into property owned by Cogent prior to payment. (ECF No. 195 at 1, 3–4, 7–8; ECF No. 183 at 1.)

The character of the arrangement is that of a secured lending facility with a sweep feature, not an ownership transfer. No matter what name is printed on the account, no matter what routing instructions are given to account debtors, the legal relationships remain the same: Aery is the debtor and owner of the collateral, Cogent

is the secured creditor with a lien on the collateral, and Talentscale is a judgment creditor with a garnishment lien.

Cogent's own characterizations prove this point. If the blocked account arrangement truly conferred ownership on Cogent, then the receivables would not be "collateral" at all within the meaning of Article 9. They would simply be Cogent's property. Yet Cogent consistently refers to the receivables as "collateral" throughout its filings and affidavits. By referring to the receivables as collateral, which they are, Cogent implicitly admits it does not own them.

### D. Florida Statute § 77.16 Requires Ownership, Not Merely a Security Interest.

Florida Statute § 77.16 governs motions to quash or dissolve writs of garnishment filed by third parties. It provides:

> If any person other than the defendant claims that the debt due by a garnishee is **due to that person and not to the defendant**, or that the property in the hands or possession of any garnishee **is that person's property**, and shall make affidavit to that effect, the court shall impanel a jury to try the issue.

Fla. Stat. § 77.16(1)(a) (emphasis added).

The statute's plain language requires that the third party claim ownership of the property, not merely a lien or security interest in the property. The statute asks whether "the property... is that person's property," not whether the third party has an "interest" in the property or a "lien" on the property.

18

Cogent does not own the receivables garnished by Talentscale. Cogent has a security interest in those receivables, which is a fundamentally different thing. A security interest is a lien, and a lien is not ownership. Cogent cannot satisfy the statutory requirement of § 77.16 because it cannot truthfully claim that the garnished funds are "Cogent's property." They are Aery's property, subject to Cogent's security interest.

Doc. 195 confirms that Cogent is not asserting ownership of the CCF receivables. Cogent opens that motion by stating that it "involves competing claims over funds owed by CCF to Aery Aviation, LLC ('Aery')," not to Cogent. (ECF No. 195 at 1 (emphasis added).) Cogent further asserts that "the CCF Receivables constitute Aery's 'accounts receivable' under the Loan Documents," that they are "encumbered by Cogent's first priority security interest," and that they are part of Cogent's "Collateral." (ECF No. 195 at 3–4, 7–8; ECF No. 193 ¶ 24.) CCF's Answer to the writ is consistent: it states that CCF "was indebted to Aery in the amount of $11,897.00" and that CCF "may also be indebted to Aery in the amount of $34,552.44." (ECF No. 183 at 1.) Neither filing asserts that CCF is indebted to Cogent or that the receivables are Cogent's property. They describe Aery as the obligee and Cogent as a lienholder.

Cogent nevertheless attempts to use § 77.16 as if the statute were triggered by a perfected security interest. It is not. The statute asks whether "the debt due by a

19

garnishee is due to that person and not to the defendant," or whether "the property in the hands or possession of any garnishee is that person's property." Fla. Stat. § 77.16(1)(a). A lien or security interest does not satisfy this standard; as Sun Bank and the text of Article 9 both assume, the debtor retains an interest in the receivable that can be reached by a judgment creditor unless and until ownership is actually transferred. See *Sun Bank, N.A. v. Parkland Design & Dev. Corp.*, 466 So. 2d 1089, 1091–93 (Fla. 5th DCA 1985); Fla. Stat. §§ 679.1021(1)(ggg), 679.2031(2)(b). On Cogent's own description of the CCF receivables as Aery's accounts receivable that are part of its collateral package, Cogent is a secured creditor, not an owner, and it does not fit within § 77.16's ownership requirement.

Cogent also cites general "first in time, first in right" lien-priority principles and garnishment cases that address priority among competing liens. (ECF No. 195 at 10–12.) Those authorities do not speak to § 77.16's procedural command. When a third party properly claims that the garnished property is "that person's property," and competing claims cannot be resolved, the statute directs that "the court shall impanel a jury to try the issue." Fla. Stat. § 77.16(1)(a). It does not authorize the court, on a bare assertion of lien priority, to bypass the ownership requirement and the contemplated fact-finding process. Cogent has not filed an affidavit claiming that the CCF receivables are its property rather than Aery's, and it has not moved for

summary judgment under Rule 56. Its attempt to convert a narrow § 77.16 procedure into an abstract Article 9 priority adjudication should therefore be rejected.

### E. Cogent's Reliance on *Sun Bank* Undermines Its Own Position.

Cogent cites *Sun Bank, N.A. v. Parkland Design & Development Corp.*, 466 So. 2d 1089 (Fla. 5th DCA 1985), in its brief. Doc. 195, at 10-11. But *Sun Bank* actually supports Talentscale's position, and Cogent's citation undermines its own arguments. Sun Bank provides that Article 9 governs all assignments of accounts, whether absolute or for security. 466 So. 2d at 1091. This debunks any suggestion by Cogent that its "assignment" language means it owns the receivables outright rather than holding a mere security interest.

A garnishing judgment creditor qualifies as a "lien creditor" under UCC § 9-301(1)(b). *Id.* at 1093. This confirms Talentscale's status under the UCC framework. Sun Bank confirms that the receivables remain Aery's property subject to Cogent's security interest and Cogent has no ownership. This is fatal to any argument that Cogent "owns" the receivables and that garnishment therefore cannot reach them.

## II. COGENT HAS NOT DECLARED DEFAULT AND CANNOT ASSERT PRIORITY UNDER *WEAVER*.

At the May 23, 2025 hearing, Cogent's counsel admitted that Cogent had not declared Aery in default. The Court inquired whether Aery was in breach of the loan covenants, and Cogent's counsel, Ms. Keller, responded: "Yes, that's, I think that

would be accurate. I don't know that Cogent has told them they're in breach because of that yet."

This admission is fatal to Cogent's claim of priority, and that came without recognition that Cogent and Aery entered into a new agreement on May 5, 2025. Under Florida law, a secured creditor's security interest does not defeat a garnishment lien unless the secured creditor has taken enforcement action by declaring default. *American Home Assurance Co. v. Weaver Aggregate Transport, Inc.*, 84 F. Supp. 3d 1314, 1323-24 (M.D. Fla. 2015).

In *Weaver*, the court addressed a situation remarkably similar to the present case. A secured creditor claimed priority over a garnishment creditor based on its security interest. The court held:

"[T]he Bank cannot 'refuse to exercise its rights under the security agreement, thereby maintaining [the debtor] as a going concern, while it impairs the status of other creditors by preventing them from exercising valid liens.... [T]o do so would fly in the face of all of Article 9, which is premised on the debtor's ability to exercise rights in the property.'" *Weaver Aggregate*, 84 F. Supp. 3d at 1326 (quoting *Frierson v. United Farm Agency, Inc.*, 868 F.2d 302, 305 (8th Cir. 1989)).

*Weaver* is predicated on the straightforward proposition that the special remedies afforded to secured creditors arise upon default and enforcement, not merely from the existence of a security agreement and a financing statement. *See*

*Weaver*, 84 F. Supp. 3d at 1323–27; Fla. Stat. §§ 679.601–679.609. A lender that elects to treat the borrower as performing, to continue funding, and to preserve the borrower as a going concern cannot simultaneously use its unexercised Article 9 rights to bar other creditors from enforcing valid liens. *Frierson*, which *Weaver* quotes, makes the same point in the context of future advances. 868 F.2d at 305. Secured creditors are not exempt from this default-based framework, as they occupy the position they bargained for, and no more.

Cogent cannot have it both ways. It has chosen not to declare Aery in default, has chosen to increase and maintain the line of credit, and has chosen to continue collecting substantial fees and interest. (ECF No. 193 ¶¶ 9–11, 22.) Under *Weaver* and *Frierson*, those choices preclude Cogent from invoking default-based priority to defeat Talentscale's garnishment lien while Aery remains, by Cogent's own account, a borrower in good standing. The existence of the new contractual agreement dated May 5, 2025, which was not disclosed to the Court in the prior iteration, disallows Cogent  and Aery from suggesting or even intimating a breach.

## III. COGENT'S       POST-GARNISHMENT       ADVANCES       ARE SUBORDINATE UNDER FLORIDA STATUTE § 679.323(2).

Under Fla. Stat. § 679.323(2), a future advance made after a conflicting lien arises does not prime that lien unless it was made "pursuant to a commitment entered into" before the lien attached:

> Except as otherwise provided in subsection (3), a security interest is subordinate to the rights of... a person that becomes a lien creditor to the extent that the security interest secures an advance made more than 45 days after the person becomes a lien creditor unless the advance is made... (b) pursuant to a commitment entered into without knowledge of the lien and before the expiration of the 45-day period.

Fla. Stat. § 679.323(2).

Talentscale's original garnishment lien on the Cleveland Clinic receivables attached no later than March 31, 2025, when Cleveland Clinic was served and then admitted in its amended answer that it owed Aery $921,471. Doc. 73. After that date, Cogent extended $6,336,853.46 in additional credit to Aery in the ensuing seven weeks between March 31 and May 21, 2025, while the garnishment remained pending. Doc. 105, at 4-5. The amount advanced has increased many times over, and it increases constantly, as more than 10 months have passed and Cogent continues to profit as it forces Aery to spend only borrowed money which is subject to the automatic 1.5% draw fee. This 1.5% draw fee alone on the $6,336,853.46 advanced immediately after Talentscale's original lien attached corresponds to $95,052.82 in pure fees received by Cogent. The draw arrangement itself, on its own, could approach annual fees of $1 million to Cogent. This is before application of the prime plus 2.25% APR rate is applied.

Cogent has identified no prior binding commitment obligating it to extend this additional $6.3 million. The May 5, 2025 loan agreement increasing the facility from $15 million to $18 million was executed after Talentscale's garnishment lien

attached on March 31, 2025. Doc. 193, ¶ 11. This amendment created no obligation to lend, it merely expanded Cogent's discretion to make additional advances if Cogent chose to do so. These are classic discretionary, non-obligatory future advances. As a matter of law, they cannot relate back to defeat Talentscale's earlier-arising garnishment lien.

*Frierson v. United Farm Agency, Inc.*, 868 F.2d 302 (8th Cir. 1989), directly addresses this issue and confirms Talentscale's position. In *Frierson*, the Eighth Circuit held: "[A secured creditor] cannot refuse to exercise its rights under the security agreement, thereby maintaining [the debtor] as a going concern, while it impairs the status of other creditors by preventing them from exercising valid liens. Allowing [the secured creditor] to do so would fly in the face of all of Article 9, which is premised on the debtor's ability to exercise rights in the property." *Id.* at 305.

That precisely matches Cogent's conduct here. Cogent has: (1) never declared Aery in default; (2) continued to extend millions in new discretionary credit after Talentscale's lien arose; (3) maintained Aery as a profitable going concern generating lucrative fees for Cogent; and (4) simultaneously sought to prevent Talentscale from exercising its valid garnishment lien.

Cogent's motion to dissolve does not identify any provision of the Loan Documents that obligated Cogent, before Talentscale's liens arose, to make the

$6,336,853.46 in future advances it chose to extend between March 31 and May 21, 2025. (ECF No. 105 at 4–5; ECF No. 193 ¶ 11; Exs. 2–5.) Its assertion of "priority" with respect to those advances therefore conflicts directly with the text of § 679.323(2) and with *Frierson's* insistence that a secured lender may not, under the guise of future advances, impair a lien creditor's rights while voluntarily maintaining the debtor as a going concern.

## IV. PRUDENT CAPITAL'S POSITION IS EVEN WEAKER THAN COGENT'S.

Prudent has subordinated its security interest to Cogent's security interest pursuant to a written subordination agreement. Doc. 189-1, at 13. Under that agreement, Prudent has contractually agreed to stand down and not enforce its lien while Cogent's debt remains outstanding. Prudent cannot simultaneously claim that it has a superior right to garnished funds while contractually agreeing not to enforce its lien at this time at all. A subordinated creditor that has voluntarily agreed not to exercise enforcement rights during the pendency of a senior creditor's debt cannot invoke § 77.16 to quash a garnishment. To do so would permit Prudent to do what it has contractually bound itself not to do.

Second, Prudent does not claim ownership. When Prudent withdrew funds from the Capital Bank account on September 22, 2025, the balance was $3,106,949.17. Prudent withdrew $1,964,481.97 and rendered the post-transfer balance in the account to be $1,142,467.20, the exact principal amount of the

$1,142,467.20 Talentscale judgment, exclusive of interest. Instead of paying the judgment, more resources are presently being expended. This Honorable Court has held that "[a] widespread inability to enforce money judgments would result in disrespect for the courts and the law, to the detriment of society." Doc. 141 at 5; Id. (citing *Richmark Corp. v. Timber Falling Consultants*, 959 F.2d 1468, 1478 (9th Cir. 1992) (holding that for these and other reasons, the "United States has a strong interest in enforcing its judgments . . . ."

If Prudent truly believed that those funds were "Prudent's property" within the meaning of § 77.16, it would have withdrawn the entire balance. The fact that Prudent left the funds in the account demonstrates that Prudent recognizes it does not have an ownership interest in those funds.

Prudent's pattern of forbearance demonstrates lack of enforcement. Prudent's Supplemental Declaration (setting aside the impropriety of the submission of new evidence in the reply) admits that Prudent had not received any payments from Aery on the Note since October 31, 2023. Doc. 184-2, ¶ 14. The Note matured on June 30, 2025. *Id.* ¶ 16. This means Prudent tolerated nineteen months of non-payment from October 2023 through June 2025 without declaring default. Seven months after maturity, in January 2026, Prudent was still "negotiating" a payment plan with Aery. *Id.* ¶ 15. A creditor that tolerates nearly two years of non-payment, declines to accelerate a matured loan, and continues to purportedly negotiate indefinitely cannot

27

credibly claim that its security interest trumps the rights of a judgment creditor actively seeking to collect.

Moerover, Prudent's subordination agreement with Cogent precludes it from asserting any rights superior to Cogent's. If Cogent lacks standing to move to quash (and it does), then Prudent, whose rights are expressly contractually subordinate to Cogent's, necessarily lacks standing as well.

Prudent's own affidavit and subordination agreement confirm that it is asserting only a lien interest in Aery's equity, and that it has contractually agreed to stand behind Cogent. (ECF No. 184-2 ¶¶ 1–5, 8–11, 14–17; ECF No. 189-1 at 13.) It has never stated, in any filing, that the garnished funds are "Prudent's property" within the meaning of § 77.16(1)(a), which is an additional and independent reason why it cannot obtain dissolution of Talentscale's writs under that statute.

## V.    CHANGED CIRCUMSTANCES SINCE MAY 23, 2025 WARRANT A DIFFERENT OUTCOME.

As discussed herein, the Court's order dissolving the Cleveland Clinic garnishment on May 23, 2025 was based on materially false representations made by Cogent's counsel and Aery's counsel. The Court was told that Aery's credit line was $15 million and that Aery had made no payments to Cogent in 60 days. Both representations were false. Aery's counsel represented to the Court that Aery "just doesn't have it" while Aery could have paid the Talentscale judgment immediately that day given the increased credit line.  (ECF No. 93-3 at 25:16–19).

Since that hearing, the following facts have come to light, fundamentally altering the factual predicate on which the Court's May 23 order rested:

1. **The credit line was $18 million, not $15 million.** On May 5, 2025—eighteen days before the hearing—Cogent and Aery executed an amended loan agreement increasing the credit facility from $15 million to $18 million. Doc. 193, ¶ 11. Cogent's counsel did not disclose this $3 million increase to the Court. When the Court asked about Aery's borrowing capacity, counsel's representation of a "$15 million" limit was materially false and misleadingly created the impression that Aery had exhausted its borrowing capacity when in fact it had $3 million in additional, undisclosed credit available.

2. **Aery had made millions in payments to Cogent in March and April 2025.** Bank statements and ledgers produced by Cogent after the hearing show that Aery paid Cogent $5,923,136.08 over 46 separate payments in March and April 2025 alone. Doc. 105, at 5-6. Cogent's counsel represented at the May 23 hearing that Aery had made no payments "in approximately 60 days." This representation was categorically false. Nearly $6 million in payments over 46 transactions in the preceding eight weeks is not "no payments in 60 days."

3. **Cogent extended over $6.3 million in new credit after Talentscale's garnishment lien attached.** Between March 31, 2025 (when Cleveland Clinic answered the writ of garnishment) and May 21, 2025, Cogent extended $6,336,853.46 in new advances to Aery. Doc. 105, at 4-5. These advances were made after Talentscale's garnishment lien had attached and while the garnishment was pending. Under Florida Statute § 679.323(2), these post-garnishment advances do not prime Talentscale's lien unless they were made pursuant to a prior binding commitment, which Cogent has not shown.

4. **Aery is not in default, and Cogent continues to treat Aery as a borrower in good standing.** Cogent has never declared Aery in default. Cogent continues to extend credit, permit draws on the line, and treat Aery as a borrower in good standing. Doc. 193, ¶¶ 10-11. This is fundamentally different from the picture painted at the May

23 hearing, where the Court was led to believe that Aery's financial condition was dire and that Cogent's rights were imperiled.

5. There is undisputedly sufficient availability under the credit facility to pay the Talentscale judgment in full. According to Cogent's January 27, 2026 affidavit, Aery owes Cogent approximately $15.98 million against a credit facility of $17 million (after the scheduled step-down). Doc. 193, ¶ 22. This leaves at least $1.02 million of credit undisputedly available and this is roughly equal to Talentscale's judgment.

The most recent CCF Answer underscores that the current Cleveland Clinic writ presents additional factual concerns that were not before the Court in May 2025. CCF now states that it was "indebted to Aery in the amount of $11,897.00 for invoice numbers 5249 and 5250," and that it "may also be indebted to Aery in the amount of $34,552.44 for invoice numbers 5272 and 5273," leaving the latter obligation in a "may also be indebted" limbo. (ECF No. 183 at 1; ECF No. 195 at 2–3.) In the prior round of garnishment, unlike the four invoices referenced now, CCF disclosed approximately 80 invoices and a receivable balance roughly 20 times higher. (See ECF No. 59 at 1–2; ECF No. 73 at 1–2; ECF No. 93 at 4–5.) CCF has not filed any amended answer explaining the sharp reduction in invoice count or the unusual "may also be indebted" language. These unexplained shifts in the CCF receivable profile suggest that something improper is again afoot relative to Aery.

Doc. 195 also frames its request in summary-judgment terms, asserting that "there being no genuine dispute of material fact" as to Cogent's interest, "this Court may properly determine the rights to the CCF Receivables without a jury trial." (ECF

30

No. 195 at 19.) Cogent has not, however, filed a motion under Rule 56, complied with the procedural safeguards associated with summary judgment, or submitted an affidavit that satisfies § 77.16's ownership requirement. Fla. Stat. § 77.16(1)(a). To the extent Cogent seeks to obtain dispositive relief on the basis of supposed "no genuine dispute" of material fact, it has not done so in a procedurally proper way.

Moreover, the loan agreement requires Aery to "pay and discharge at or before maturity, all of their respective obligations and liabilities... before the same shall become delinquent or in default." Doc. 193, Exh. 3, § 5.08. The Court's May 23 order was based on materially incomplete and inaccurate information presented by Cogent's counsel and Aery's counsel, whose clients have refused to produce their own communications. With a complete and accurate record before it, the Court should enter final judgments in garnishment on both the Capital Bank and Cleveland Clinic garnishments.

## VI. ALTERNATIVELY, THE COURT MAY IMPOSE AN EQUITABLE LIEN IN FAVOR OF TALENTSCALE.

In *Gordon v. Flamingo Holding P'ship*, the Third District approved an equitable lien on specific property "superior to the lien of Irving Trust Company," a perfected secured creditor, where fraud, misrepresentation, or affirmative deception justified equitable intervention. 624 So. 2d 294, 297–98 & n.5 (Fla. 3d DCA 1993). Florida courts recognize that an equitable lien may be imposed based on unjust enrichment or fraud and unclean hands. Id.; *Rinker Materials Corp. v. Palmer First*

*Nat'l Bank & Tr. Co. of Sarasota,* 361 So. 2d 156, 158 (Fla. 1978); *Plotch v. Gregory,* 463 So. 2d 432, 436 n.1 (Fla. 4th DCA 1985).

As summarized in Sections II–V above and in Talentscale's prior submissions (ECF Nos. 184, 189, 194), Cogent and Aery coordinated to preserve Aery's operations and revenue stream while millions of dollars were diverted to insiders and litigation counsel, Talentscale's judgment remained unpaid, and the Court was not given accurate information about Aery's payments and borrowing capacity. (See, e.g., ECF No. 193 ¶ 10; ECF No. 189 at 6–12; ECF No. 105 at 5–6.) If the Court concludes that Cogent's and Prudent's security interests would otherwise defeat Talentscale's garnishment liens, Talentscale respectfully requests, in the alternative, that the Court impose an equitable lien in Talentscale's favor on the Capital Bank and Cleveland Clinic funds superior to those security interests.

## **CONCLUSION**

Plaintiff respectfully requests that this Court:

1. Deny Cogent Bank's motions to quash the Capital Bank and Cleveland Clinic writs of garnishment;

2. Deny Prudent Capital III, LP's motion to quash;

3. Enter final judgments in garnishment on the Capital Bank and Cleveland Clinic garnishments in favor of Talentscale in the amount of its unsatisfied judgment, plus post-judgment interest at the applicable federal rate, plus costs;

4. Alternatively, or additionally, impose an equitable lien in favor of Talentscale on the Cleveland Clinic and Capital Bank funds superior to

Cogent's and Prudent's security interests, based on unjust enrichment, fraud, misrepresentation, and unclean hands;

5.  Award Talentscale its reasonable attorneys' fees and costs incurred in prosecuting this motion and opposing the motions to quash; and

6.  Grant such other and further legal or equitable relief as the Court deems just and proper.

Respectfully submitted,

CHASE LAW & ASSOCIATES, P.A.

*/s/ Kenneth E. Chase*
Kenneth E. Chase
Florida Bar No. 17661
kchase@chaselaw.com
Chase Law & Associates, P.A.
951 Yamato Road, Suite 280
Boca Raton, FL 33431
Telephone: (305) 402-9800

*Counsel for Plaintiff /*
*Judgment-Creditor Talentscale, Inc.*

## CERTIFICATE OF WORD COUNT

Pursuant to Local Rule 7.1(F), I hereby certify that this memorandum contains 7792 words, excluding the case style, signature block, and certificates, as counted by Microsoft Word.

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing was served by CM/ECF on February 11, 2026 which automatically sends notice to all counsel or parties of record.

By:    */s/ Kenneth E. Chase*
Kenneth E. Chase